## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **W HOLDING COMPANY, INC., FRANK STIPES GARCIA, JUAN C. FRONTERA GARCIA, HÉCTOR DEL RÍO TORRES, WILLIAM VIDAL CARVAJAL, CESAR RUIZ, and PEDRO R. DOMINGUEZ ZAYAS,**<br>**Plaintiffs** | **CIVIL ACTION NO. 11-02271 (GAG)**<br><br>**JURY TRIAL DEMANDED** |
| **v.** | |
| **CHARTIS INSURANCE COMPANY OF PUERTO RICO,**<br>**Defendant** | |
| **FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WESTERNBANK PUERTO RICO,**<br>**Plaintiff Intervenor** | |
| **v.** | |
| **FRANK STIPES GARCIA, JUAN C. FRONTERA GARCIA, HÉCTOR DEL RÍO TORRES, WILLIAM VIDAL CARVAJAL, CESAR RUIZ, and PEDRO R. DOMINGUEZ ZAYAS,**<br>**Cross Claim Defendants** | |
| **CHARTIS INSURANCE COMPANY OF PUERTO RICO,**<br>**Previously Joined Defendant** | |
| **MARLENE CRUZ CABALLERO AND THE FRONTERA-CRUZ CONJUGAL PARTNERSHIP; LILLIAM DIAZ CABASSA AND THE DEL RIO-DIAZ CONJUGAL PARTNERSHIP; GLADYS BARLETTA SEGARRA AND THE VIDAL-BARLETTA CONJUGAL PARTNERSHIP; HANNALORE SCHMIDT MICHELS AND THE RUIZ-** | |

1

**SCHMIDT CONJUGAL PARTNERSHIP;
SONIA SOTOMAYOR VICENTY AND
THE DOMINGUEZ-SOTOMAYOR
CONJUGAL PARTNERSHIP; JOSE M.
BIAGGI LANDRON, HIS SPOUSE JANE
DOE, AND THE BIAGGI-DOE
CONJUGAL PARTNERSHIP; RICARDO
CORTINA CRUZ, HIS SPOUSE
ELIZABETH ALDEBOL DE CORTINA,
AND THE CORTINA-ALDEBOL
CONJUGAL PARTNERSHIP; MIGUEL A.
VAZQUEZ SEIJO, HIS SPOUSE SHARON
MCDOWELL NIXON, AND THE
VAZQUEZ-MCDOWELL CONJUGAL
PARTNERSHIP; JULIA FUENTES DEL
COLLADO; MARIO A. RAMIREZ
MATOS; CORNELIUS TAMBOER, HIS
SPOUSE OLGA MORALES PEREZ, AND
THE TAMBOER-MORALES CONJUGAL
PARTNERSHIP; XL SPECIALTY
INSURANCE COMPANY; LIBERTY
MUTUAL INSURANCE COMPANY; and
ACE INSURANCE COMPANY,**
Additional Defendants

## AMENDED AND RESTATED COMPLAINT IN INTERVENTION

NOW INTO COURT, through undersigned counsel, comes the Federal Deposit Insurance

Corporation ("FDIC" or "Receiver"), as Receiver of Westernbank Puerto Rico ("Westernbank"

or "the Bank"), to hereby amend and restate its Complaint in Intervention, assert Cross Claims,

and join additional parties Defendant and assert claims against them, as follows:

## INTRODUCTION

1.      FDIC, in its receivership capacity, asserts claims against former officers and

directors of Westernbank of Mayaguez, Puerto Rico.  On April 30, 2010, the Office of the

Commissioner of Financial Institutions of the Commonwealth of Puerto Rico ("OCFI") closed

Westernbank, with a loss to the Deposit Insurance Fund currently estimated at $4.25 billion.   All

of Westernbank's corporate stock was owned by its holding company, W Holding Company, Inc. ("W Holding").

2.      FDIC, as Receiver of Westernbank, seeks recovery of $176.02 million in damages caused by the gross negligence of the Cross Claim Defendants and additional individual Defendants joined herein (collectively, the "Defendants"), all former officers and/or directors of Westernbank.

3.      The $176.02 million damage claim is based on losses from four commercial real estate ("CRE") loans, ten construction loans, and seven asset based loans (collectively, the "Loss Loans") approved and administered by the Bank from January 28, 2004, through July 10, 2009.

4.      The Defendants approved the Loss Loans pursuant to an aggressive and reckless growth strategy that placed short term income and profits ahead of the safety and soundness of the federally insured depositor funds entrusted to them.

5.      The Defendants approved the Loss Loans despite numerous violations of the Bank's loan policies and procedures, federal safety and soundness regulations, and prudent banking practices.  These violations included: (1) violations of the Bank's Loan to Value ("LTV") ratio limits; (2) lack of required borrower equity; (3) inadequate real estate appraisals; (4) insufficient analyses of collateral or inadequate collateral; (5) insufficient borrower repayment information and repayment sources; (6) the questionable character of the borrower or guarantor; and (7) other loan policy violations.  Additionally, the Defendants repeatedly increased, extended, and/or renewed expired and deteriorating loans to enable continued funding of interest reserves.

6.      Former Bank officers administered and funded the construction and asset based loans in violation of major loan terms, Bank policies and procedures, and prudent lending and

3

administration standards.  These violations included: (1) continued funding of asset based loans despite receipt of reports showing dilution and aging of accounts receivable and other severe collateral impairment; (2) waiver of key borrower financial covenants relating to working capital, net adjusted equity value, and cash flow ratios; (3) manipulation of Bank loan monitoring systems so as not to reflect continuing deterioration of collateral; (4) funding of construction loans despite borrower defaults on key loan approval terms and Bank policy requirements; and (5) extensions and continued funding of expired loans despite the borrower's failure to cure defaults, significant cost overruns, lack of progress in construction, and other clear indications of the infeasibility of the project.

7.      A former Bank director, Defendant Cornelius Tamboer ("Tamboer"), failed to disclose his substantial *de facto* personal financial interest in a $12 million CRE loan prior to its approval, in violation of Bank policies and federal regulations and in breach of his fiduciary duties owed to Westernbank.

8.      The Defendants failed to heed and act upon examiner and auditor warnings of deficiencies in commercial lending and administration, and continued approving, increasing, extending, and/or renewing loans in the face of those deficiencies and warnings.

9.      The Defendants' actions and inactions constituted gross negligence, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason.  These actions and inactions were the direct and proximate cause of the losses FDIC now seeks to recover.

## INTERVENTION AND REMOVAL

10.      On October 6, 2011, W Holding and individual plaintiffs Frank C. Stipes Garcia ("Stipes"), Juan Carlos Frontera Garcia ("Frontera"), Héctor L. Del Río Torres ("Del Rio"),

William M. Vidal Carvajal ("Vidal"), Cesar A. Ruiz Rodriguez ("Ruiz"), and Pedro R. Dominguez Zayas ("Dominguez") (collectively, the "Individual Plaintiffs"), commenced this action in the Puerto Rico Commonwealth Court (the "State Court Action"). The Individual Plaintiffs are former officers and/or directors of Westernbank. In the State Court Action, the Individual Plaintiffs asserted claims against Defendant Chartis Insurance Company of Puerto Rico, f/k/a American International Insurance Company of Puerto Rico ("Chartis"), for declarations of coverage under insurance policies (the "policies") issued by Chartis and covering Westernbank's officers and directors for their liabilities to the Receiver.

11.   The Puerto Rico Direct Action Statute, P.R. Laws Ann. tit. 26, §§ 2001, 2003, grants the Receiver a direct interest in the proceeds of the insurance policies that are the subject of this action, and a substantive cause and right of direct action against the insurance carriers that issued the policies. In the direct action, all issues of liability and insurance coverage are decided in a single action.

12**.**   Pursuant to Rule 21.1 of the Puerto Rico Rules of Civil Procedure, a third person having an interest in a pending action may intervene as a matter of right whenever the law confers an unconditional right to intervene or when a person claims a right or interest relating to the property or transaction that is the subject of the action that may as a practical matter be affected by the final disposition of the action.

13.   Because the instant action seeks a declaration of Chartis' contractual obligations under the policies, including its obligations to cover and pay the Receiver's claims, the outcome of the action may, as a practical matter, affect and impair the Receiver's rights and interests in and to the policies and its rights and claims against Chartis. Further, the

exclusion of the Receiver from this action would lead to duplicative litigation and potentially inconsistent and conflicting adjudications of the same factual and legal issues in different courts.

14.     On December 30, 2011, FDIC, as Receiver of Westernbank, intervened as a plaintiff in the State Court Action as matter of law and right, to protect and assert its substantive rights and interests in and to the policies and its claims against Chartis under the Puerto Rico Direct Action Statute.

15.     FDIC, as Receiver of Westernbank, incorporates by reference its original Complaint in Intervention as though set forth herein in its entirety.

16.     FDIC, as Receiver, removed the case to this Court on December 30, 2011, pursuant to 12 U.S.C. § 1819(b)(2)(B).

## JURISDICTION AND VENUE

17.     Pursuant to 12 U.S.C. § 1819(b)(2)(A) and (B), with certain exceptions not applicable to this case, all civil lawsuits in which FDIC, in any capacity, is a party are deemed to arise under the laws of the United States.  Pursuant to 12 U.S.C. § 1819 and 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action.

18.     This Court has personal jurisdiction over the Defendants who at all relevant times were residents of and conducted the business of the Bank in Puerto Rico, or issued policies of liability insurance in Puerto Rico covering the Bank and its officers and directors.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1446(a) as this Court is the United States District Court for the district and division in which the State Court Action was pending when FDIC removed it to this Court.  Additionally, the events giving rise to this case occurred in this district.

20.     FDIC asserts the following additional claims:

## THE PARTIES

### Plaintiff Intervenor - FDIC

21.     FDIC is a corporation organized and existing under the laws of the United States of America with its principal place of business in Washington, D.C.  12 U.S.C. § 1811, *et. seq.* FDIC is an instrumentality of the United States of America and is charged with, among other things, the orderly liquidation of failed banks.   12 U.S.C. § 1821(d).   The OCFI appointed FDIC as Receiver of Westernbank on April 30, 2010, pursuant to 12 U.S.C. § 1821(c).  On that date, pursuant to 12 U.S.C. § 1821(d)(2)(A) and § 1823(d)(3)(A), the Receiver succeeded to all rights, titles, powers, privileges, and assets of Westernbank, including its rights and claims against its former officers and directors and their liability insurers.

### Cross Claim Defendants

FDIC names the Individual Plaintiffs as Cross Claim Defendants, as follows:

22.     Cross Claim Defendant Stipes was Chairman of the Board of the Bank from 1990 to April 30, 2010, and was President and Chief Executive Officer ("CEO") from 1992 to July 10, 2005, and again from March 31, 2007, to April 30, 2010.  He also was a member of both the Bank's Senior Lending Committee ("SLC") and its Senior Credit Committee ("SCC") from January 1, 2004, until the Bank failed.  Stipes is currently the Chairman of the Board, CEO, and President of W Holding.  As of March 30, 2007, he owned 11,738,531 shares (7.12 percent) of W Holding's stock.  Stipes is a resident of Puerto Rico residing in Mayaguez.

23.     Cross Claim Defendant Frontera was a director of both the Bank and W Holding from October 2003, Secretary of both the Bank and W Holding Boards from February 2007, a member of the SLC from January 1, 2004, and a member of the SCC from July 29, 2004, until

the Bank failed.  As of March 30, 2007, he owned 1,584,668 shares (0.96 percent) of W

Holding's stock.  Frontera is a resident of Puerto Rico residing in Mayaguez.

24.     Cross Claim Defendant Del Rio was a director of the Bank and of W Holding

from October 2003, a member of the SLC from January 1, 2004, and a member of the SCC from

July 29, 2004, until the Bank failed.  As of March 30, 2007, he owned 108,573 shares (0.07

percent) of W Holding's stock.  Del Rio is a resident of Puerto Rico residing in Mayaguez.

25.     Cross Claim Defendant Vidal was Vice President ("VP") of Commercial Credit

and was Chief Lending Officer ("CLO") of the Bank's Northern Region from June 26, 2000, to

August 31, 2008.  He was Executive VP ("EVP") and Chief Banking Officer ("CBO") from

September 1, 2008, until the Bank failed.  Vidal also was a member of the SCC and SLC from

January 1, 2004, until April 30, 2010.  As of March 30, 2007, he owned 182,045 shares (0.11

percent) of W Holding's stock.  Vidal is a resident of Puerto Rico residing in San Juan.

26.     Cross Claim Defendant Ruiz was a director of the Bank and of W Holding from

1999 to December 31, 2008, and Secretary of both the Bank and W Holding Boards from April

2001, to February 28, 2007.  As of March 30, 2007, he owned 125,337 shares (0.08 percent) of

W Holding's stock.  Ruiz is a resident of Puerto Rico residing in Mayaguez.

27.     Cross Claim Defendant Dominguez was VP of Commercial Credit and CLO for

the Bank's Southern Region from September 25, 1989, until the Bank failed, and he also was a

director of the Bank from 1992 until the Bank failed.  He was a member of the SCC and SLC

from January 1, 2004, until the Bank failed.  He was a director of W Holding from 1999 to April

30, 2010.  As of March 30, 2007, he owned 1,287,302 shares (0.78 percent) of W Holding's

stock.  Dominguez is a resident of Puerto Rico residing in Ponce.

**Previously Joined Defendant -  Chartis**

28**.**     Defendant Chartis issued policies of insurance covering the individual Defendants for their liabilities to the Receiver.  FDIC asserts claims against Chartis under the policies pursuant to the Puerto Rico Direct Action Statute.

**Additional Defendants**

FDIC joins, as additional defendants (1) the spouses and conjugal partnerships of the Cross Claim Defendants as required by Puerto Rico law, (2) additional former officers and directors of Westernbank, and their spouses and conjugal partnerships, and (3) additional insurance carrier defendants, as follows:

29.     Defendant Marlene Cruz Caballero is the spouse of Cross Claim Defendant Frontera.

30.     Defendant Frontera-Cruz is the Conjugal Partnership formed by Cross Claim Defendant Frontera and Defendant Marlene Cruz Cabellero.

31.     Defendant Lilliam Diaz Cabassa is the spouse of Cross Claim Defendant Del Rio.

32.     Defendant Del Rio-Diaz is the Conjugal Partnership formed by Cross Claim Defendant Del Rio and Defendant Lilliam Diaz Cabassa.

33.     Defendant Gladys Barletta Segarra is the spouse of Cross Claim Defendant Vidal.

34.     Defendant Vidal-Barletta is the Conjugal Partnership formed by Cross Claim Defendant Vidal and Defendant Gladys Barletta Segarra.

35.     Defendant Hannalore Schmidt Michels is the spouse of Cross Claim Defendant Ruiz.

36.     Defendant Ruiz-Schmidt is the Conjugal Partnership formed by Cross Claim Defendant Ruiz and Defendant Hannalore Schmidt Michels.

37.     Defendant Sonia Sotomayor Vicenty is the spouse of Cross Claim Defendant Dominguez.

38.     Defendant Dominguez-Sotomayor is the Conjugal Partnership formed by Cross Claim Defendant Dominguez and Defendant Sonia Sotomayor Vicenty.

39.     Defendant Jose M. Biaggi Landron ("Biaggi") succeeded Stipes as President and CEO of the Bank on July 11, 2005, while Stipes continued as Chairman.  Biaggi was President and CEO until Stipes forced him to resign in lieu of termination on March 30, 2007.  Thereafter, Stipes resumed the offices of President and CEO of the Bank.  Biaggi was a director of the Bank from July 11, 2005, to March 30, 2007, a member of the SLC from July 11, 2005, to March 30, 2007, and a member of the SCC from September 20, 2005, to March 30, 2007.  As of March 31, 2006, he owned 167,900 shares (0.10 percent) of W Holding's stock.  Biaggi is a resident of Puerto Rico residing in Mayaguez.

40.     Defendant Jane Doe is the spouse of Defendant Biaggi.

41.     Defendant Biaggi-Doe is the Conjugal Partnership formed by Defendant Biaggi and Defendant Jane Doe.

42.     Defendant Ricardo Cortina Cruz ("Cortina") was VP of Commercial Credit and Chief Construction Officer ("CCO") of the Bank, and was CLO for the Western Region of the Bank, from May 10, 1999, to August 31, 2008.  He was Senior VP ("SVP") of Commercial Credit from September 1, 2008, to June 14, 2009, and SVP of Commercial Credit for the Northwest Region from June 15, 2009, until Westernbank failed.  He also was a member of the SLC from January 1, 2004, until February 19, 2009.  As of January 17, 2006, he owned 17,404 shares (0.01 percent) of W Holding's stock.  Cortina is a resident of Puerto Rico residing in Mayaguez.

43.     Defendant Elizabeth Aldebol de Cortina is the spouse of Defendant Cortina.

44.     Defendant Cortina-Aldebol is the Conjugal Partnership formed by Defendant Cortina and Defendant Elizabeth Aldebol de Cortina.

45.     Defendant Miguel A. Vazquez Seijo ("Vazquez") was the President of the Business Credit Division ("BCD") of the Bank from June 1, 2001, until he was terminated on November 1, 2007.  Vazquez was a member of the SCC during that same period.  As of March 21, 2006, he owned 144,058 shares (0.09 percent) of W Holding's stock.  Vazquez is a resident of Puerto Rico residing in San Juan.

46.     Defendant Sharon McDowell Nixon is the spouse of Defendant Vazquez.

47.     Defendant Vazquez-McDowell is the Conjugal Partnership formed by Defendant Vazquez and Defendant Sharon McDowell Nixon.

48.     Defendant Julia Fuentes del Collado ("Fuentes") was VP of the BCD from June 18, 2001, to January 9, 2002.  She was SVP of the BCD from January 10, 2002, to January 9, 2005.  She was SVP - Portfolio Manager of the BCD from January 10, 2005, until she resigned on December 12, 2007.  She also was a member of the SCC from January 1, 2004, to December 12, 2007.  Fuentes is a resident of Puerto Rico residing in San Juan.

49.     Defendant Mario A. Ramirez Matos ("Ramirez") was the Bank's VP of Construction Lending from January 9, 2007, to July 13, 2008, and VP and CCO from July 14, 2008, until the Bank failed.  Ramirez is a resident of Puerto Rico residing in San Juan.

50.     Defendant Tamboer was a director of the Bank and of W Holding from 1999 to January 19, 2010, and a member of the SCC and of the SLC from January 1, 2004, until Westernbank failed.  As of March 30, 2007, he owned 5,880,144 shares (3.57 percent) of W Holding's stock.  Tamboer is a resident of Puerto Rico residing in Mayaguez.

51.     Defendant Olga Morales Perez is the spouse of Defendant Tamboer.

52.     Defendant Tamboer-Morales is the Conjugal Partnership formed by Defendant Tamboer and Defendant Olga Morales Perez.

53.     Defendant XL Specialty Insurance Company ("XL") issued a policy or policies of insurance covering the individual Defendants for their liabilities to the Receiver.  FDIC asserts claims against XL under the policies pursuant to the Puerto Rico Direct Action Statute.

54.     Defendant Liberty Mutual Insurance Company ("Liberty") issued a policy or policies of insurance covering the individual Defendants for their liabilities to the Receiver.  FDIC asserts claims against Liberty under the policies pursuant to the Puerto Rico Direct Action Statute.

55.     Defendant ACE Insurance Company ("ACE") issued a policy or policies of insurance covering the individual Defendants for their liabilities to the Receiver.  FDIC asserts claims against ACE under the policies pursuant to the Puerto Rico Direct Action Statute.

## BACKGROUND

56.     Westernbank opened to the public on March 1, 1958, as a Puerto Rico chartered savings institution with its principal place of business in Mayaguez, Puerto Rico.  On November 30, 1994, it converted its charter to become a full service commercial bank under the laws of Puerto Rico.  Under Stipes's leadership, from 1999 through 2009, the Bank grew over 526 percent from $3.4 billion to $17.9 billion in assets.  During this rapid growth period, the Defendants, driven by the desire for short term income and profits, approved and/or administered numerous CRE, construction, and asset based commercial loans in violation of Bank policies, federal safety and soundness regulations, and prudent banking practices.  Stipes and Tamboer received millions of dollars in dividends from their W Holding stock during this period,

attributable to the income generated by these poorly underwritten and administered loans. Other Defendants likewise received substantial stock dividends resulting from the loans. When Westernbank failed, it was the second largest bank in Puerto Rico, with 45 branches located throughout the island.

57.     Beginning in 2001, the Board gave Vazquez, President of the BCD, unfettered control over asset-based lending. The BCD was responsible for origination of asset based loans. Between 2001 and 2007, the Bank paid Vazquez substantial bonuses based upon the short term income and profits generated by the BCD's loan originations. Vazquez tightly controlled asset based lending, directed loan administration, supervised numerous employees, and reported to Stipes and the Board. However, Vazquez, driven by the desire for short term profit and compensation, ignored loan policy requirements, regulations, and principles of safety and soundness. Vazquez dismissed the warnings of his subordinate, Fuentes, regarding these deficiencies and directed her to continue funding the loans (which she then did). Vazquez also repeatedly directed increases to interest reserves to fund deteriorating loans.

58.     Similarly, the Bank's CRE and construction loans lacked financial support, lacked global cash flow and debt service analyses, exceeded LTV ratio limits, and were based on unrealistic appraisals. Construction loans were administered, extended, and funded in violation of key loan approval terms and Bank policies.

59.     In November 2005, Biaggi advised Stipes and Dominguez to slow the Bank's growth until severe deficiencies in the Bank's commercial lending and administration could be corrected. Notwithstanding his knowledge of these deficiencies, Biaggi approved four of the Loss Loans between October 28, 2005, and September 5, 2006. On March 30, 2007, Stipes directed Biaggi to resign in lieu of termination. Stipes and Dominguez failed to take corrective

action commensurate with the Bank's growth, as Biaggi had cautioned.  As the result, between March 31, 2006, and June 30, 2008, Westernbank's adversely classified loans increased from $176 million to $1.61 billion (a 915 percent increase).

60.    The Defendants approved, increased, renewed and/or extended the Loss Loans in the face of mounting examiner and auditor warnings of problems in the commercial loan portfolio.  In the 2005 Report of Examination ("RoE"), FDIC examiners cited management's failure to correct deficiencies in loan administration and review cited in the prior year's examination.  On April 13, 2006, the Bank's auditors, Deloitte & Touche LLP ("Deloitte"), warned Bank management of "significant deficiencies," including insufficient analysis and documentation of impaired loans.

61.    The 2006 FDIC RoE warned of significant increases in adversely classified loans and again criticized commercial loan administration, quoting from Deloitte's April 13, 2006, management letter.  The examiners warned management that the Bank's internal loan review function had identified only $28.5 million in adversely classified and special mention BCD loans, while the examiners had identified $330.4 million of such loans in the same period – more than an elevenfold difference.  The examiners adversely classified $211 million of the Bank's assets, nearly triple the amount from the preceding year.

62.    The 2007 FDIC RoE again extensively criticized commercial lending and administration and management's failure to correct the deficiencies cited in the previous examinations.  The examiners adversely classified $536 million of the Bank's assets as of June 30, 2007, a 254 percent increase from the prior year.  The 2008 FDIC RoE repeated the criticisms of commercial lending and administration and the failure to correct previously cited deficiencies.  The examiners also criticized the Bank's continued funding of interest reserves on

troubled projects.  The examiners adversely classified $1.8 billion of the Bank's assets, a more

than 300 percent increase from the prior year.  FDIC issued a Cease and Desist Order to the

Bank on May 22, 2009, and the OCFI closed the Bank on April 30, 2010, and appointed FDIC as

Receiver.

63.     Despite these warnings, the Defendants approved, increased, renewed, and/or

extended Loss Loans in violation of the Bank's approval terms, policies and procedures, federal

safety and soundness regulations, and prudent banking practices.

64.     In a restated Form 10-K for 2007, filed on March 16, 2009, with the Securities

and Exchange Commission ("SEC"), the W Holding Board, which included Stipes, Dominguez,

Del Rio, Frontera, Ruiz, and Tamboer, acknowledged the Bank's failures to correct the

deficiencies previously cited by auditors and examiners.  They acknowledged that (i) the Bank

approved and funded loans that "did not comply with . . . underwriting criteria;" (ii) loans were

"approved or extended . . . on the basis of poorly supported analysis of the repayment capacity of

the borrower;" (iii) the Bank "made significant use of interest reserve advances to cover interest

payments on delinquent loans or on loans to borrowers with financial difficulties;" and (iv) the

Bank failed to "obtain updated appraisal reports for classified loans."  This acknowledged

conduct amounted to gross negligence, including reckless indifference to or deliberate disregard

of the welfare of the Bank and its depositors, or actions which were without the bounds of

reason, causing the Bank damages exceeding $176.02 million.

65.     Pursuant to Westernbank's Commercial Loan Policy ("Loan Policy"), the SLC

was responsible for evaluation and approval of CRE and construction loans.  The Board also was

responsible for evaluation and approval of CRE and construction loans of over $50 million.

During all or part of the relevant time period, Defendants Stipes, Biaggi, Tamboer, Del Rio, Dominguez, Frontera, Cortina, and Vidal were members of the SLC.

66.     The Bank had a separate policy manual for the BCD governing asset based lending (the "BCD Policy").  Pursuant to the BCD Policy, the SCC was responsible for evaluation and approval of asset based loans.  The Board also was responsible for evaluation and approval of asset based loans of over $50 million.  During all or part of the relevant time period, Defendants Stipes, Dominguez, Vidal, Tamboer, Del Rio, Frontera, Vazquez, Fuentes, and Biaggi were members of the SCC.

67.     All  Defendants who were members of the SLC, SCC, and/or the Board (for loans over $50 million) were responsible for analyzing supporting information so as to ensure that loans complied with the Bank's policies and procedures and prudent banking practices.  The Defendants failed to so reasonably inform themselves of material information or alternatives or to engage in due analysis and deliberation.  Instead, they approved the Loss Loans in violation of the Bank's policies and procedures, federal safety and soundness regulations, and prudent banking practices.  In so acting and failing to act, the Defendants breached their duties to Westernbank.

68.     The director Defendants were responsible for heeding examiner and auditor warnings of deficiencies in lending and loan administration and correcting those deficiencies.  They failed to do so, and instead continued to approve, increase, extend, and/or renew Loss Loans in violation of Bank approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  In so acting and failing to act, the director Defendants breached their duties to Westernbank.

69.    As President and CEO of the Bank from 1992 to July 10, 2005, and again from March 31, 2007 through the Bank's failure, Stipes was responsible for ensuring that the Bank's commercial lending and administration complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  He also was responsible for heeding examiner and auditor warnings of deficiencies in commercial lending and administration and correcting those deficiencies.  Stipes breached those duties to Westernbank.

70.    As President and CEO of the Bank from July 11, 2005, to March 30, 2007, Biaggi was responsible for ensuring that the commercial loans he approved complied with the Bank's policies and procedures, federal safety and soundness regulations, and prudent banking practices. Biaggi breached those duties to Westernbank.

71.    As President of the BCD from 2001 to November 1, 2007, Vazquez was responsible for ensuring that the BCD's asset based lending and administration complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  Vazquez breached those duties to Westernbank.

72.    As SVP - Portfolio Manager of the BCD from January 10, 2005, to December 12, 2007, Fuentes was responsible for ensuring that the BCD's asset based lending and administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  Fuentes breached those duties to Westernbank.

73.    As CLO of the Bank's Northern Region from June 26, 2000, to August 31, 2008, Vidal was responsible for ensuring that the Bank's commercial lending and administration within that region complied with the Bank's approval terms, policies and procedures, federal safety and

soundness regulations, and prudent banking practices.   As the Bank's CBO from September 1, 2008, until the Bank's failure, Vidal was responsible for ensuring that the Bank's commercial loan administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  Vidal breached those duties to Westernbank.

74.     As CLO of the Bank's Southern Region from September 25, 1989, until the Bank's failure, Dominguez was responsible for ensuring that the Bank's commercial lending and administration within that region complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. Dominguez breached those duties to Westernbank.

75.     As the Bank's CCO from May 10, 1999, to August 31, 2008, Cortina was responsible for ensuring that the Bank's construction lending and administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.   As CLO of the Bank's Western Region from May 10, 1999, to August 31, 2008, Cortina was responsible for ensuring that the Bank's commercial lending and administration within that region complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  Cortina breached those duties to Westernbank.

76.     As the Bank's CCO from July 14, 2008, until the Bank's failure, Ramirez was responsible for ensuring that the Bank's construction loan administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  Ramirez breached those duties to Westernbank.

## THE LOSS LOANS

77.     The CRE Loss Loans include the Bank's loans to Museum Towers LP ("Museum Towers"), Yasscar Development Corporation ("Yasscar Development"), Yasscar Caguas Development Corporation ("Yasscar Caguas"), and its $8 million loan to Sabana Del Palmar, Inc. ("Sabana").  The construction Loss Loans include the Bank's construction loans to Plaza CCD Development Corporation ("Plaza CCD") and its $42.5 million loan to Sabana.  Each of these Loss Loans violated one or more of the following applicable requirements of Westernbank's Loan Policy:

- The importance of evaluating a borrower's character and creditworthiness "cannot be overstated."
- All credit extensions must be supported by current financial statements that are certified by the borrowers and guarantors and updated annually.
- Credit officers must ensure completeness of required documentation before disbursement and should annually review loans and prepare statements regarding borrower compliance with terms and covenants.
- For secured commercial loans, current appraisal reports (within the past 12 months) must be obtained prior to closing of loans or loan increases.
- LTV ratio limits were: 50 percent (65 percent as of January 2006) for undeveloped land; 75 percent for secured commercial land development loans; 80 percent for commercial construction loans; and 85 percent for improved properties.
- Exceptions to LTV ratio requirements should be identified in the Bank's records and reported to the Board of Directors.
- To obtain a second or subsequent renewal of a commercial loan, the borrower must pay down at least 20 percent.
- When repayment of construction loans depends upon unit sales, refinancing, or income producing property, at least 50 percent of the interim credit facility must be recoverable from committed pre-sale revenues.
- Prior to disbursement of a construction loan, the borrower must invest at least 10 percent upfront equity in the form of cash, land, or prepaid plans and specifications.
- Completion/payment bonds must be in place prior to commencement of construction.
- Borrowers/guarantors must covenant to immediately fund cost overruns.

78.     The asset based Loss Loans include the Bank's loans to Inyx, Inc. ("Inyx") and to Intercoffee, Inc. ("Intercoffee").  Each of these Loss Loans violated one or more of the following requirements of the BCD Policy:

- Disbursements are to be made only after review of collateral availability.
- Each loan officer is responsible for assigned clients.  The administration of the account will be based on the terms of the financing as outlined in the credit line authorization and the client resume.  Any variances between these two forms must be immediately reported to Senior Management.
- Loan officers must alert their supervisors (Portfolio Managers) to any deteriorating loan along with recommendations for when such loans should be placed in a non-performing status (*i.e.,* cash basis) or when write-offs or reserves are warranted. Portfolio Managers should report these loans and recommendations to the Division President, WB Risk Management Officer, or the Chairman of the Senior Credit Committee.
- Credit is extended only to borrowers of good character and for legitimate purposes. Information establishing the character and reputation of prospective borrowers should be confirmed by appropriate investigation early in the due diligence process and prior to submission to the Credit Committee.

79.     The following table lists the Defendants who were responsible for approving the Loss Loans.  Loss Loans include original loans, additional credits (increases), and/or extensions of construction loans enabling continued funding.  The table also lists the Defendants who were responsible for post-approval administration and funding of the Plaza CCD construction loan line and the Inyx asset based line of credit.

| Loss Transactions | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Loan Approvals and Funding | | | | | | | | | | | |
| Borrower | Loan Amount ($ millions) | Approval Date | Loss ($ millions) | Stipes | Biaggi | Dominguez | Del Rio | Frontera | Ruiz | Tamboer | Vazquez | Vidal | Fuentes | Cortina | Ramirez |
| 1. Sabana | $42.5[i] | Jan. 28, 2004 | $19.3 | x | | x | | | | x | | | | x | |
| Sabana | $4.59[a] | May 8, 2006 | | x | x | x | x | x | | x | | | | x | |
| Sabana | $3.21[a] | May 15, 2007 | | x | | x | x | x | | x | | x | | x | |
| Sabana | $2.9[a] | May 15, 2008 | | x | | | | x | | | | x | | x | |
| 2. Sabana | $8.0 | May 15, 2007 | $8.0 | | | | x | x | | x | | x | | x | |
| 3. Inyx | $36.5[a] | June 15, 2005 | $56.72 | | | | | | | | a f | | a f | | |
| Inyx | $15.0[a] | Jan. 17, 2006 | | | | | | | | | x | | x | | |
| Inyx | $12.5[a] | Sept. 5, 2006 | | | | | | | | | x | | x | | |
| Inyx | $10.0[a] | Nov. 7, 2006 | | | | | | | | | x | | x | | |
| 4. Intercoffee | $106.1[i] | Oct. 28, 2005 | $34.8 | x | x | x | x | x | x | x | x | x | x | | |
| Intercoffee | $13.0[a] | Sept. 5, 2006 | | x | x | | x | x | | x | x | x | x | | |
| Intercoffee | $10.5[a] | Sept. 28, 2007 | | x | | x | x | x | x | x | | x | | x | |
| 5. Plaza CCD | $62.25[i] | Apr. 28, 2006 | $37.3 | | | | | | | | | | | a f | |
| Plaza CCD | $4.91[e] | Apr. 24, 2008 | | x | | x | x | x | | x | | x | | x | |
| Plaza CCD | $2.1[e] | Sept. 18, 2008 | | | | | x | x | | x | | x | | x | a f |
| Plaza CCD | $4.7[e] | Dec. 1, 2008 | | x | | x | | | | | | x | | | a f |
| Plaza CCD | $1.9[e] | Mar. 19, 2009 | | x | | x | x | x | | x | | x | | | a f |
| Plaza CCD | $0.2[e] | June 9, 2009 | | x | | x | x | x | | x | | x | | | a f |
| 6. Museum Towers | $12.0 | Apr. 5, 2006 | $7.6 | x | x | x | | x | | | | x | | x | |
| 7. Yasscar Develop. | $13.6 | May 15, 2007 | $5.8 | x | | x | x | | | x | | x | | x | |
| 8. Yasscar Caguas | $16.6 | Oct. 10, 2007 | $6.5 | | | | | x | | x | | x | | x | |
| TOTAL | $383.06 | | $176.02 | | | | | | | | | | | | |

*Key to column 2 of the table:  "i" = initial loan; "a" = additional credit; "e" = extension of construction loan enabling continued funding.

*Key to "Loan Approvals and Funding" columns of the table:  "x" = approval; "af" = post-approval administration and funding.

80.     The Loss Loans had key deficiencies in underwriting and/or administration that were readily apparent to the Defendants who approved and/or administered them, including, but not limited to:

A.  Sabana ($42.5 million) and increases:

- lack of required pre-sales;

- LTV ratio of 90.5%, in excess of Bank LTV ratio limits;

- grossly inadequate financial analysis of guarantors;

- loan increases and extensions without an updated appraisal to fund interest reserves and unfunded cost overruns.

B.  Sabana ($8 million):

- faltering economy;

- secured only by the pledge of speculative future profits from two distressed borrower projects also financed by the Bank;

- no appraisals obtained to support collateral values;

- while the loan was approved for "capital to various construction projects in Puerto Rico," the borrower used $3.5 million of the loan proceeds to purchase an option on property in Tampa, Florida;

- multiple loan renewals and extensions without obtaining additional collateral or repayment.

C.  Inyx and increases:

- Vazquez and Fuentes approved multiple loan increases and funded over $56 million in loan proceeds despite receipt of reports showing dilution and aging of accounts receivable, a negative borrowing base, and other severe collateral impairment in violation of the loan terms;

- Vasquez unilaterally waived key borrower financial covenants relating to working capital, net adjusted equity value, and cash flow ratios, and advanced $21 million over the authorized credit limit;

- Vasquez and Fuentes manipulated Bank loan monitoring systems so as not to reflect continuing deterioration of the collateral.

D.  Intercoffee and increases:

- bad borrower character;

- failure to evaluate borrower creditworthiness and repayment ability;

- loan increases and additional loan to cover delinquencies and fund interest reserves despite knowledge of the borrower's inability to service the debt and its diversions of loan proceeds to pay for personal and family expenses.

E.  Plaza CCD and extensions:

- under Cortina's administration, the Bank disbursed $26.9 million in draws despite borrower defaults on key loan approval terms and Bank policy requirements, including borrower equity contributions, unit pre-sales, construction contracts, and bonds;

- under Ramirez's administration, the Bank disbursed another $10.4 million in draws despite the borrower's failure to cure defaults, lack of progress beyond foundation work, and significant unfunded cost overruns;

- the Defendants approved multiple extensions to enable continued funding after expiration of the original loan term, despite the borrower's continued failure to cure defaults, significant cost overruns, lack of progress in construction, a faltering economy, and other clear indications of the infeasibility of the project;

- the Bank disbursed over $45.8 million of a $62.25 million credit facility, including $2.4 million in "administration and supervision" fees to the borrower, on a project that is less than one third complete – a shell of rusting beams in downtown San Juan.

F.  Museum Towers:

- the purported "as is" appraisal relied upon an estimated future "as completed" value, in violation of appraisal standards and federal regulations;

- the borrower retained the appraiser, in violation of federal appraiser independence regulations and Bank policy;

- the appraised value of $9.4 million was over twice the acquisition price a year earlier – an obviously unrealistic appreciation;

- the LTV ratios of 96 percent for the term loan and 128 percent for the entire facility both exceeded the Bank's LTV ratio limits;

- repayment was dependent on numerous uncertain future contingencies, including a future take-out construction loan and speculative future zoning changes;

- notwithstanding management's lack of understanding of the Florida real estate market, the Bank failed to obtain a feasibility study of the project;

- the analysis of the repayment ability of the borrower and guarantors was grossly inadequate. One of the guarantors had placed virtually all of his assets in an asset protection trust; the other guarantors' assets consisted principally of investments in start-up companies or other illiquid interests;

- Tamboer's daughter was a principal of the borrower. Although she guaranteed the loan, she had virtually no repayment ability;

- Tamboer failed to disclose his *de facto* 50 percent interest in the borrower and the loan, in violation of federal regulations and Bank policies;

- the other 50 percent interest holder in the borrower, Michael Scarfia, Sr. ("Scarfia"), had loaned substantial sums to Tamboer and had close business relationships with him. Tamboer approved approximately $150 million in other Bank loans to Scarfia-controlled entities, including the Loss Loans to Sabana, Yasscar Development, and Yasscar Caguas, without fully disclosing his dealings with Scarfia. Scarfia owed $142 million to the Bank at the time of its failure;

- the Defendants repeatedly extended and/or renewed the loan through the Bank's failure;

- Tamboer voted to approve the extensions and renewals of the loan notwithstanding his and his daughter's interests in the borrower and the loan;

- the project was never developed.

G. Yasscar Development:

- the LTV ratio of 103% exceeded the Bank's LTV ratio limits;

- the faulty appraisal assumed that all permits were obtained (when they were not). Permitting for commercial development in Puerto Rico is an uncertain process that may take years;

- financial analysis of the guarantors was grossly inadequate;

- the Defendants renewed the loan on November 19, 2009, based on a stale appraisal in the face of a severe decline in market conditions.

H. Yasscar Caguas:

- the LTV ratio exceeded the Bank's LTV ratio limits;

- the faulty appraisal assumed that all permits were in place (when they were not);

- financial analysis of the guarantors was grossly inadequate;

- the Defendants renewed the loan November 19, 2009, based on a stale appraisal and despite a severe decline in market conditions.

81.     In approving, increasing, renewing, extending and/or administering and funding the Loss Loans in the face of the foregoing gross and obvious deficiencies, the Defendants were grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason.  The Defendants' gross negligence proximately caused the Bank damages exceeding $176.02 million.

## TAMBOER'S BREACH OF FIDUCIARY DUTY

82.     As a director, Tamboer owed the Bank fiduciary duties of loyalty, fidelity, and good faith.  These duties included, at a minimum, the duty to safeguard the interests of the Bank, to avoid conflicts of interest, self dealing, or other personal benefit arising from his position as a director, and to fully disclose any and all actual and/or *de facto* interests he may have had in borrowers, projects, and/or loans funded with federally insured dollars.  By failing to disclose his *de facto* 50 percent interest in the Bank's $12 million loan to Museum Towers, and by voting for multiple extensions and/or renewals of the loan for his own and his daughter's benefit, Tamboer breached his fiduciary duties of loyalty, fidelity and good faith owed to Westernbank. Alternatively, in so acting and failing to act, Tamboer was grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason.  Had Tamboer fully disclosed his interests in the loan, it would not have been approved, funded, renewed or extended.  Hence Tamboer is liable solidarily for all losses suffered by the Bank on the loan.

## CLAIMS FOR RELIEF

### Count 1 -  Gross Negligence Against All Defendants

83.     FDIC incorporates by reference as though set forth in full the allegations of

paragraphs 1 through 82 herein.

84.     By their actions and inactions, as described specifically and generally herein,

the Defendants were grossly negligent, amounting to reckless indifference to or deliberate

disregard of the welfare of the Bank and its depositors, or actions which were without the

bounds of reason.  These acts of gross negligence included:

- pursuing an aggressive and reckless growth and lending strategy that placed short term income and profits ahead of the safety and soundness of the federally insured depositor funds entrusted to the Defendants;

- permitting the Bank's commercial loan portfolio to deteriorate due to continued approvals, increases, extensions, and renewals of poorly underwritten, high risk commercial loans in violation of Bank policies, procedures, federal regulations, and prudent banking practices, thereby jeopardizing the Bank's financial health and causing it to fail;

- failing to reasonably inform themselves of material information or alternatives or to engage in due analysis or deliberation as to the extreme risks of such strategies, actions, and failures to act;

- as members of the SLC, SCC and/or Board (for loans over $50 million), failing to analyze supporting information so as to ensure that loans complied with the Bank's policies and procedures and prudent banking practices, and failing to otherwise reasonably inform themselves of material information or alternatives, or to engage in due analysis or deliberation as to the extreme risks inherent in those loans;

- approving the Loss Loans in violation of the Bank's policies and procedures, federal safety and soundness regulations, and prudent banking practices;

- approving multiple increases, extensions and/or renewals of delinquent and defaulted Loss Loans in order to fund interest reserves and continue to derive short term income and profits at the expense of the safety and soundness of federally insured depositor funds;

- failing to heed examiner and auditor warnings of deficiencies in lending and loan administration, failing to correct those deficiencies, and approving, increasing, extending, and/or renewing Loss Loans despite those warnings;

26

- as senior executive officers, failing to ensure that lending and administration within each officer's respective area of responsibility complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices;

- as senior asset based lending officers, administering and funding asset based loans despite receipt of reports showing borrower defaults on key loan approval terms and severe collateral impairment; unilateral waiver of key borrower financial covenants designed to protect the Bank; manipulation of Bank loan monitoring systems so as not to reflect continuing deterioration of collateral; and advancing sums above authorized credit limits;

- as senior construction officers, administering and funding construction loans despite borrower defaults on key loan approval terms and Bank policy requirements, significant cost overruns, lack of progress in construction, and other clear indications of the infeasibility of the project;

- other acts and omissions to be discovered through pretrial discovery and at trial.

85.    The Defendants' grossly negligent acts and omissions proximately caused at least $176.02 million in damages to Westernbank, or such other amount as may be proven at trial.

86.    The Defendants are liable, solidarily, for all damages proximately caused by their grossly negligent acts and omissions.

### Count 2 – Breach of Fiduciary Duty Against Tamboer

87.    Tamboer breached his fiduciary duties of loyalty, fidelity, and good faith owed to Westernbank by:

- failing to safeguard the interests of the Bank;

- placing his personal interests ahead of the Bank's interests;

- failing to avoid conflicts of interest, self dealing, or other personal benefit arising from his position as a director;

- failing to disclose his *de facto* 50 percent interest in the Bank's $12 million loan to Museum Towers;

- voting for multiple extensions and/or renewals of the loan for his own and his daughter's benefit;

- other acts and omissions to be discovered through pretrial discovery and at trial.

Alternatively, Tamboer was grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason.

88.     Had Tamboer fully disclosed his interests in the Museum Towers loan, it would not have been approved, funded, renewed, and/or extended.  Hence, in addition to the other losses for which he is proximately liable, Tamboer is liable solidarily for all losses suffered by the Bank on the Museum Towers loan.

## Count 3 – Adverse Domination

89.     FDIC incorporates by reference as though set forth in full the allegations of paragraphs 1 through 88 herein.

90.     The Defendants adversely controlled and dominated Westernbank at all times relevant to this action, thereby preventing the Bank from taking legal action against the Defendants prior to the failure of the Bank and appointment of FDIC as Receiver.  Alternatively, the continued increases, renewals, extensions, and funding of Loss Loans prevented the running of applicable statutes of limitation, if any.

## Count 4 – Direct Action Claims Against Insurance Carriers

91.     Defendants Chartis, XL, Liberty and ACE issued policies of insurance covering the individual Defendants for their liabilities to the Receiver.  FDIC and the Defendants timely reported claims to these carriers within the claim reporting periods under the policies.  Pursuant to the Puerto Rico Direct Action Statute, FDIC is entitled to judgment against Chartis, XL, Liberty and ACE in the full amount of the policies.

## RELIEF REQUESTED

I.  Pursuant to Federal Rule of Civil Procedure 38, FDIC demands a trial by jury on all claims.

II. FDIC prays that summons issue against all newly added Defendants, to be served upon them with this Amended and Restated Complaint in Intervention in accordance with law.

III.  FDIC prays for judgment against all Defendants, solidarily, in the amounts to be proven as to each Defendant at trial, with interest pursuant to 12 U.S.C. § 1821(l), the costs of this action, and such other legal, general, and equitable relief to which FDIC is entitled.

In San Juan, Puerto Rico, on January 20, 2012.


RESPECTFULLY SUBMITTED.

**TORO, COLON, MULLET, RIVERA & SIFRE, PSC**
Post Office Box 195383
San Juan, Puerto Rico  00919-5383
Telephone:      (787) 751-8999
Facsimile:      (787) 763-7760

/s/MANUEL FERNÁNDEZ-BARED
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204204
E-mail: mfb@tcmrslaw.com

/s/JANE PATRICIA VAN KIRK
JANE PATRICIA VAN KIRK
USDC No. 220510
E-mail: jvankirk@tcmrslaw.com


**Attorneys for the Federal Deposit Insurance Corpoation**

**OF COUNSEL:**

/James A. Brown/
James A. Brown, T.A. (Bar # 14101)
(*pro hac vice*) jabrown@liskow.com

/Geroge Denegre, Jr./
George Denegre, Jr. (Bar # 8387)
(*pro hac vice*)  gdenegre@liskow.com
LISKOW & LEWIS, PLC
One Shell Square
701 Poydras St., Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:  (504) 581-7979
Facsimile:   (504) 556-4108


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 20th day of January, 2012, I electronically filed the
forgoing document with the Clerk of Court by using the CM/ECF system, and a copy of the
foregoing pleading has been electronically mailed to all attorneys of record.


/s/JANE PATRICIA VAN KIRK
JANE PATRICIA VAN KIRK
USDC No. 220510
E-mail: jvankirk@tcmrslaw.com