**UNITED STATES DISTRICT COURT,**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **W HOLDING COMPANY, INC., FRANK STIPES GARCIA, JUAN C. FRONTERA GARCIA, HÉCTOR DEL RÍO TORRES, WILLIAM VIDAL CARVAJAL, CESAR RUIZ, and PEDRO R. DOMINGUEZ ZAYAS,**<br>**Plaintiffs**<br><br>**v.**<br><br>**CHARTIS INSURANCE COMPANY OF PUERTO RICO,**<br>**Defendant** | **CIVIL ACTION NO. 11-02271 (GAG)** |

**FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WESTERNBANK PUERTO RICO,**
**Plaintiff Intervenor**

**v.**

**FRANK STIPES GARCIA, JUAN C. FRONTERA GARCIA, HÉCTOR DEL RÍO TORRES, WILLIAM VIDAL CARVAJAL, CESAR RUIZ, and PEDRO R. DOMINGUEZ ZAYAS,**
**Cross Claim Defendants**

**CHARTIS INSURANCE COMPANY OF PUERTO RICO,**
**Previously Joined Defendant**

**MARLENE CRUZ CABALLERO AND THE FRONTERA-CRUZ CONJUGAL PARTNERSHIP; LILLIAM DIAZ CABASSA AND THE DEL RIO-DIAZ CONJUGAL PARTNERSHIP; GLADYS BARLETTA SEGARRA AND THE VIDAL-BARLETTA CONJUGAL PARTNERSHIP; HANNALORE SCHMIDT MICHELS AND THE RUIZ-**

SCHMIDT CONJUGAL PARTNERSHIP;
SONIA SOTOMAYOR VICENTY AND
THE DOMINGUEZ-SOTOMAYOR
CONJUGAL PARTNERSHIP; JOSE M.
BIAGGI LANDRON, HIS SPOUSE JANE
DOE, AND THE BIAGGI-DOE
CONJUGAL PARTNERSHIP; RICARDO
CORTINA CRUZ, HIS SPOUSE
ELIZABETH ALDEBOL DE CORTINA,
AND THE CORTINA-ALDEBOL
CONJUGAL PARTNERSHIP; MIGUEL A.
VAZQUEZ SEIJO, HIS SPOUSE SHARON
MCDOWELL NIXON, AND THE
VAZQUEZ-MCDOWELL CONJUGAL
PARTNERSHIP; JULIA FUENTES DEL
COLLADO; MARIO A. RAMIREZ
MATOS; CORNELIUS TAMBOER, HIS
SPOUSE OLGA MORALES PEREZ, AND
THE TAMBOER-MORALES CONJUGAL
PARTNERSHIP; XL SPECIALTY
INSURANCE COMPANY; LIBERTY
MUTUAL INSURANCE COMPANY; ACE
INSURANCE COMPANY; LUIS
BARTOLEME RIVERA CUEBAS, AS
TRUSTEE OF THE SOCIO CULTURAL
CONSERVATION TRUST; JOHN DOE,
AS TRUSTEE OF THE DOMINGUEZ
SOTOMAYOR FAMILY TRUST; AND
JANE DOE, AS TRUSTEE OF THE CT
FAMILY TRUST,
**Additional Defendants**

## DEFENDANT CHARTIS INSURANCE COMPANY – PUERTO RICO'S ANSWER TO SECOND AMENDED AND RESTATED COMPLAINT IN INTERVENTION

NOW COMES the Defendant, Chartis Insurance Company – Puerto Rico ("Chartis"), by and through its counsel of record, and for its Answer to Intervening Plaintiff, Federal Deposit Insurance Corporation ("FDIC" or "Receiver"), as Receiver of Westernbank Puerto Rico's ("Westernbank" or "the Bank"), Second Amended and Restated Complaint in Intervention, states as follows:

INTRODUCTION

1.      FDIC, in its receivership capacity, asserts claims against former officers and directors of Westernbank of Mayaguez, Puerto Rico.   On April 30, 2010, the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico ("OCFI") closed Westernbank, with a loss to the Deposit Insurance Fund currently estimated at $4.25 billion.   All of Westernbank's corporate stock was owned by its holding company, W Holding Company, Inc. ("W Holding").

**ANSWER:   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 1 and, therefore, denies the same.**

2.      FDIC, as Receiver of Westernbank, seeks recovery of at least $176.02 million in damages caused by the gross negligence of the former officers and/or directors of Westernbank.

**ANSWER:   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 2 and, therefore, denies the same.**

3.      The $176.02 million damage claim is based on losses from four commercial real estate ("CRE") loans, ten construction loans, and seven asset based loans (collectively, the "Loss Loans") approved and administered by the Bank from January 28, 2004, through November 19, 2009.

**ANSWER:   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 3 and, therefore, denies the same.**

4.      The Bank's officers and directors approved and/or administered the Loss Loans pursuant to an aggressive and reckless growth strategy that placed short term income and profits ahead of the safety and soundness of the federally insured depositor funds entrusted to them.

**ANSWER:   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 4 and, therefore, denies the same.**

5.     The Bank's officers and directors approved the Loss Loans despite numerous violations of the Bank's loan policies and procedures, federal safety and soundness regulations, and prudent banking practices.  These violations included: (1) violations of the Bank's Loan to Value ("LTV") ratio limits; (2) lack of required borrower equity; (3) inadequate real estate appraisals; (4) insufficient analyses of collateral or inadequate collateral; (5) insufficient borrower repayment information and repayment sources; (6) the questionable character of the borrower or guarantor; and (7) other loan policy violations.  Additionally, the Bank's officers and directors repeatedly increased, extended, and/or renewed expired and deteriorating loans to enable continued funding of interest reserves, delaying  losses and defaults and increasing the losses on the loans.

**ANSWER:   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 5 and, therefore, denies the same.**

6.     Former Bank officers administered and funded the construction and asset based loans in violation of major loan terms, Bank policies and procedures, and prudent lending and administration standards.  These violations included: (1) continued funding of asset based loans despite receipt of reports showing dilution and aging of accounts receivable, violations of borrower covenants and loan agreements,  ineligible collateral, and other severe collateral impairment; (2) unilateral and unauthorized waiver of key borrower financial covenants relating to working capital, net adjusted equity value, and cash flow ratios; (3) manipulation of Bank loan monitoring systems so as not to reflect continuing deterioration of collateral and ineligible collateral; (4) funding of construction loans despite borrower defaults on key loan approval terms

and Bank policy requirements; and (5) extensions and continued funding of expired loans, delaying losses and defaults, despite the borrower's failure to cure defaults, significant cost overruns, lack of progress in construction, and other clear indications of the infeasibility of the project.

**ANSWER:   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 6 and, therefore, denies the same.**

7.      A former Bank director, Defendant Cornelius Tamboer ("Tamboer"), failed to disclose his substantial *de facto* personal financial interest in a $12 million CRE loan prior to its approval, in violation of Bank policies and federal regulations and in breach of his fiduciary duties owed to Westernbank.

**ANSWER:   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 7 and, therefore, denies the same.**

8.      The director Defendants failed to heed and act upon examiner and auditor warnings of deficiencies in commercial lending and administration, and continued approving, increasing, extending, and/or renewing loans in the face of those deficiencies and warnings.

**ANSWER:   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 8 and, therefore, denies the same.**

9.      The officer and director Defendants' actions and inactions constituted gross negligence, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason.  These actions and inactions were the direct and proximate cause of the damages FDIC now seeks to recover.

**ANSWER:   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 9 and, therefore, denies the same.**

<u>INTERVENTION AND REMOVAL</u>

10.     On October 6, 2011, W Holding and individual plaintiffs Frank C. Stipes Garcia ("Stipes"), Juan Carlos Frontera Garcia ("Frontera"), Héctor L. Del Río Torres ("Del Rio"), William M. Vidal Carvajal ("Vidal"), Cesar A. Ruiz Rodriguez ("Ruiz"), and Pedro R. Dominguez Zayas ("Dominguez") (collectively, the "Individual Plaintiffs"), commenced this action in the Puerto Rico Commonwealth Court (the "State Court Action").   The Individual Plaintiffs are former officers and/or directors of Westernbank.   In the State Court Action, the Individual Plaintiffs asserted claims against Defendant Chartis Insurance Company of Puerto Rico, f/k/a American International Insurance Company of Puerto Rico ("Chartis"), for declarations of coverage under insurance policies (the "policies") issued by Chartis and covering Westernbank's officers and directors for their liabilities to the Receiver.

**<u>ANSWER</u>:     Chartis states that the State Court Action speaks for itself and, therefore, denies any allegations inconsistent therewith.**

11.     The Puerto Rico Direct Action Statute, P.R. Laws Ann. tit. 26, §§ 2001, 2003, grants the Receiver a direct interest in the proceeds of the insurance policies that are the subject of this action, and a substantive cause and right of direct action against the insurance carriers that issued the policies.   In the direct action, all issues of liability and insurance coverage are decided in a single action.

**<u>ANSWER</u>:     Chartis states that the Puerto Rico Direct Action Statute, P.R. Laws Ann. tit. 26, §§ 2001, 2003, speaks for itself and, therefore, denies any allegations inconsistent therewith.   In further answering, Chartis denies the remaining allegations contained in Paragraph 11 as said allegations are conclusions of law.**

6

12.     Pursuant to Rule 21.1 of the Puerto Rico Rules of Civil Procedure, a third person having an interest in a pending action may intervene as a matter of right whenever the law confers an unconditional right to intervene or when a person claims a right or interest relating to the property or transaction that is the subject of the action that may as a practical matter be affected by the final disposition of the action.

**ANSWER:     Chartis states that Rule 21.1 of the Puerto Rico Rules of Civil Procedure speaks for itself and, therefore, denies any allegations inconsistent therewith.**

13.     Because the instant action seeks a declaration of Chartis' contractual obligations under the policies, including its obligations to cover and pay the Receiver's claims, the outcome of the action may, as a practical matter, affect and impair the Receiver's rights and interests in and to the policies and its rights and claims against Chartis.  Further, the exclusion of the Receiver from this action would lead to duplicative litigation and potentially inconsistent and conflicting adjudications of the same factual and legal issues in different courts.

**ANSWER:     Chartis denies the allegations contained in Paragraph 13 as said allegations are conclusions of law.**

14.     On December 30, 2011, FDIC, as Receiver of Westernbank, intervened as a plaintiff in the State Court Action as matter of law and right, to protect and assert its substantive rights and interests in and to the policies and its claims against Chartis under the Puerto Rico Direct Action Statute.

**ANSWER:     Chartis states that the FDIC's Original Complaint in Intervention speaks for itself and, therefore, denies any allegations inconsistent therewith.**

15.     FDIC, as Receiver of Westernbank, incorporates by reference its original Complaint in Intervention as though set forth herein in its entirety.

**ANSWER:    Chartis makes no answer to the allegations contained in Paragraph 15 as no answer is required.   To the extent that it can be construed that said allegations require an answer, then Chartis denies the allegations contained in Paragraph 15.**

16.    FDIC, as Receiver, removed the case to this Court on December 30, 2011, pursuant to 12 U.S.C. § 1819(b)(2)(B).

**ANSWER:    Chartis admits the allegations contained in Paragraph 16.**

JURISDICTION AND VENUE

17.    Pursuant to 12 U.S.C. § 1819(b)(2)(A) and (B), with certain exceptions not applicable to this case, all civil lawsuits in which FDIC, in any capacity, is a party are deemed to arise under the laws of the United States.   Pursuant to 12 U.S.C. § 1819 and 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action.

**ANSWER:    Chartis states that 12 U.S.C. § 1819(b)(2)(A) and (B) speaks for itself and, therefore, denies any allegations inconsistent therewith.   Chartis admits the remaining allegations contained in Paragraph 17.**

18.    This Court has personal jurisdiction over the Defendants who at all relevant times were residents of and conducted the business of the Bank in Puerto Rico, or issued policies of liability insurance in Puerto Rico covering the Bank and its officers and directors.

**ANSWER:    Chartis admits that this Court has personal jurisdiction over it because it was a resident of and conducted business Puerto Rico.   In further answering, Chartis admits that it issued policies to W Holding Company, Inc., but denies that said policies provide coverage for the allegations set forth in this lawsuit, and denies the remaining allegations of Paragraph 18.**

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1446(a) as this Court is the United States District Court for the district and division in which the State Court Action was pending when FDIC removed it to this Court.  Additionally, the events giving rise to this case occurred in this district.

**ANSWER:     Chartis admits the allegations contained in Paragraph 19.**

20.     FDIC asserts the following additional claims:

**ANSWER:     Chartis makes no answer to the allegations contained in Paragraph 20 as no answer is required.  To the extent that it can be construed that said allegations require an answer, then Chartis denies the allegations contained in Paragraph 20.**

<u>THE PARTIES</u>

<u>Plaintiff Intervenor – FDIC</u>

21.     FDIC is a corporation organized and existing under the laws of the United States of America with its principal place of business in Washington, D.C.  12 U.S.C. § 1811, *et. seq.* FDIC is an instrumentality of the United States of America and is charged with, among other things, the orderly liquidation of failed banks.   12 U.S.C. § 1821(d).  The OCFI appointed FDIC as Receiver of Westernbank on April 30, 2010, pursuant to 12 U.S.C. § 1821(c).  On that date, pursuant to 12 U.S.C. § 1821(d)(2)(A) and § 1823(d)(3)(A), the Receiver succeeded to all rights, claims, titles, powers, privileges, and assets of Westernbank and its stockholders, members, account holders, depositors, officers, or directors of Westernbank with respect to the institution and the assets of the institution, including the right to bring this action against the former officers and directors of Westernbank.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 21 and, therefore, denies the same.**

<u>Cross Claim Defendants</u>

22.   Cross Claim Defendant Stipes was Chairman of the Board of the Bank from 1990 to April 30, 2010, and was President and Chief Executive Officer ("CEO") from 1992 to July 10, 2005, and again from March 31, 2007, to April 30, 2010.   He also was a member of both the Bank's Senior Lending Committee ("SLC") and its Senior Credit Committee ("SCC") from January 1, 2004, until the Bank failed.  Stipes is currently the Chairman of the Board, CEO, and President of W Holding.  As of March 30, 2007, he owned 11,738,531 shares (7.12 percent) of W Holding's stock.  Stipes is a resident of Puerto Rico residing in Mayaguez.

**ANSWER:**   **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 22 and, therefore, denies the same.**

23.   Cross Claim Defendant Frontera was a director of both the Bank and W Holding from October 2003, Secretary of both the Bank and W Holding Boards from February 2007, a member of the SLC from January 1, 2004, and a member of the SCC from July 29, 2004, until the Bank failed.   As of March 30, 2007, he owned 1,584,668 shares (0.96 percent) of W Holding's stock.  Frontera is a resident of Puerto Rico residing in Mayaguez.

**ANSWER:**    **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 23 and, therefore, denies the same.**

24.   Cross Claim Defendant Del Rio was a director of the Bank and of W Holding from October 2003, a member of the SLC from January 1, 2004, and a member of the SCC from July 29, 2004, until the Bank failed.  As of March 30, 2007, he owned 108,573 shares (0.07 percent) of W Holding's stock.  Del Rio is a resident of Puerto Rico residing in Mayaguez.

**ANSWER:**    **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 24 and, therefore, denies the same.**

25.      Cross Claim Defendant Vidal was Vice President ("VP") of Commercial Credit and was Chief Lending Officer ("CLO") of the Bank's Northern Region from June 26, 2000, to August 31, 2008.  He was Executive VP ("EVP") and Chief Banking Officer ("CBO") from September 1, 2008, until the Bank failed.  Vidal also was a member of the SCC and SLC from January 1, 2004, until April 30, 2010.  As of March 30, 2007, he owned 182,045 shares (0.11 percent) of W Holding's stock.  Vidal is a resident of Puerto Rico residing in San Juan.

**ANSWER:      Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 25 and, therefore, denies the same.**

26.      Cross Claim Defendant Ruiz was a director of the Bank and of W Holding from 1999 to December 31, 2008, and Secretary of both the Bank and W Holding Boards from April 2001, to February 28, 2007.  As of March 30, 2007, he owned 125,337 shares (0.08 percent) of W Holding's stock.  Ruiz is a resident of Puerto Rico residing in Mayaguez.

**ANSWER:      Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 26 and, therefore, denies the same.**

27.      Cross Claim Defendant Dominguez was VP of Commercial Credit and CLO for the Bank's Southern Region from September 25, 1989, until the Bank failed, and he also was a director of the Bank from 1992 until the Bank failed.  He was a member of the SCC and SLC from January 1, 2004, until the Bank failed.  He was a director of W Holding from 1999 to April 30, 2010.  As of March 30, 2007, he owned 1,287,302 shares (0.78 percent) of W Holding's stock.  Dominguez is a resident of Puerto Rico residing in Ponce.

**ANSWER:      Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 27 and, therefore, denies the same.**

<u>Previously Joined Defendant – Chartis</u>

28.    Defendant Chartis is a Puerto Rico insurance corporation which issued policies of insurance covering the individual Defendants for their liabilities to the Receiver.  FDIC asserts claims against Chartis under the policies pursuant to the Puerto Rico Direct Action Statute.

**<u>ANSWER:</u>    Chartis admits that it is a Puerto Rico insurance corporation which issued policies of insurance that, subject to its terms, conditions, exclusion and/or endorsements, provide coverage to the individual Defendants, but denies that said policies covered their alleged liabilities to the Receiver.  Chartis denies the remaining allegations contained in Paragraph 28 as said allegations are conclusions of law.**

<u>Additional Defendants</u>

FDIC joins, as additional defendants (1) the spouses and conjugal partnerships of the Cross Claim Defendants as required by Puerto Rico law, (2) additional former officers and directors of Westernbank, and their spouses and conjugal partnerships, and (3) additional insurance carrier defendants, as follows.  FDIC joins the spouses of the officer and director Defendants as representatives of the conjugal partnerships, and in their individual capacity to the extent that they may be liable if the conjugal partnership does not have sufficient funds to satisfy a judgment in this case.  The responsible Defendants acted in the course and scope of their duties as former officers and directors of the Bank, resulting in economic gain attributable to the conjugal partnerships.

29.    Defendant Marlene Cruz Caballero is the spouse of Cross Claim Defendant Frontera.

**<u>ANSWER:</u>    Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 29 and, therefore, denies the same.**

30.     Defendant Frontera-Cruz is the Conjugal Partnership formed by Cross Claim Defendant Frontera and Defendant Marlene Cruz Cabellero.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 30 and, therefore, denies the same.**

31.     Defendant Lilliam Diaz Cabassa is the spouse of Cross Claim Defendant Del Rio.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 31 and, therefore, denies the same.**

32.     Defendant Del Rio-Diaz is the Conjugal Partnership formed by Cross Claim Defendant Del Rio and Defendant Lilliam Diaz Cabassa.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 32 and, therefore, denies the same.**

33.     Defendant Gladys Barletta Segarra is the spouse of Cross Claim Defendant Vidal.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 33 and, therefore, denies the same.**

34.     Defendant Vidal-Barletta is the Conjugal Partnership formed by Cross Claim Defendant Vidal and Defendant Gladys Barletta Segarra.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 34 and, therefore, denies the same.**

35.     Defendant Hannalore Schmidt Michels is the spouse of Cross Claim Defendant Ruiz.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 35 and, therefore, denies the same.**

36.     Defendant Ruiz-Schmidt is the Conjugal Partnership formed by Cross Claim Defendant Ruiz and Defendant Hannalore Schmidt Michels.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 36 and, therefore, denies the same.**

37.     Defendant Sonia Sotomayor Vicenty is the spouse of Cross Claim Defendant Dominguez.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 37 and, therefore, denies the same.**

38.     Defendant Dominguez-Sotomayor is the Conjugal Partnership formed by Cross Claim Defendant Dominguez and Defendant Sonia Sotomayor Vicenty.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 38 and, therefore, denies the same.**

39.     Defendant Jose M. Biaggi Landron ("Biaggi") succeeded Stipes as President and CEO of the Bank on July 11, 2005, while Stipes continued as Chairman.  Biaggi was President and CEO until Stipes forced him to resign in lieu of termination on March 30, 2007.  Thereafter, Stipes resumed the offices of President and CEO of the Bank.  Biaggi was a director of the Bank from July 11, 2005, to March 30, 2007, a member of the SLC from July 11, 2005, to March 30, 2007, and a member of the SCC from September 20, 2005, to March 30, 2007.  As of March 31, 2006, he owned 167,900 shares (0.10 percent) of W Holding's stock.  Biaggi is a resident of Puerto Rico residing in Mayaguez.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 39 and, therefore, denies the same.**

40.     Defendant Jane Doe is the spouse of Defendant Biaggi.

**ANSWER:**   **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 40 and, therefore, denies the same.**

41.   Defendant Biaggi-Doe is the Conjugal Partnership formed by Defendant Biaggi and Defendant Jane Doe.

**ANSWER:**   **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 41 and, therefore, denies the same.**

42.   Defendant Ricardo Cortina Cruz ("Cortina") was VP of Commercial Credit and Chief Construction Officer ("CCO") of the Bank, and was CLO for the Western Region of the Bank, from May 10, 1999, to August 31, 2008.  He was Senior VP ("SVP") of Commercial Credit from September 1, 2008, to June 14, 2009, and SVP of Commercial Credit for the Northwest Region from June 15, 2009, until Westernbank failed.  He also was a member of the SLC from January 1, 2004, until February 19, 2009.  As of January 17, 2006, he owned 17,404 shares (0.01 percent) of W Holding's stock.  Cortina is a resident of Puerto Rico residing in Mayaguez.

**ANSWER:**   **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 42 and, therefore, denies the same.**

43.   Defendant Elizabeth Aldebol de Cortina is the spouse of Defendant Cortina.

**ANSWER:**   **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 43 and, therefore, denies the same.**

44.   Defendant Cortina-Aldebol is the Conjugal Partnership formed by Defendant Cortina and Defendant Elizabeth Aldebol de Cortina.

**ANSWER:**   **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 44 and, therefore, denies the same.**

45.     Defendant Miguel A. Vazquez Seijo ("Vazquez") was the President of the Business Credit Division ("BCD") of the Bank from June 1, 2001, until he was terminated on November 1, 2007.  Vazquez was a member of the SCC during that same period.  As of March 21, 2006, he owned 144,058 shares (0.09 percent) of W Holding's stock.  Vazquez is a resident of Puerto Rico residing in San Juan.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 45 and, therefore, denies the same.**

46.     Defendant Sharon McDowell Nixon is the spouse of Defendant Vazquez.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 46 and, therefore, denies the same.**

47.     Defendant Vazquez-McDowell is the Conjugal Partnership formed by Defendant Vazquez and Defendant Sharon McDowell Nixon.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 47 and, therefore, denies the same.**

48.     Defendant Julia Fuentes del Collado ("Fuentes") was VP of the BCD from June 18, 2001, to January 9, 2002.  She was SVP of the BCD from January 10, 2002, to January 9, 2005.  She was SVP - Portfolio Manager of the BCD from January 10, 2005, until she resigned on December 12, 2007.  During that period, she was the second most senior officer in the BCD, next to Vazquez.  She also was a member of the SCC from January 1, 2004, to December 12, 2007.  Fuentes is a resident of Puerto Rico residing in San Juan.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 48 and, therefore, denies the same.**

49.     Defendant Mario A. Ramirez Matos ("Ramirez") was the Bank's VP of Construction Lending from January 9, 2007, to July 13, 2008, and VP and CCO from July 14, 2008, until the Bank failed.  Ramirez is a resident of Puerto Rico residing in San Juan.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 49 and, therefore, denies the same.**

50.     Defendant Tamboer was a director of the Bank and of W Holding from 1999 to January 19, 2010, and a member of the SCC and of the SLC from January 1, 2004, until Westernbank failed.  As of March 30, 2007, he owned 5,880,144 shares (3.57 percent) of W Holding's stock.  Tamboer is a resident of Puerto Rico residing in Mayaguez.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 50 and, therefore, denies the same.**

51.     Defendant Olga Morales Perez is the spouse of Defendant Tamboer.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 51 and, therefore, denies the same.**

52.     Defendant Tamboer-Morales is the Conjugal Partnership formed by Defendant Tamboer and Defendant Olga Morales Perez.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 52 and, therefore, denies the same.**

53.     Defendant XL Specialty Insurance Company ("XL") is an insurance corporation authorized to do and doing business in Puerto Rico which issued a policy or policies of insurance covering the individual Defendants for their liabilities to the Receiver.  FDIC asserts claims against XL under the policies pursuant to the Puerto Rico Direct Action Statute.

**ANSWER:**     **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 53 and, therefore, denies the same.**

54.     Defendant Liberty Mutual Insurance Company ("Liberty") is an insurance corporation authorized to do and doing business in Puerto Rico which issued a policy or policies of insurance covering the individual Defendants for their liabilities to the Receiver.  FDIC asserts claims against Liberty under the policies pursuant to the Puerto Rico Direct Action Statute.

**ANSWER:**     **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 54 and, therefore, denies the same.**

55.     Defendant ACE Insurance Company ("ACE") is an insurance corporation authorized to do and doing business in Puerto Rico which issued a policy or policies of insurance covering the individual Defendants for their liabilities to the Receiver.  FDIC asserts claims against ACE under the policies pursuant to the Puerto Rico Direct Action Statute.

**ANSWER:**     **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 55 and, therefore, denies the same.**

55(A). Defendant Luis Bartoleme Rivera Cuebas, in his capacity as Trustee of the Socio Cultural Conservation Trust, is the Trustee of a family trust named the "Socio Cultural Conservation Trust," settled by Defendant Stipes and to which he transferred substantial assets without consideration.

**ANSWER:**     **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 55(A) and, therefore, denies the same.**

55(B). Defendant John Doe, in his capacity as Trustee of the Dominguez Sotomayor Family Trust, is the Trustee of a family trust named the "Dominguez Sotomayor Family Trust," to which Defendant Dominguez transferred substantial assets without consideration.

18

**ANSWER:**    Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 55(B) and, therefore, denies the same.

55(C). Defendant Jane Doe, in her capacity as Trustee of the  CT Family Trust, is the Trustee of a family trust named the "CT Family Trust," to which Defendant Tamboer transferred substantial assets without consideration.

**ANSWER:**    Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 55(C) and, therefore, denies the same.

BACKGROUND

56.    Westernbank opened to the public on March 1, 1958, as a Puerto Rico chartered savings institution with its principal place of business in Mayaguez, Puerto Rico.  On November 30, 1994, it converted its charter to become a full service commercial bank under the laws of Puerto Rico.  Under Stipes's leadership, from 1999 through 2009, the Bank grew over 526 percent from $3.4 billion to $17.9 billion in assets.  During this rapid growth period, the officer and director Defendants, driven by the desire for short term income and profits, approved and/or administered numerous CRE, construction, and asset based commercial loans in violation of Bank policies, federal safety and soundness regulations, and prudent banking practices.  Stipes and Tamboer received millions of dollars in dividends from their W Holding stock during this period, attributable to the income generated by these poorly underwritten and administered loans. Other Defendants likewise received substantial stock dividends resulting from the loans.  When Westernbank failed, it was the second largest bank in Puerto Rico, with 45 branches located throughout the island.

**ANSWER:**    Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 56 and, therefore, denies the same.

19

57.     Beginning in 2001, the Board gave Vazquez, President of the BCD, unfettered control over asset-based lending.  The BCD was responsible for origination of asset based loans. Between 2001 and 2007, the Bank paid Vazquez substantial bonuses based upon the short term income and profits generated by the BCD's loan originations.  Vazquez tightly controlled asset based lending, directed loan administration, supervised numerous employees, and reported to Stipes and the Board.   However, Vazquez, driven by the desire for short term profit and compensation, ignored loan policy requirements, regulations, and principles of safety and soundness.   Vazquez dismissed the warnings of his subordinate, Fuentes, regarding these deficiencies and directed her to continue funding the loans (which she then did).  Vazquez also repeatedly directed increases to interest reserves to fund deteriorating loans, delaying losses and defaults and increasing the losses on the loans.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 57 and, therefore, denies the same.**

58.     Similarly, the Bank's CRE and construction loans lacked financial support, lacked global cash flow and debt service analyses, exceeded LTV ratio limits, and were based on unrealistic appraisals.  Construction loans were administered, extended, and funded in violation of key loan approval terms and Bank policies.

**ANSWER:     Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 58 and, therefore, denies the same.**

59.     In November 2005, Biaggi advised Stipes and Dominguez to slow the Bank's growth until severe deficiencies in the Bank's commercial lending and administration could be corrected.  Notwithstanding his knowledge of these deficiencies, Biaggi approved four of the Loss Loans between October 28, 2005, and September 5, 2006.  On March 30, 2007, Stipes

directed Biaggi to resign in lieu of termination.  Stipes and Dominguez failed to take corrective action commensurate with the Bank's growth, as Biaggi had cautioned.  As the result, between March 31, 2006, and June 30, 2008, Westernbank's adversely classified loans increased from $176 million to $1.61 billion (a 915 percent increase).

**ANSWER:**     **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 59 and, therefore, denies the same.**

60.     The responsible officer and director Defendants approved, increased, renewed and/or extended the Loss Loans in the face of mounting examiner and auditor warnings of problems in the commercial loan portfolio.  In the 2005 Report of Examination ("RoE"), FDIC examiners cited management's failure to correct deficiencies in loan administration and review cited in the prior year's examination.  On April 13, 2006, the Bank's auditors, Deloitte & Touche LLP ("Deloitte"), warned Bank management of "significant deficiencies," including insufficient analysis and documentation of impaired loans.

**ANSWER:**     **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 60 and, therefore, denies the same.**

61.     The 2006 FDIC RoE warned of significant increases in adversely classified loans and again criticized commercial loan administration, quoting from Deloitte's April 13, 2006, management letter.  The examiners warned management that the Bank's internal loan review function had identified only $28.5 million in adversely classified and special mention BCD loans, while the examiners had identified $330.4 million of such loans in the same period – more than an elevenfold difference.  The examiners adversely classified $211 million of the Bank's assets, nearly triple the amount from the preceding year.

**ANSWER:**     **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 61 and, therefore, denies the same.**

62.     The 2007 FDIC RoE again extensively criticized commercial lending and administration and management's failure to correct the deficiencies cited in the previous examinations.  The examiners adversely classified $536 million of the Bank's assets as of June 30, 2007, a 254 percent increase from the prior year.  The 2008 FDIC RoE repeated the criticisms of commercial lending and administration and the failure to correct previously cited deficiencies.  The examiners also criticized the Bank's continued funding of interest reserves on troubled projects.  The examiners adversely classified $1.8 billion of the Bank's assets, a more than 300 percent increase from the prior year.  FDIC issued a Cease and Desist Order to the Bank on May 22, 2009, and the OCFI closed the Bank on April 30, 2010, and appointed FDIC as Receiver.

**ANSWER:**     **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 62 and, therefore, denies the same.**

63.     Despite these warnings, the responsible Defendants approved, increased, renewed, and/or extended Loss Loans in violation of the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.

**ANSWER:**     **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 63 and, therefore, denies the same.**

64.     In a restated Form 10-K for 2007, filed on March 16, 2009, with the Securities and Exchange Commission ("SEC"), the W Holding Board, which at that time included Stipes, Dominguez, Del Rio, Frontera, and Tamboer, acknowledged the Bank's failures to correct the deficiencies previously cited by auditors and examiners.  They acknowledged that (i) the Bank

approved and funded loans that "did not comply with . . . underwriting criteria;" (ii) loans were "approved or extended . . . on the basis of poorly supported analysis of the repayment capacity of the borrower;" (iii) the Bank "made significant use of interest reserve advances to cover interest payments on delinquent loans or on loans to borrowers with financial difficulties;" and (iv) the Bank failed to "obtain updated appraisal reports for classified loans."  This acknowledged conduct amounted to gross negligence, including reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason, causing the Bank damages exceeding $176.02 million.

**ANSWER:**    **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 64 and, therefore, denies the same.**

65.    Pursuant to Westernbank's Commercial Loan Policy ("Loan Policy"), the SLC was responsible for evaluation and approval of CRE and construction loans.  The Board also was responsible for evaluation and approval of CRE and construction loans of over $50 million.  During all or part of the relevant time period, Defendants Stipes, Biaggi, Tamboer, Del Rio, Dominguez, Frontera, Cortina, and Vidal were members of the SLC.

**ANSWER:**    **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 65 and, therefore, denies the same.**

66.    The Bank had a separate policy manual for the BCD governing asset based lending (the "BCD Policy").   Pursuant to the BCD Policy, the SCC was responsible for evaluation and approval of asset based loans.  The Board also was responsible for evaluation and approval of asset based loans of over $50 million.  During all or part of the relevant time period, Defendants Stipes, Dominguez, Vidal, Tamboer, Del Rio, Frontera, Vazquez, Fuentes, and Biaggi were members of the SCC.

**ANSWER:** **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 66 and, therefore, denies the same.**

67.     All  Defendants who were members of the SLC, SCC, and/or the Board (for loans over $50 million) were responsible for analyzing supporting information so as to ensure that loans complied with the Bank's policies and procedures and prudent banking practices.  The responsible Defendants failed to so reasonably inform themselves of material information or alternatives or to engage in due analysis and deliberation.  Instead, they approved the Loss Loans in violation of the Bank's policies and procedures, federal safety and soundness regulations, and prudent banking practices.  In so acting and failing to act, the responsible Defendants breached their duties to Westernbank.

**ANSWER:** **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 67 and, therefore, denies the same.**

68.     The director Defendants were responsible for heeding examiner and auditor warnings of deficiencies in lending and loan administration and correcting those deficiencies. They failed to do so, and instead continued to approve, increase, extend, and/or renew Loss Loans in violation of Bank approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.   In so acting and failing to act, the director Defendants breached their duties to Westernbank.

**ANSWER:** **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 68 and, therefore, denies the same.**

69.     As President and CEO of the Bank from 1992 to July 10, 2005, and again from March 31, 2007 through the Bank's failure, Stipes was responsible for ensuring that the Bank's commercial lending and administration complied with the Bank's approval terms, policies and

procedures, federal safety and soundness regulations, and prudent banking practices.  He also was responsible for heeding examiner and auditor warnings of deficiencies in commercial lending and administration and correcting those deficiencies.  Stipes breached those duties to Westernbank.

**ANSWER:**    **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 69 and, therefore, denies the same.**

70.    As President and CEO of the Bank from July 11, 2005, to March 30, 2007, Biaggi was responsible for ensuring that the commercial loans he approved complied with the Bank's policies and procedures, federal safety and soundness regulations, and prudent banking practices. Biaggi breached those duties to Westernbank.

**ANSWER:**    **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 70 and, therefore, denies the same.**

71.    As President of the BCD from 2001 to November 1, 2007, Vazquez was responsible for ensuring that the BCD's asset based lending and administration complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  Vazquez breached those duties to Westernbank.

**ANSWER:**    **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 71 and, therefore, denies the same.**

72.    As SVP - Portfolio Manager of the BCD from January 10, 2005, to December 12, 2007, Fuentes was responsible for ensuring that the BCD's asset based lending and administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  Fuentes breached those duties to Westernbank.

**ANSWER:**   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 72 and, therefore, denies the same.

73.      As CLO of the Bank's Northern Region from June 26, 2000, to August 31, 2008, Vidal was responsible for ensuring that the Bank's commercial lending and administration within that region complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.   As the Bank's CBO from September 1, 2008, until the Bank's failure, Vidal was responsible for ensuring that the Bank's commercial loan administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  Vidal breached those duties to Westernbank.

**ANSWER:**   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 73 and, therefore, denies the same.

74.      As CLO of the Bank's Southern Region from September 25, 1989, until the Bank's failure, Dominguez was responsible for ensuring that the Bank's commercial lending and administration within that region complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. Dominguez breached those duties to Westernbank.

**ANSWER:**   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 74 and, therefore, denies the same.

75.      As the Bank's CCO from May 10, 1999, to August 31, 2008, Cortina was responsible for ensuring that the Bank's construction lending and administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.   As CLO of the Bank's Western Region

from May 10, 1999, to August 31, 2008, Cortina was responsible for ensuring that the Bank's commercial lending and administration within that region complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  Cortina breached those duties to Westernbank.

**ANSWER:**    **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 75 and, therefore, denies the same.**

76.    As the Bank's CCO from July 14, 2008, until the Bank's failure, Ramirez was responsible for ensuring that the Bank's construction loan administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.  Ramirez breached those duties to Westernbank.

**ANSWER:**    **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 76 and, therefore, denies the same.**

<u>THE LOSS LOANS</u>

77.    The CRE Loss Loans include the Bank's loans to Museum Towers LP ("Museum Towers"), Yasscar Development Corporation ("Yasscar Development"), Yasscar Caguas Development Corporation ("Yasscar Caguas"), and its $8 million loan to Sabana Del Palmar, Inc. ("Sabana").  The construction Loss Loans include the Bank's construction loans to Plaza CCD Development Corporation ("Plaza CCD") and its $42.5 million loan to Sabana.  Each of these Loss Loans violated one or more of the following applicable requirements of Westernbank's Loan Policy:

- The importance of evaluating a borrower's character and creditworthiness "cannot be overstated."

- All credit extensions must be supported by current financial statements that are certified by the borrowers and guarantors and updated annually.

- Credit officers must ensure completeness of required documentation before disbursement and should annually review loans and prepare statements regarding borrower compliance with terms and covenants.
- For secured commercial loans, current appraisal reports (within the past 12 months) must be obtained prior to closing of loans or loan increases.

- LTV ratio limits were: 50 percent (65 percent as of January 2006) for undeveloped land; 75 percent for secured commercial land development loans; 80 percent for commercial construction loans; and 85 percent for improved properties.

- Exceptions to LTV ratio requirements should be identified in the Bank's records and reported to the Board of Directors.

- To obtain a second or subsequent renewal of a commercial loan, the borrower must pay down at least 20 percent.

- When repayment of construction loans depends upon unit sales, refinancing, or income producing property, at least 50 percent of the interim credit facility must be recoverable from committed pre-sale revenues.

- Prior to disbursement of a construction loan, the borrower must invest at least 10 percent upfront equity in the form of cash, land, or prepaid plans and specifications.

- Completion/payment bonds must be in place prior to commencement of construction. Borrowers/guarantors must covenant to immediately fund cost overruns.

**<u>ANSWER:</u>   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 77 and, therefore, denies the same.**

78.   The asset based Loss Loans include the Bank's loans to Inyx, Inc. ("Inyx") and to Intercoffee, Inc. ("Intercoffee").  Each of these Loss Loans violated one or more of the following requirements of the BCD Policy:

- Disbursements are to be made only after review of collateral availability.

- Each loan officer is responsible for assigned clients.  The administration of the account will be based on the terms of the financing as outlined in the credit line authorization and the client resume.  Any variances between these two forms must be immediately reported to Senior Management.

- Loan officers must alert their supervisors (Portfolio Managers) to any deteriorating loan along with recommendations for when such loans should be placed in a non-performing status (*i.e.,* cash basis) or when write-offs or reserves are warranted.

Portfolio Managers should report these loans and recommendations to the Division President, WB Risk Management Officer, or the Chairman of the Senior Credit Committee.

- Credit is extended only to borrowers of good character and for legitimate purposes. Information establishing the character and reputation of prospective borrowers should be confirmed by appropriate investigation early in the due diligence process and prior to submission to the Credit Committee.

**ANSWER:** **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 78, and therefore, denies the same.**

79. The following table lists the Defendants who were responsible for approving the Loss Loans. Loss Loans include original loans, additional credits (increases), and/or extensions of construction loans enabling continued funding. The table also lists the Defendants who were responsible for post-approval administration and funding of the Plaza CCD construction loan line and the Inyx asset based line of credit.

| Loss Transactions | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Loan Approvals and Funding | | | | | | | | | | | |
| Borrower | Loan Amount ($ millions) | Approval Date | Loss ($ millions) | Stipes | Biaggi | Dominguez | Del Rio | Frontera | Ruiz | Tamboer | Vazquez | Vidal | Fuentes | Cortina | Ramirez |
| 1. Sabana | $42.5[i] | Jan. 28, 2004 | $19.3 | x | | x | | | | x | | | | x | |
| Sabana | $4.59[a] | May 8, 2006 | | x | x | x | x | x | | x | | | | x | |
| Sabana | $3.21[a] | May 15, 2007 | | x | | x | x | x | | x | | x | | x | |
| Sabana | $2.9[a] | May 15, 2008 | | x | | x | | | | | | x | | x | |
| 2. Sabana | $8.0 | May 15, 2007 | $8.0 | | | x | x | | | x | | x | | x | |
| 3. Inyx | $36.5[a] | June 15, 2005 | $56.72 | | | | | | | | a f | | a f | | |
| Inyx | $15.0[a] | Jan. 17, 2006 | | | | | | | | | x | | x | | |
| Inyx | $12.5[a] | Sept. 5, 2006 | | | | | | | | | x | | x | | |
| Inyx | $10.0[a] | Nov. 7, 2006 | | | | | | | | | x | | x | | |
| 4. Intercoffee | $106.1[1] | Oct. 28, 2005 | $34.8 | x | x | x | x | x | x | x | x | x | x | | |
| Intercoffee | $13.0[a] | Sept. 5, 2006 | | x | x | | x | x | | x | x | x | x | | |
| Intercoffee | $10.5[a] | Sept. 28, 2007 | | x | | x | x | x | x | | x | | | x | |
| 5. Plaza CCD | $62.25[i] | Apr. 28, 2006 | $37.3 | | | | | | | | | | a f | | |

| Loan | Amount | Date | Loss | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Plaza CCD | $4.91$^e$ | Apr. 24, 2008 | | x | | x | x | x | | x | | x | | x | |
| Plaza CCD | $2.1$^e$ | Sept. 18, 2008 | | | | | x | x | | x | | x | | x | af |
| Plaza CCD | $4.7$^e$ | Dec. 1, 2008 | | x | | x | | | | | x | | | | af |
| Plaza CCD | $1.9$^e$ | Mar. 19, 2009 | | x | | x | x | x | | x | | x | | | af |
| Plaza CCD | $0.2$^e$ | June 9, 2009 | | x | | x | x | x | | x | | x | | | af |
| 6. Museum Towers | $12.0 | Apr. 5, 2006 | $7.6 | x | x | x | | | x | | x | | x | | |
| 7. Yasscar Develop. | $13.6 | May 15, 2007 | $5.8 | x | | x | x | x | x | | x | | x | | |
| 8. Yasscar Caguas | $16.6 | Oct. 10, 2007 | $6.5 | | | x | | x | | x | x | | x | | |
| TOTAL | $383.06 | | $176.02 | | | | | | | | | | | | |

*Key to column 2 of the table: "i" = initial loan; "a" = additional credit; "e" = extension of construction loan enabling continued funding.

*Key to "Loan Approvals and Funding" columns of the table: "x" = approval; "af" = post-approval administration and funding.

**ANSWER:** **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 79 and, therefore, denies the same.**

80. The Loss Loans had key deficiencies in underwriting and/or administration that were readily apparent to the Defendants who approved and/or administered them, including, but not limited to:

A. Sabana ($42.5 million) and increases:

- lack of required pre-sales;

- LTV ratio of 90.5%, in excess of Bank LTV ratio limits;

- grossly inadequate financial analysis of guarantors;

- multiple loan increases (as set forth in the foregoing table), without an updated appraisal, in order to fund interest reserves and cost overruns, delaying losses and default until within one year before the Bank's failure, increasing the losses on the loan.

B. Sabana ($8 million):

- faltering economy;

- secured only by the pledge of speculative future profits from two distressed borrower projects also financed by the Bank;

- no appraisals obtained to support collateral values;

- while the loan was approved for "capital to various construction projects in Puerto Rico," the borrower used $3.5 million of the loan proceeds to purchase an option on property in Tampa, Florida;

- multiple loan renewals and extensions, on May 15, 2008, September 17, 2009, and November 19, 2009,  without obtaining additional collateral or repayment, delaying losses and default on the loan until within one year before the Bank's failure and increasing the losses on the loan.

C.  Inyx and increases:

- Vazquez and Fuentes approved multiple loan increases (as set forth in the foregoing table) and funded over $56 million in loan proceeds despite receipt of multiple reports showing dilution and aging of accounts receivable and other major violations of loan agreements, borrower covenants and bank policy, including ineligible collateral, borrower re-aging of ineligible collateral, cash diversions, a negative borrowing base, and other severe collateral impairment;

- Vazquez unilaterally and without authorization waived key borrower financial covenants requiring borrower working capital, net adjusted equity value, and cash flow ratios, and advanced $21 million over the authorized credit limit;

- Vazquez and Fuentes manipulated Bank loan monitoring systems so as not to reflect continuing deterioration of the collateral, ineligible collateral, and related major violations of borrower covenants and loan agreements;

- Vazquez and Fuentes failed to disclose to the Bank's directors the foregoing severe deficiencies and problems with the loan, the collateral, and the borrower. As a result of these failures to disclose, the Board did not learn of Vazquez's and Fuentes's grossly negligent and reckless mismanagement of the line of credit until after May of 2007.

D.  Intercoffee and increases:

- bad borrower character;

- failure to evaluate borrower creditworthiness and repayment ability;

- multiple loan increases and additional loans (as set forth in the foregoing table) to cover delinquencies and fund interest reserves, despite knowledge of the borrower's inability to service the debt and its diversions of loan proceeds to pay for personal and family expenses, increasing the losses on the loan.  The Board approved the

September 28, 2007 increase in the amount of $10.5 million because it was part of a $92 million credit facility transferred to the Bank's commercial credit department.

E.  Plaza CCD and extensions:

- under Cortina's administration, the Bank disbursed $26.9 million in draws despite borrower defaults on major loan approval terms and Bank policy requirements, including the borrower's failure to provide required ten percent equity contributions, unit pre-sales, construction contracts, bonds, or funding of cost overruns;

- under Ramirez's administration, the Bank disbursed another $10.4 million in draws despite the borrower's failure to cure the foregoing major defaults and policy violations, lack of progress beyond foundation work, and significant unfunded cost overruns;

- the responsible Defendants approved multiple extensions to enable continued funding after expiration of the original loan term (as set forth in the foregoing table), thereby delaying losses and default until within one year before the Bank's failure and increasing the losses on the loan.  They approved the extensions and continued funding despite the borrower's continued failure to cure the major defaults and policy violations, significant unfunded cost overruns, lack of progress in construction, a faltering economy, and other clear indications of the infeasibility of the project.  The responsible Defendants funded $28.7 million of the loan proceeds within three years before the Bank's failure;

- the Bank disbursed over $45.8 million of a $62.25 million credit facility, including $2.4 million in "administration and supervision" fees to the borrower, on a project that is less than one third complete – a shell of rusting beams in downtown San Juan.

F.  Museum Towers:

- the purported "as is" appraisal relied upon an estimated future "as completed" value, in violation of appraisal standards and federal regulations;

- the borrower retained the appraiser, in violation of federal appraiser independence regulations and Bank policy;

- the appraised value of $9.4 million was over twice the acquisition price a year earlier – an obviously unrealistic appreciation;

- the LTV ratios of 96 percent for the term loan and 128 percent for the entire facility both exceeded the Bank's LTV ratio limits;

- repayment was dependent on numerous uncertain future contingencies, including a future take-out construction loan and speculative future zoning changes;

- notwithstanding management's lack of understanding of the Florida real estate market, the Bank failed to obtain a feasibility study of the project;

- the analysis of the repayment ability of the borrower and guarantors was grossly inadequate.  One of the guarantors had placed virtually all of his assets in an asset protection trust; the other guarantors' assets consisted principally of investments in start-up companies or other illiquid interests;

- Tamboer's daughter was a principal of the borrower.  Although she guaranteed the loan, she had virtually no repayment ability;

- Tamboer failed to disclose to the Board his *de facto* 50 percent interest in the borrower and the loan, in violation of federal regulations and Bank policies;

- the other 50 percent interest holder in the borrower, Michael Scarfia, Sr. ("Scarfia"), had loaned substantial sums to Tamboer and had close business relationships with him. Tamboer approved approximately $150 million in other Bank loans to Scarfia-controlled entities, including the Loss Loans to Sabana, Yasscar Development, and Yasscar Caguas, without fully disclosing his dealings with Scarfia.  Scarfia owed $142 million to the Bank at the time of its failure;

- the responsible Defendants repeatedly extended and/or renewed the loan, on June 19, 2008, July 22, 2009, and November 19, 2009, based on a stale appraisal, delaying losses and default on the loan through the Bank's failure and increasing the losses on the loan;

- Tamboer voted to approve the extensions and renewals of the loan notwithstanding his and his daughter's interests in the borrower and the loan;

- the project was never developed.

G.  Yasscar Development:

- the LTV ratio of 103% exceeded the Bank's LTV ratio limits;

- the faulty appraisal assumed that all permits were obtained (when they were not). Permitting for commercial development in Puerto Rico is an uncertain process that may take years;

- financial analysis of the guarantors was grossly inadequate;

- the responsible Defendants renewed the loan on November 19, 2009, based on a stale appraisal in the face of a severe decline in market conditions, delaying losses and default on the loan until within one year before the Bank's failure and increasing the losses on the loan.

H.  Yasscar Caguas:

- the LTV ratio exceeded the Bank's LTV ratio limits;

- the faulty appraisal assumed that all permits were in place (when they were not);

- financial analysis of the guarantors was grossly inadequate;

- the responsible Defendants renewed the loan on November 19, 2009, based on a stale appraisal and despite a severe decline in market conditions, delaying losses and default on the loan until within one year before the Bank's failure and increasing the losses on the loan.

**ANSWER:   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 80 and, therefore, denies the same.**

81.     In approving, increasing, renewing, extending and/or administering and funding the Loss Loans in the face of the foregoing gross and obvious deficiencies, the responsible Defendants were grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason.  The responsible Defendants' gross negligence proximately caused the Bank damages exceeding $176.02 million.

**ANSWER:   Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 81 and, therefore, denies the same.**

TAMBOER'S BREACH OF FIDUCIARY DUTY

82.     As a director, Tamboer owed the Bank fiduciary duties of loyalty, fidelity, and good faith.  These duties included, at a minimum, the duty to safeguard the interests of the Bank, to avoid conflicts of interest, self dealing, or other personal benefit arising from his position as a director, and to fully disclose any and all actual and/or *de facto* interests he may have had in borrowers, projects, and/or loans funded with federally insured dollars.  By failing to disclose his *de facto* 50 percent interest in the Bank's $12 million loan to Museum Towers, and by voting for multiple extensions and/or renewals of the loan for his own and his daughter's benefit, Tamboer breached his fiduciary duties of loyalty, fidelity and good faith owed to Westernbank.

Alternatively, in so acting and failing to act, Tamboer was grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason.  Had Tamboer fully disclosed his interests in the loan, it would not have been approved, funded, renewed or extended.  Hence Tamboer is liable solidarily for all losses suffered by the Bank on the loan.

**ANSWER:**    **Chartis lacks sufficient information and knowledge to either admit or deny the allegations in Paragraph 82 and, therefore, denies the same.**

CLAIMS FOR RELIEF

Count 1 -  Gross Negligence Against All Defendants

83.    FDIC incorporates by reference as though set forth in full the allegations of paragraphs 1 through 82 herein.

**ANSWER:**    **Chartis incorporates its Answers to Paragraphs 1 through 82 as if fully set forth herein.**

84.    By their actions and inactions, as described specifically and generally herein, the officer and director Defendants were grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason.  These acts of gross negligence included:

- pursuing an aggressive and reckless growth and lending strategy that placed short term income and profits ahead of the safety and soundness of the federally insured depositor funds entrusted to the officer and director Defendants;

- permitting the Bank's commercial loan portfolio to deteriorate due to continued approvals, increases, extensions, and renewals of poorly underwritten, high risk commercial loans in violation of Bank policies, procedures, federal regulations, and prudent banking practices, thereby jeopardizing the Bank's financial health and causing it to fail;

- failing to reasonably inform themselves of material information or alternatives or to engage in due analysis or deliberation as to the extreme risks of such strategies, actions, and failures to act;

- as members of the SLC, SCC and/or Board (for loans over $50 million), failing to analyze supporting information so as to ensure that loans complied with the Bank's policies and procedures and prudent banking practices, and failing to otherwise reasonably inform themselves of material information or alternatives, or to engage in due analysis or deliberation as to the extreme risks inherent in those loans;

- approving the Loss Loans in violation of the Bank's policies and procedures, federal safety and soundness regulations, and prudent banking practices;

- approving multiple increases, extensions and/or renewals of delinquent and defaulted Loss Loans in order to fund interest reserves and continue to derive short term income and profits at the expense of the safety and soundness of federally insured depositor funds, delaying losses and defaults and increasing the losses on the loans;

- failing to heed examiner and auditor warnings of deficiencies in lending and loan administration, failing to correct those deficiencies, and approving, increasing, extending, and/or renewing Loss Loans despite those warnings;

- as senior executive officers, failing to ensure that lending and administration within each officer's respective area of responsibility complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices;

- as senior asset based lending officers, administering and funding asset based loans despite receipt of reports showing borrower defaults on key loan approval terms and severe collateral impairment; unilateral and unauthorized waiver of key borrower financial covenants designed to protect the Bank; manipulation of Bank loan monitoring systems so as not to reflect continuing deterioration of collateral, ineligible collateral, and violations of covenants and loan agreements; and advancing sums above authorized credit limits;

- as senior construction officers, administering and funding construction loans despite borrower defaults on key loan approval terms and Bank policy requirements, significant cost overruns, lack of progress in construction, and other clear indications of the infeasibility of the project;

- other acts and omissions to be discovered through pretrial discovery and at trial.

**ANSWER:**   **Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis even though this Count is captioned as being against "all defendants."   To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

36

85.    The officer and director Defendants' grossly negligent acts and omissions proximately caused at least $176.02 million in damages to Westernbank, or such other amount as may be proven at trial.

**ANSWER:    Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis even though this Count is captioned as being against "all defendants."   To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

86.    The officer and director Defendants are liable, solidarily, for all damages proximately caused by their grossly negligent acts and omissions.

**ANSWER:    Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis even though this Count is captioned as being against "all defendants."   To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

<u>Count 2 – Breach of Fiduciary Duty Against Tamboer</u>

87.    Tamboer breached his fiduciary duties of loyalty, fidelity, and good faith owed to Westernbank by:

- failing to safeguard the interests of the Bank;

- placing his personal interests ahead of the Bank's interests;

- failing to avoid conflicts of interest, self dealing, or other personal benefit arising from his position as a director;

- failing to disclose his *de facto* 50 percent interest in the Bank's $12 million loan to Museum Towers;

- voting for multiple extensions and/or renewals of the loan for his own and his daughter's benefit;

- other acts and omissions to be discovered through pretrial discovery and at trial.

37

Alternatively, Tamboer was grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason.

**ANSWER:   Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis.  To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

88.     Had Tamboer fully disclosed his interests in the Museum Towers loan, it would not have been approved, funded, renewed, and/or extended.  Hence, in addition to the other losses for which he is proximately liable, Tamboer is liable solidarily for all losses suffered by the Bank on the Museum Towers loan.

**ANSWER:   Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis.  To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

Count 3 – Adverse Domination

89.     FDIC incorporates by reference as though set forth in full the allegations of paragraphs 1 through 88 herein.

**ANSWER:    Chartis incorporates its Answers to Paragraphs 1 through 88 as if fully set forth herein.**

90.     The officer and director Defendants adversely controlled and dominated Westernbank at all times relevant to this action, thereby preventing the Bank from taking legal action against the Defendants prior to the failure of the Bank and appointment of FDIC as Receiver.   Alternatively, the repeated increases, renewals, extensions, administration, and funding of Loss Loans constituted continuing, separate and distinct tortious acts causing

additional damages.  Those repeated acts delayed losses and defaults on the loans until within one year before the Bank's failure, preventing the commencement or running of applicable statutes of limitation, if any.

**ANSWER:   Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis.  To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

<u>Count 4 - Fraudulent Conveyance Claim Against Stipes</u>

91.   On or about September 15, 2010, over four months after FDIC was appointed Receiver of Westernbank, Stipes transferred approximately $7.44 million in assets to the "Socio Cultural Conservation Trust," a family trust which he settled and controls and of which he is the primary beneficiary.  Defendant Luis Bartoleme Rivera Cuebas, in his capacity as Trustee of the Socio Cultural Conservation Trust, is the Trustee of this family trust.   There was no consideration for the transfers.

**ANSWER:   Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis.  To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

92.   At the time of the asset transfers, Stipes knew of his liabilities to FDIC arising from his grossly negligent acts as a former officer and director of Westernbank, and of his liabilities to other creditors.  At the time of the transfers, Stipes was a debtor of FDIC and other creditors and was insolvent in that he lacked assets sufficient to pay FDIC's claims against him. Stipes made the transfers in fraud of FDIC.  Stipes knew or should have known that the transfers would make it impossible for FDIC to enforce and recover on its claims against him.  FDIC has been injured by the transfers because they are designed so as to hinder and prevent FDIC from

recovering on its claims against Stipes.  FDIC has no other remedy to recover on its claims against Stipes.  The transfers also constitute contracts in prejudice of FDIC's rights and claims. FDIC therefore is entitled to judgment invalidating, voiding and rescinding the transfers under both Puerto Rico and federal law.

**ANSWER:**    **Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis. To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

93.    Alternatively, FDIC is entitled to judgment annulling the trust established by Stipes because it was established in fraud of FDIC.  In the further alternative, FDIC is entitled to judgment establishing a constructive trust over the assets of Stipes, including the assets which he fraudulently conveyed to the family trust.

**ANSWER:**    **Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis.  To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

Count 5 - Fraudulent Conveyance Claim Against Tamboer

94.    On or about December 1, 2010, over seven months after FDIC was appointed Receiver of Westernbank, Tamboer transferred approximately $3.55 million in assets to the "CT Family Trust."  Defendant Jane Doe, in her capacity as Trustee of the  CT Family Trust, is the Trustee of this trust.  There was no consideration for the transfers.

**ANSWER:**    **Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis.  To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

95.     At the time of the asset transfers, Tamboer knew of his liabilities to FDIC arising from his grossly negligent acts and breach of fiduciary duty as a former director of Westernbank, and of his liabilities to other creditors.   At the time of the transfers, Tamboer was a debtor of FDIC and other creditors and was insolvent in that he lacked assets sufficient to pay FDIC's claims against him.   Tamboer made the transfers in fraud of FDIC.   Tamboer knew or should have known that the transfers would make it impossible for FDIC to enforce and recover on its claims against him.   FDIC has been injured by the transfers because they are designed so as to hinder and prevent FDIC from recovering on its claims against Tamboer.   FDIC has no other remedy to recover on its claims against Tamboer.   The transfers also constitute contracts in prejudice of FDIC's rights and claims.   FDIC therefore is entitled to judgment invalidating, voiding and rescinding the transfers under both Puerto Rico and federal law.

**ANSWER:**     **Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis.  To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

96.     Alternatively, FDIC is entitled to judgment annulling the trust.   In the further alternative, FDIC is entitled to judgment establishing a constructive trust over the assets of Tamboer, including the assets which he fraudulently conveyed to the family trust.

**ANSWER:**     **Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis.  To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

Count 6 - Fraudulent Conveyance Claim Against Dominguez

97.     On or about December 28, 2010, over seven months after FDIC was appointed Receiver of Westernbank, Dominguez transferred approximately $745,000 in assets to the

"Dominguez Sotomayor Family Trust."  Defendant John Doe, in his capacity as Trustee of the Dominguez Sotomayor Family Trust, is the Trustee of this trust.  There was no consideration for the transfers.

**ANSWER:**   **Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis.  To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

98.     At the time of the asset transfers, Dominguez knew of his liabilities to FDIC arising from his grossly negligent acts as a former officer and director of Westernbank, and of his liabilities to other creditors.  At the time of the transfers, Dominguez was a debtor of FDIC and other creditors and was insolvent in that he lacked assets sufficient to pay FDIC's claims against him.  Dominguez made the transfers in fraud of FDIC.  Dominguez knew or should have known that the transfers would make it impossible for FDIC to enforce and recover on its claims against him.  FDIC has been injured by the transfers because they are designed so as to hinder and prevent FDIC from recovering on its claims against Dominguez.  FDIC has no other remedy to recover on its claims against Dominguez.  The transfers also constitute contracts in prejudice of FDIC's rights and claims.  FDIC therefore is entitled to judgment invalidating, voiding and rescinding the transfers under both Puerto Rico and federal law.

**ANSWER:**   **Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis.  To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

99.     Alternatively, FDIC is entitled to judgment annulling the trust.  In the further alternative, FDIC is entitled to judgment establishing a constructive trust over the assets of Dominguez, including the assets which he fraudulently conveyed to the family trust.

**ANSWER:**   **Chartis makes no Answer the allegations contained in this Paragraph as said allegations are not directed to Chartis.  To the extent that any allegations in this Paragraph are directed at Chartis, those allegations are specifically denied.**

Count 7 – Direct Action Claims Against Insurance Carriers

100.    Defendants Chartis, XL, Liberty and ACE issued policies of insurance covering the individual officer and director Defendants for their liabilities to the Receiver.  FDIC and the Defendants timely reported claims to these carriers within the claim reporting periods under the policies.  Pursuant to the Puerto Rico Direct Action Statute, FDIC is entitled to judgment against Chartis, XL, Liberty and ACE in the full amount of the policies.

**ANSWER:**   **Chartis admits that it issued policies of insurance to W Holding Company, Inc. which, subject to its terms, conditions, exclusions and/or endorsements, provides coverage to the officer and director defendants, but denies that said policies covered their liabilities to the Receiver.  Chartis denies the remaining allegations contained in Paragraph 100.**

WHEREFORE, Defendant Chartis prays that FDIC's Intervening Complaint be dismissed, with prejudice, and that judgment be entered in its favor and against Intervening Plaintiff, including the award of costs wrongfully incurred in the defense of this matter.

**AFFIRMATIVE DEFENSES**

NOW COMES the Defendant Chartis and for its Affirmative Defenses to the FDIC's Intervening Complaint, states as follows:

**Affirmative Defense No. 1**

1.      Chartis issued an Executive Liability and Organization Reimbursement Insurance Policy, Policy No. 024-001001291 to W Holding effective from December 31, 2009 to December 31, 2010 (the "2009-10 Policy").

2.      On or about December 30, 2011, the FDIC filed its Intervening Complaint – which was almost a year after the Chartis 2009-10 Policy Period expired.  The allegations set forth in the FDIC's Intervening Complaint are alleging, arising out of, based upon or attributable facts alleged in certain previously filed lawsuits, including (1) *Samuel Hildenbrand v. W Holding Company, Inc., et al.*, case no. 07-1886, filed before the United States District Court, District of Puerto Rico; (2) *Josefina Saavedra v. W Holding Company, Inc., et al.,* case no. 07-1931, filed before the United States District Court, District of Puerto Rico; (3) *Hunter Wylie v. Frank C. Stipes, et al.,* case no. 08-1036, filed before the United States District Court, District of Puerto Rico; and (4) *Jack Kachkar, et al v. Westernbank Puerto Rico*, case no. 08-2427, removed from Florida state court to the United States District Court, District of Puerto Rico (collectively hereinafter, the "Prior Lawsuits").  The Prior Lawsuits were filed and notified under a prior Executive Liability and Organization Reimbursement Insurance Policy issued by Chartis to W Holding for the Policy Period of November 15, 2006 to November 15, 2007 (the "2006-07 Policy").

3.      Section 7(b) of the 2006-07 Policy provides, "If written notice of a Claim has been given to the Insurer pursuant to Clause 7(a) above, then a Claim which is subsequently made against an Insured and reported to the Insurer, alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same or related to any Wrongful Act alleged in the Claim of

which such notice has been given, shall be considered related to the first Claim and made at the time such notice was given."

4.      Section 5 (the Limit of Liability) of the 2006-07 Policy provides that "a Claim which is made subsequent to the Policy Period...and which, pursuant to Clause 7(b) or 7(c), is considered made during the Policy Period...shall also be subject to the one aggregate Limit of Liability stated in Item 3 of the Declarations."

5.      As a result of Section 7(b) and Section 5, the FDIC's Intervening Complaint is "alleging, arising out of, based upon or attributable to the facts alleged in" the Prior Lawsuits, "or alleging any Wrongful Act which is the same or related to any Wrongful Act alleged in" the Prior Lawsuits, whereby the FDIC's Intervening Complaint shall be considered related to the Prior Lawsuits and made during the 2006-07 Policy and, therefore, shall be subject to one aggregate Limit of Liability under the 2006-07 Policy.

**Affirmative Defense No. 2**

1.      Section 4(i) of the 2006-07 Policy and the 2009-10 Policy contain the following Exclusion: "The insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured: which is brought by, on behalf of or in the right of, an Organization…".  This exclusion is referred to as the "Insured v. Insured Exclusion."

2.      As a Receiver of Westernbank, the FDIC's claims against the directors and officers of Westernbank are "on behalf of" or "in the right of" Westernbank.

3.      Accordingly, the Insured v. Insured Exclusion in the 2006-07 or, alternatively, in the 2009-10 Policy bars the coverage sought by the FDIC in the Intervening Complaint.

**Affirmative Defense No. 3**

1.      By Endorsement, the 2006-07 Policy and the 2009-10 Policy excludes any claim alleging, arising out of, etc., Westernbank or its directors, officers and employees' "performance of professional services for others for a fee…".  This exclusion is referred to as the "Professional Services Exclusion."

2.      The directors, officers and employees of Westernbank provided loans to third parties for which Westernbank received fees.  The directors, officers and employees responsible for generating and administering these loans disregarded Westernbank's policies and procedures by approving the loans without adequate information and, therefore, violated Westernbank's policies and procedures.

3.      Accordingly, the Professional Services Exclusion of the 2006-07 Policy or, alternatively, the 2009-10 Policy bars the coverage sought by the FDIC in the Intervening Complaint.

## Affirmative Defense No. 4

1.      By Endorsement, the 2006-07 Policy and the 2009-10 Policy specifically provides that Chartis "shall not be liable to make any payment for loss in connection with any 'claim(s)', notices, events, proceedings, investigations, or actions:  (1) arising from, in whole or in part, any of items (1) to (5) below (collectively, the 'Listed Items'); or (2) alleging in whole or in part any 'wrongful act', underlying facts, circumstances, acts or omissions in any way relating to any Listed Item(s), including, but not limited to any 'securities claim(s)' which is brought by, or on behalf of any individual(s)/entity(ies) that purchased securities of W Holdings:…LISTED ITEMS…(2)…Corporate Loan Obligations including their valuation…" and including "any claim alleging, arising out of, based upon, attributable to or in any way related directly or indirectly, in part or in whole, to any disclosure, restatement, retraction, amendment or revision

of in part or in whole in:…(i) any document or statement filed or submitted or required to be filed with or submitted to the SEC or any other similar federal, state or local agency (including but not limited to any 10K's, 10Q's, 20F's or similar annual or quarterly reports); or (ii) any written or oral statement made regarding the assets, revenues, sales or financial condition of the Organization, resulting from, arising out, based upon or attributable to any Listed Item…"  This Exclusion is referred to as the "Specific Matters Exclusion."

2.     The allegations set forth in the FDIC's Intervening Complaint relate to Westernbank's loan obligations and their valuation.

3.     Accordingly, the Specific Matters Exclusion of the 2006-07 Policy or alternatively, the 2009-10 Policy bars the coverage sought by the FDIC in the Intervening Complaint.

**Affirmative Defense No. 5**

1.     Pursuant to the 2006-07 Policy and the 2009-10 Policy, W. Holding and its directors and officers were required to submit an application for insurance (the "Application"). Specifically, Question 9.(a) of the Application states: "No Director or Officer has knowledge or information of any act, error or omission which might give rise to a claim under the proposed policy except as follows:"  The Insured responded "None" to Question 9.(a).

2.     The Application further states: "It is agreed that with respect to Questions 9 and 10 above, that if such knowledge, information or involvement exists, any claim or action arising therefrom is excluded from the proposed coverage."  This Exclusion is referred to as the "Known Claim Exclusion."

3.     The FDIC's Intervening Complaint alleges misconduct by the directors, officers and employees of Westernbank that occurred well before the inception of the 2006-07 Policy

inception date of November 15, 2006, including but not limited to wrongful extension of loans, ignoring FDIC's warnings and reports, and loans that were improper when made.

4.     In the alternative, the FDIC's Intervening Complaint alleges misconduct by the directors, officers and employees of Westernbank that occurred well before the inception of the 2009-10 Policy inception date of December 31, 2009, including but not limited to wrongful extension of loans, ignoring FDIC's warnings and reports, and loans that were improper when made.

5.     Accordingly, the Known Claim Exclusion in the 2006-07 Policy or, alternatively, in the 2009-10 Policy bars the coverage sought by the FDIC in the Intervening Complaint.

**Affirmative Defense No. 6**

1.     On December 17, 2010, the FDIC's counsel sent a letter to the directors and officers of Westernbank, Chartis, and others (the "FDIC Letter").  Chartis acknowledged the FDIC Letter as a "Claim" under the 2006-07 Policy (*see*, Affirmative Defense No. 1).

2.     On or about December 30, 2011, the FDIC filed its Intervening Complaint – which was almost a year after the Chartis 2009-10 Policy Period expired.  Thereafter, the FDIC filed an Amended Complaint which, for the first time, included allegations of fraudulent transfers by the director and officer defendants.  These Wrongful Acts first alleged more than 16 months after the expiration of the 2009-10 Policy are not "related back" to the FDIC Letter and, therefore, are not covered under the Chartis Policies.

**Affirmative Defense No. 7**

The Chartis Policies contain a retention that must be satisfied before the policy is implicated, including $1,000,000 under the 2006-07 Policy and alternatively, $500,000 under the 2009-10 Policy.

**Affirmative Defense No. 8**

The Chartis Policies expressly exclude coverage for any Claim against an Insured arising out of or resulting, directly or indirectly: (1) from any gaining of any profit or advantage to which they were not entitled; (2) any payments to an Insured Person or any remuneration without the previous approval of the stockholders or members of the Organization; (3) any criminal or fraudulent act, error or omission, or any intentional or knowing violation of the law by the Insured Person.

**Affirmative Defense No. 9**

The Chartis Policies exclude coverage for any Claim against an Insured alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained in any Claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time.

**Affirmative Defense No. 10**

The Chartis Policies' definition of "Loss" does not include the Defense Costs, settlements or judgments being sought in the FDIC Lawsuit including, but not limited to, the causes of action for fraudulent conveyances, disgorgement, restitution, or any matters uninsurable under the law.

**Affirmative Defense No. 11**

The Chartis Policies' definition of "Insured" and/or "Wrongful Act" does not include the Defense Costs, settlements or judgments being sought in the FDIC Lawsuit including, but not limited to, the causes of action for fraudulent conveyances when said director or officer is not acting in their capacity as director, officer, or employee.

**Affirmative Defense No. 12**

The Chartis Policies do not provide coverage for any Loss to the lawful spouse or other legally recognized domestic partner if the Claim is for any actual or alleged act, error or omission of such spouse or domestic partner.

**Affirmative Defense No. 13**

The Chartis Policies' definition of "Insured" does not include the trustees of any family trust of the directors, officers, or employees.

**Affirmative Defense No. 14**

The Chartis Policies only provide coverage for a "Claim first made" during the Policy Period.  The Intervening Complaint filed by the FDIC is not a "Claim first made" during the 2007-08 Policy, the 2008-09 Policy, nor the 2009-10 Policy.

**Affirmative Defense No. 15**

The Limit of Liability under the 2006-07 Policy is $20 million.  To date, Chartis has paid or is obligated to pay millions in Defense Costs related to the *Hildenbrand* Lawsuit and the Intervening Complaint.  To the extent any further Defense Costs, settlements and/or judgments are paid related to the *Hildenbrand* Lawsuit and/or the Intervening Complaint, the Chartis 2006-07 Limit of Liability could be exhausted – under which circumstances Chartis would have no further liability under the 2006-07 Policy for either the *Hildenbrand* Lawsuit and/or the Intervening Complaint, or any other Claims under said policy.

**Affirmative Defense No. 16**

Pending final resolution of the Intervening Complaint and discovery related to the same, Chartis expressly reserves (and does not waive) any and all of its rights, remedies and defenses at law, in equity and under the policies including, but not limited to, the right to raise any of the terms, conditions, exclusions and/or endorsements to the policies as warranted.

WHEREFORE, the Defendant Chartis respectfully requests the FDIC's Intervening Complaint be dismissed with prejudice; a Declaration that FDIC, is not entitled to insurance overage under the Chartis Policies; that Chartis is entitled to all costs associated with defending this matter; and for any other relief that this Court deems just and appropriate.

RESPECTFULLY SUBMITTED,

**For Chartis Insurance Company**
**of Puerto Rico**

/s/ Fernando Sabater-Clavell
**Fernando Sabater-Clavell, Esq.**

/s/ Luis N. Saldaña
**Luis N. Saldaña, Esq.**

**Saldaña, Carvajal & Vélez-Rivé, P.S.C**.
166 Constitución Avenue
San Juan, P.R. 00901
Tel. 787-289-9250 / Fax 787-289-9253

**James K. Thurston, Esq.**
**Anjali Das, Esq.**
**Wilson Elser Moskowitz Edelman &**
**Dicker LLP**
55 W. Monroe Street, Suite 3800
Chicago, IL. 60603
Tel. 312-821-6125 / Fax 312-704-0550
E-mail: james.thurston@wilsonelser.com
E-mail: anjali.das@wilsonelser.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 7th, 2012, I electronically filed the foregoing with the Clerk of the U.S. District Court for the District of Puerto Rico using the CM/ECF system which will send notification of such filing to all counsel and parties of record**.**