## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

FEDERAL DEPOSIT INSURANCE
CORPORATION, AS RECEIVER OF
WESTERNBANK PUERTO RICO,

    plaintiff intervenor,

v.

FRANK C. STIPES, et al.,

CIVIL ACTION NO. 11-02271 (GAG)

RE: DECLARATORY JUDGMENT

### NOTICE OF SUBPOENA

    **YOU ARE HEREBY NOTIFIED** that under Federal Rule of Civil Procedure 45, the D&Os[1], intend to serve on the third party listed below the subpoena attached here. The D&Os intend to serve this subpoena on April 5, 2013, or as soon thereafter as service may be effectuated.

    1.    **Popular, Inc.**
        **c/o Lcdo. Ignacio Alvarez, as Registered Agent**
        **Ave. Munoz Rivera #209**
        **San Juan, Puerto Rico 00918**

### CERTIFICATE OF SERVICE

    I CERTIFY that a copy of this notice, the subpoena, and the subpoena's exhibits were served by email on April 5, 2013 to:

**James A. Brown, Esq.**
**LISKOW & LEWIS, PLC**
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139
Tel:  (504) 581-7979
Fax: (504) 556-4108
Email: jabrown@liskow.com
Email: gdenegre@liskow.com

**Manuel Fernández-Bared, Esq.**
**TORO, COLON, MULLET, RIVERA &**
**SIFRE, PSC**
Post Office Box 195383
San Juan, Puerto Rico  00919-5383
Tel:  (787) 751-8999
Fax: (787) 763-7760
E-mail: mfb@tcmrslaw.com
E-mail: jvankirk@tcmrslaw.com

---

[1] The D&Os, for purposes of this document request, include Frank C. Stipes García, Juan C. Frontera García, Héctor Del Río Torres, William Vidal Carvajal, César Ruiz, and Pedro R. Dominguez Zayas. By submitting this request the D&Os are not agreeing to submit joint requests in the future and expressly reserve the right, and fully intend, to submit separate or individual requests on issues relevant to individual defendants' defenses.

**Norman Moscowitz, Esq.**
**MOSCOWITZ & MOSCOWITZ, P.A.**
1111 Brickell Avenue, Ste. 2050
Miami, Florida 33131
Telephone: (305) 379-8300
Facsimile: (305) 379-4404
Email: nmoscowitz@moscowitz.com
         jmoscowitz@moscowitz.com

**Antonio J. Amadeo-Murga, Esq.**
Midtown Building
420 Ponce de León Ave., Suite 910
San Juan, PR 00918
Tel: (787) 765-2731
Fax: (787) 641-1845

**Robert Busó-Aboy, Esq.**
BUFETE BUSÓ ABOY
268 Ponce de León, suite 1100
Hato Rey Center
San Juan, Puerto Rico 00918-2007
Tel. (787)250-7171
Fax (787)758-2448
E-mail: busoaboy@gmail.com

**Enrique Peral, Esq.**
ENRIQUE PERAL LAW OFFICES,
P.S.C.
340 Felisa Rincon Ave., Apdo. 2508
San Juan PR 00926-6641
Tel. (787) 360-6035/600-6435
Fax (787) 919-7319
*eperal@peral-law.com*
*legalassistant@peral-law.com*

**James K. Thurston, Esq.**
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
55 W. Monroe Street, Suite 3800
Chicago, IL. 60603
Tel. 312-821-6125 / Fax 312-704-0550
E-mail: james.thurston@wilsonelser.com

**Raúl González-Toro, Esq.**
**RAUL GONZALEZ TORO**
**LAW OFFICES, L.L.C.**
Banco Popular Center Bldg.
208 Ponce de León Ave., Suite 1028
San Juan, PR 00918
PO Box 270343
San Juan, PR 00927-0343
Telephone: (787) 753-6090
Fax: (787) 294-5759
Email: rgtlaw@ymail.com
         rgonzaleztoro@yahoo.com

**Gary H. Montilla-Brogan, Esq.**
P.O. Box 70171, PMG 103
San Juan, Puerto Rico 00936
Tel. (787) 617-0423
Facsimile: (787) 753-4019
Email: gmontillabrogan@sprynet.com

**Robert Long, Esq.**
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309-3424
Tel. (404) 881-7000
Fax (404) 881-7777
*robert.long@alston.com*

**Rubén T. Nigaglioni, Esq.**
Nigaglioni Law Offices, P.S.C.
P.O. Box 9023865
San Juan, Puerto Rico 00902-3865
Tel.: 787.765.9966
Fax: 787.751.2520
E-mail: rtn@nigaglionilaw.com

**Luis N. Saldaña, Esq.**
SALDAÑA, CARVAJAL & VÉLEZ-
RIVÉ, P.S.C.
166 Constitución Avenue
San Juan, P.R. 00901
Tel: 787-289-9250
Fax: 787-289-9253

E-mail: craig.derrig@wilsonelser.com
E-mail: anjali.das@wilsonelser.com

**Robin Henry, Esq.**
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10576
Tel. 914-749-8200
Fax 914-749-8300
E-mail: rhenry@bsfllp.com
E-mail: jwilson@bsfllp.com

**Michael Goodstein, Esq.**
BAILEY CAVALIERI LLC
10 W. Broad Street, Ste. 2100
Columbus, Ohio 43215-3422
Tel. 614-221-3155
Fax 614-221-0479
E-mail:
michael.goodstein@baileycavalieri.com
E-mail:
kathy.bowman@baileycavalieri.com

**Heidi L. Rodriguez, Esq.**
PIETRANTONI MÉNDEZ &
ALVAREZ LLC
Popular Center 19th Floor
208 Ponce de León Ave.
San Juan, PR 00918
Tel. 787-274-4926
Fax 787-274-1470

**Francisco E. Colón-Ramírez, Esq.**
COLÓN & COLÓN, P.S.C.
PO Box 9023355
San Juan, PR 00902-3355
173 O'Neill Street
San Juan, PR 00918-2404
Tel. 787-758-6060 (ex. 222)
Fax 787-753-1656
E-mail: fecolon@colonlaw.com

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Puerto Rico ▼

| | | |
|---|---|---|
| Federal Deposit Insurance Corporation, | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   11-cv-2271 |
| Frank C. Stipes, et al., | ) | |
| *Defendant* | ) | (If the action is pending in another district, state where: |
| | ) | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Popular, Inc., c/o Lcdo. Ignacio Alvarez, as Registered Agent, Ave. Munoz Rivera, #209, San Juan, Puerto Rico 00918

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

     See attached "Schedule A"

| Place: RAUL GONZALEZ TORO LAW OFFICES, L.L.C. Banco Popular Center Bldg., 208 Ponce de Leon Ave., Suite 1208, San Juan, Puerto Rico 00918 | Date and Time: 04/25/2013 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:    04/05/2013

        *CLERK OF COURT*
                           OR

                                         /s/ Andres Rivero

             *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    Frank C. Stipes, Juan Frontera, Hector del Rio, William Vidal, Cesar Ruiz, Pedro Dominguez    , who issues or requests this subpoena, are: Andres Rivero, Esq., Rivero Mestre LLP, 2525 Ponce de Leon Blvd., Suite 1000, Miami, Florida 33134 Tel.: 305-445.2500

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## SCHEDULE A

### I.  DEFINITIONS

As used in this Subpoena, the following terms and words have the following meanings:

A.  "Agent" shall mean any agent, employee, officer, director, attorney, independent contractor, or any other person acting at the direction of, or on behalf of, another.

B.  "And/or" shall be both conjunctive and disjunctive; and the term "including" means "including without limitation."

C.  "Any" shall include the word "all"; the term "all" shall include the word "any."

D.  "Banco Popular" shall mean Banco Popular de Puerto Rico, any partner, subsidiary, affiliate, officer, director, shareholder, employee, agent, representative or attorney for Banco Popular, and any other person or entity acting for or on behalf of Banco Popular, or under the authority or control of Banco Popular.

E.  "Board" shall refer to the Westernbank board of directors, and to any and all of the acting members of the board of directors at a given moment.

F.  "Board of Governors" shall refer to the Board of Governors of the Federal Reserve System any partner, subsidiary, affiliate, officer, director, shareholder, employee, agent, representative or attorney for the Board of Governors, and any other person or entity acting for or on behalf of the Board of Governors, or under the authority or control of the Board of Governors.

G.   "Communications" shall mean any oral, written, or electronic transmission of information, including but not limited to letters or correspondence, conversations, meetings, discussions, telephone calls, telegrams, telecopies, telexes, seminars, conferences, messages, facsimile transmissions, e-mails, notes or memoranda.

H.   "Complaint" means the most recent complaint filed in this lawsuit (*See* Exhibit A).

I.   "Control" means in your possession, custody or control or under your direction, and includes the possession, custody or control of those under the direction of you or your employees, subordinates, counsel, accountants, consultants, experts, parents or affiliated corporations, and any person(s) purporting to act on your behalf.

J.   "D&Os," for purposes of this document request, include Frank C. Stipes García, Juan C. Frontera García, Héctor Del Río Torres, William Vidal Carvajal, César Ruiz, Pedro R. Domínguez Zayas, Ricardo Cortina Cruz, and Julia Fuentes del Collado. By submitting this request the D&Os are not agreeing to submit joint requests in the future and expressly reserve the right, and fully intend, to submit separate or individual requests on issues relevant to individual defendants' defenses.

K.   "Date" shall mean the exact day, month, and year, if ascertainable, or, if not, the best approximation of the date (based upon the relationship with other events).

L.   "Document" refers to and includes any item within the scope of Federal Rule of Civil Procedure 34, including, without limitation, any written or graphic matter or other means of preserving thought or expression, and all tangible things from which information can be processed or transcribed, including the originals and all non-identical

copies, whether different from the original by reason of any notation made on such copy or otherwise.

M.    "Defendants" or "Defendant" shall mean all of the defendants named in the above-captioned matter.

N.    "ESI" means "electronically stored information" and associated metadata.

O.    "FDIC" or "Plaintiff" means the Federal Deposit Insurance Corporation, in all capacities, including FDIC-Corporate and FDIC-Receiver, all affiliated entities, persons and employees, and all persons acting or purporting to act for, on behalf of, in concert with, or who are subject to the direction and control of, the FDIC, including but not limited to any and all of its present and former agents, officers, employees, regulators, examiners, representatives, attorneys, predecessors, successors and assigns.

P.    "Identify," when used in reference to a document shall mean to state the name and address of the custodian of the document, the location of the document, and a general description of the document, including:

1.    the type of document (that is, correspondence, memorandum, telex, etc.);

2.    the general subject matter of the document;

3.    the date of the document;

4.    the author of the document;

5.    the addressee of the document; and

6.    the relationship between the author and the addressee.

Q.    "Identify," when used in reference to a person who is a natural person shall mean to state his or her full name, present or last known residence address, all

telephone numbers, including business, home, and cellular, present or last known business address, and present or last known work position, title, job description, and business affiliation.

R.    "Identify," when used in reference to a person that is a business, juridical or governmental entity or association, shall mean to state the full name and present or last known address and telephone number, the legal form of such entity or organization, and the identity of the entity's officers.

S.    "Inyx" means Inyx, Inc., any partner, parent, subsidiary, affiliate, officer, director, shareholder, employee, agent, attorney or representative of Inyx, and any other person or entity acting for or on behalf of Inyx, or under the authority or control of Inyx.

T.    "Lawsuit" means this action.

U.    "Loans" shall mean the so-called "Loss Loans" defined at paragraph 77-78 of the Complaint.

V.    "OCFI" means the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico.

W.    "Person" shall mean a natural person acting as an individual, a group of individuals acting in a collegial, business or group capacity (e.g., as a board of directors or committee), a business, corporation, proprietorship, partnership, trust, association, or any governmental, juridical or other entity.

X.    "Popular" shall mean Popular, Inc., any partner, subsidiary (including Banco Popular), affiliate, officer, director, shareholder, employee, agent, representative or attorney for Popular, and any other person or entity acting for or on behalf of Popular, or under the authority or control of Popular.

4

Y.      "Purchase and Assumption Agreement" shall mean the Purchase and Assumption Agreement, Whole Bank, All Deposits, Among the Federal Deposit Insurance Corporation, Receiver of Westernbank Puerto Rico, Mayaguez, Puerto Rico, the Federal Deposit Insurance Corporation, and Banco Popular de Puerto Rico, dated April 30, 2010, effective May 1, 2010.

Z.      "Relating to" and "relate to" shall mean directly or indirectly referring to, evidencing, discussing, defining, mentioning, reflecting, regarding, pertaining to, consisting of, concerning, recording, evaluating, or in any way logically or factually connected with the matter discussed or to which reference is made.

AA.     "Resolution Process" shall mean any process, procedure, or activity described in the Federal Deposit Insurance Corporation Resolutions Handbook. A copy of the "Table of Contents" and "Overview" sections of the FDIC Resolutions Handbook are attached hereto as **Exhibit B**).[1]

BB.     "You" or "Your" means Popular and any affiliated persons, employees, and all persons acting or purporting to act for, on behalf of, in concert with, or who are subject to the direction and control of Popular, including but not limited to any and all of its present and former agents, officers, employees, regulators, examiners, representatives, attorneys, predecessors, successors and assigns.

CC.     "Westernbank" or the "Bank" means Westernbank Puerto Rico, any partner, subsidiary, affiliate, officer, director, shareholder, employee, agent, representative or attorney for Westernbank, and any other person or entity acting for or on behalf of Westernbank, or under the authority or control of Westernbank.

---

[1] The FDIC Resolutions Handbook can be accessed at http://www.fdic.gov/bank/historical/reshandbook/ (Last visited March 12, 2013).

DD.     "SLC" shall mean the Bank's Senior Loan Committee.

EE.     "SCC" shall mean the Bank's Senior Credit Committee.

FF.     "W Holding" means defendant W Holding Company, Inc., any partner, subsidiary (including defendant Westernbank Puerto Rico), affiliate, officer, director, shareholder, employee, agent, representative or attorney for W Holding, and any other person or entity acting for or on behalf of W Holding, or under the authority or control of W Holding.

GG.     Wherever necessary to ensure the completeness or accuracy of these document requests, the singular shall include the plural and the plural shall include the singular.

## II.     RELEVANT TIME PERIOD

Unless otherwise specified in a particular request, the relevant time period for this subpoena shall begin on January 1, 2007 and continue to the present.

## III.     INSTRUCTIONS

1.      The documents that are the subject of this subpoena are to be produced as follows: (1) in the exact order in which they are kept in the ordinary course of business; or (2) classified according to the specific request(s) to which they are responsive.

2.      To the extent that you do not have possession, custody, or control of any documents identified as responsive to a particular request herein, please indicate the lack of possession, custody, existence, or control of the responsive documents in your response.

6

3.   All electronic documents and e-mail are requested to be produced in electronic format by a forensically sound method, with all original metadata preserved and intact.

4.   ESI should be produced as follows:

a.   Email, instant messaging, calendar, contacts, and word processing files must be derived from the original electronic media and converted to single-page .tiff images with accompanying system metadata (e.g., author, recipient(s), "cc" recipient(s), "bcc" recipient(s), date and time of creation and receipt, date and time of modification, etc.) and substantive metadata (e.g., the substance of the changes, etc.), with all attachments. All chronological metadata shall be standardized to Eastern Standard Time. The D&Os reserve the right to request native format production for ESI. Upon such request, you shall produce specific documents (identified by Bates number or range) in original native electronic format.

b.   Dynamic files (e.g. databases, spreadsheets, project files, etc.) shall be produced in original native format with all accompanying metadata, along with all such software necessary to interpret the produced information if such software is not readily commercially available.

c.   For all ESI not specified above, production shall be made in native format with all accompanying metadata, along with all software necessary to interpret the produced information if such software is

7

not readily commercially available, unless the D&Os specifically agree to a different form of production.

5.    If any document requested here was previously in your possession, custody, or control but is no longer, state the following for each document in your response to this subpoena:

      a.    the type of document (that is, correspondence, memorandum, e-mail, etc.);

      b.    the date of the document;

      c.    any person(s) who signed the document;

      d.    any person(s) who received the document or a copy of it;

      e.    any person(s) now in possession of the document;

      f.    the substance of the document; and

      g.    the disposition of the document, including the date of disposition.

6.    This subpoena does not seek the production of documents protected by the attorney-client privilege or work-product rule. However, if you withhold production of a document responsive to any request on grounds of privilege, work product or any other basis, please state the following in a privilege log for each document withheld:

      a.    the type of document (e.g., correspondence, memorandum, e-mail);

      b.    the date of the document;

      c.    the person(s) who signed the document;

      d.    the person(s) who received the document or a copy of it;

      e.    the reason for non-production; and

      f.    the substance of the document.

## IV.   DOCUMENTS REQUESTED

1.      All documents relating to the Purchase and Assumption Agreement.

2.      All documents relating to communications between the FDIC and Popular about Westernbank, W Holding, or the D&Os from times prior to commencement of the Resolution Process and the sale of Westernbank assets.

3.      All documents relating to communications between the OCFI and Popular about Westernbank, W Holding, or the D&Os from times prior to commencement of the Resolution Process and the sale of Westernbank assets.

4.      All documents relating to communications between the Board of Governors and Popular about Westernbank, W Holding, or the D&Os from times prior to commencement of the Resolution Process and the sale of Westernbank assets.

5.      All documents relating to any valuation or analysis of Westernbank or Westernbank assets from times prior to commencement of the Resolution Process and the sale of Westernbank assets.

6.      All documents relating to communications between the FDIC and Popular about Westernbank, W Holding, or the D&Os from times prior to Popular's participation in the Resolution Process.

7.      All documents relating to communications between the OCFI and Popular about Westernbank, W Holding, or the D&Os from times prior to Popular's participation in the Resolution Process.

8.      All documents relating to communications between the Board of Governors and Popular about Westernbank, W Holding, or the D&Os from times prior to Popular's participation in the Resolution Process.

9.    All documents relating to Popular's valuation or analysis of Westernbank or Westernbank assets from times prior to Popular's participation in the Resolution Process.

10.    All documents relating to Popular's determination of the liquidation value of Westernbank's balance sheet assets.

11.    All documents relating to communications between the FDIC and Popular about the Resolution Process for Westernbank, including, but not limited to, valuations of any or all Westernbank assets, the packaging of Westernbank assets for sale, and the price(s) at which Westernbank assets should be sold.

12.    All documents relating to communications between the OCFI and Popular about the Resolution Process for Westernbank, including, but not limited to, valuations of any or all Westernbank assets, the packaging of Westernbank assets for sale, and the price(s) at which Westernbank assets should be sold.

13.    All documents relating to communications between the Board of Governors and Popular about the Resolution Process for Westernbank, including, but not limited to, valuations of any or all Westernbank assets, the packaging of Westernbank assets for sale, and the price(s) at which Westernbank assets should be sold.

14.    All documents relating to Popular's evaluation of potential bank Resolution procedures for Westernbank, including, but not limited to, valuations of any or all Westernbank assets, the packaging of Westernbank assets for sale, and the price(s) at which Westernbank assets should be sold.

15.    All documents relating to the FDIC's approval of Popular as a bidder for Westernbank's assets.

16.    All documents relating to communications between Popular and the FDIC about the FDIC's approval of Popular as a bidder for Westernbank's assets.

17.    All documents relating to communications between Popular and the OCFI about the FDIC's approval of Popular as a bidder for Westernbank's assets.

18.    All documents relating to communications between Popular and the Board of Governors about the FDIC's approval of Popular as a bidder for Westernbank's assets.

19.    All documents relating to Westernbank that were sent or received by Popular through the "IntraLinks" virtual data room.

20.    All documents relating to Westernbank that were sent or received by Popular through the "Venue" virtual data room.

21.    All documents relating to Popular's request to participate in the Resolution Process and bid on, or otherwise purchase, Westernbank assets.

22.    All documents relating to Popular's bid(s) for Westernbank assets.

23.    All documents relating to communications between Popular and the FDIC about Popular's bid(s) for Westernbank assets.

24.    All documents relating to communications between Popular and the OCFI about Popular's bid(s) for Westernbank assets.

25.    All documents relating to communications between Popular and the Board of Governors about Popular's bid(s) for Westernbank assets.

26.    All documents relating to Popular's analysis of Westernbank's franchise value.

27.    All documents relating to Popular's analysis of deposit premiums for Westernbank's deposits.

28.     All documents relating to Popular's analysis of Westernbank's loan portfolio(s).

29.     All documents relating to Popular's analysis of any other Westernbank asset.

30.     All documents relating to Popular's obtaining the right to purchase any Westernbank asset, including, but not limited to, any winning bid(s).

31.     All documents relating to loss-sharing agreements about Westernbank assets between or among Popular and the FDIC, or any other government entity.

32.     All documents relating to value-added agreements about Westernbank assets between or among Popular and the FDIC, or any other government entity.

33.     All documents relating to shareholder-loss agreements about Westernbank assets between or among Popular and the FDIC, or any other government entity

34.     All documents relating to the eight alleged "Loss Transactions" and alleged "Loss Loans" listed at paragraph 79 of the Complaint filed in this action (attached as **Exhibit A**), including, but not limited to, memoranda and other written analyses.

35.     All documents relating to list(s), index or indicies of categories of Westernbank assets acquired by Popular or its agents, including any description of any category.

36.     All documents relating to Popular's calculation of Loan to Value ratios, debt service analyses, or global cash flow for any Westernbank asset(s).

37.     All documents relating to the Office of Inspector General's December 2010 Material Loss Review of Westernbank Puerto Rico, Report No. MLR-11-007.

38.     All documents relating to the FDIC's or the OFCI's decision to close Westernbank.

39.     All documents relating to "Project Themis," including, but not limited to, all documents and communications about any involvement of Popular in "Project Themis."

40.     All documents relating to any proposals or suggestions for, or discussions or analyses of, the consolidation of the banking industry in Puerto Rico.

41.     All documents relating to overcoming or eliminating competition from Westernbank in any aspect of Popular's business.

42.     All documents relating to the FDIC's sale of any Westernbank assets to Popular, including, but not limited to:

      a.     the Purchase and Assumption Agreement (the "Agreement");

      b.     un-redacted copies of Schedules 3.5(o) and 4.15B to the Agreement;

      c.     all Quarterly Certificates that the Assuming Institution, as the Agreement defines those terms, delivered to the FDIC pursuant to Exhibit 4.15B, Article II, Section 2.1(a) of the Agreement;

      d.     documents evidencing or relating to any payments or adjustments of the amounts reported in the Quarterly Certificates, pursuant to Exhibit 4.15B, Article II, Sections 2.1(b)-(e) of the Agreement; and

      e.     documents evidencing or relating to any sales, transfers, foreclosures, assignments, charge-offs, or write-downs of Shared-

Loss Assets (as defined in Exhibit 4.15B, Article 1 of the Agreement).

43.     All documents relating to any bids to purchase any Westernbank assets.

44.     All documents relating to communications between Popular and Deutsche Bank A.G. about the sale or purchase of any Westernbank assets.

45.     All documents relating to communications between Popular and the FDIC about the sale or purchase of any Westernbank assets.

46.     All documents relating to communications between Popular and the OCFI about the sale or purchase of any Westernbank assets.

47.     All documents relating to communications between Popular and the Board of Governors about the sale or purchase of any Westernbank assets.

48.     All documents relating to any audits under any shared-loss agreement between Popular and the FDIC, about any of the Loans at issue in the Complaint (**Exhibit A**), including the October 2011 audit, Report No. AUD-12-001.

49.     All documents relating to any payments by Popular on any Loans at issue in the Complaint (**Exhibit A**) that were charged off, for which Popular has reimbursed the FDIC.

50.     All documents relating to any review, classification, audit, or collection effort(s) about any Loan at issue in the Complaint (**Exhibit A**) by any regulatory authority or third party after the closing of Westernbank in April 2010.

51.     All documents relating to any review, classification, audit, or collection effort(s) about any Loan at issue in the Complaint (**Exhibit A**) by Popular or its agent(s) after the closing of Westernbank in April 2010.

52.     All documents relating to the performance of any Westernbank asset(s) obtained by Popular in or after April 2010.

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| W HOLDING COMPANY, INC., FRANK STIPES GARCIA, JUAN C. FRONTERA GARCIA, HÉCTOR DEL RÍO TORRES, WILLIAM VIDAL CARVAJAL, CESAR RUIZ, and PEDRO R. DOMINGUEZ ZAYAS, **Plaintiffs** | CIVIL ACTION NO. 11-02271 (GAG) |
| v. | JURY TRIAL DEMANDED |
| CHARTIS INSURANCE COMPANY OF PUERTO RICO, **Defendant** | |
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WESTERNBANK PUERTO RICO, **Plaintiff Intervenor** | |
| v. | |
| FRANK STIPES GARCIÁ, JUAN C. FRONTERA GARCIA, HÉCTOR DEL RÍO TORRES, WILLIAM VIDAL CARVAJAL, CESAR RUIZ, and PEDRO R. DOMINGUEZ ZAYAS, **Cross Claim Defendants** | |
| CHARTIS INSURANCE COMPANY OF PUERTO RICO, **Previously Joined Defendant** | |
| MARLENE CRUZ CABALLERO AND THE FRONTERA-CRUZ CONJUGAL PARTNERSHIP; LILLIAM DIAZ CABASSA AND THE DEL RIO-DIAZ CONJUGAL PARTNERSHIP; GLADYS BARLETTA SEGARRA AND THE VIDAL-BARLETTA CONJUGAL PARTNERSHIP; HANNALORE SCHMIDT MICHELS AND THE RUIZ- | |

1

SCHMIDT CONJUGAL PARTNERSHIP;
SONIA SOTOMAYOR VICENTY AND
THE DOMINGUEZ-SOTOMAYOR
CONJUGAL PARTNERSHIP; JOSE M.
BIAGGI LANDRON, HIS SPOUSE JANE
DOE, AND THE BIAGGI-DOE
CONJUGAL PARTNERSHIP; RICARDO
CORTINA CRUZ, HIS SPOUSE
ELIZABETH ALDEBOL DE CORTINA,
AND THE CORTINA-ALDEBOL
CONJUGAL PARTNERSHIP; MIGUEL A.
VAZQUEZ SEIJO, HIS SPOUSE SHARON
MCDOWELL NIXON, AND THE
VAZQUEZ-MCDOWELL CONJUGAL
PARTNERSHIP; JULIA FUENTES DEL
COLLADO; MARIO A. RAMIREZ
MATOS; CORNELIUS TAMBOER, HIS
SPOUSE OLGA MORALES PEREZ, AND
THE TAMBOER-MORALES CONJUGAL
PARTNERSHIP; XL SPECIALTY
INSURANCE COMPANY; LIBERTY
MUTUAL INSURANCE COMPANY; ACE
INSURANCE COMPANY; LUIS
BARTOLEME RIVERA CUEBAS, AS
TRUSTEE OF THE SOCIO CULTURAL
CONSERVATION TRUST; JOHN DOE,
AS TRUSTEE OF THE DOMINGUEZ
SOTOMAYOR FAMILY TRUST; AND
JANE DOE, AS TRUSTEE OF THE CT
FAMILY TRUST,
**Additional Defendants**

## SECOND AMENDED AND RESTATED COMPLAINT IN INTERVENTION

NOW INTO COURT, through undersigned counsel, comes the Federal Deposit Insurance

Corporation ("FDIC" or "Receiver"), as Receiver of Westernbank Puerto Rico ("Westernbank"

or "the Bank"), to file its Second Amended and Restated Complaint in Intervention, as follows:

## INTRODUCTION

1.      FDIC, in its receivership capacity, asserts claims against former officers and directors of Westernbank of Mayaguez, Puerto Rico.  On April 30, 2010, the Office of the Commissioner of Financial Institutions of the Commonwealth of Puerto Rico ("OCFI") closed Westernbank, with a loss to the Deposit Insurance Fund currently estimated at $4.25 billion.  All of Westernbank's corporate stock was owned by its holding company, W Holding Company, Inc. ("W Holding").

2.      FDIC, as Receiver of Westernbank, seeks recovery of at least $176.02 million in damages caused by the gross negligence of the former officers and/or directors of Westernbank.

3.      The $176.02 million damage claim is based on losses from four commercial real estate ("CRE") loans, ten construction loans, and seven asset based loans (collectively, the "Loss Loans") approved and administered by the Bank from January 28, 2004, through November 19, 2009.

4.      The Bank's officers and directors approved and/or administered the Loss Loans pursuant to an aggressive and reckless growth strategy that placed short term income and profits ahead of the safety and soundness of the federally insured depositor funds entrusted to them.

5.      The Bank's officers and directors approved the Loss Loans despite numerous violations of the Bank's loan policies and procedures, federal safety and soundness regulations, and prudent banking practices.  These violations included: (1) violations of the Bank's Loan to Value ("LTV") ratio limits; (2) lack of required borrower equity; (3) inadequate real estate appraisals; (4) insufficient analyses of collateral or inadequate collateral; (5) insufficient borrower repayment information and repayment sources; (6) the questionable character of the borrower or guarantor; and (7) other loan policy violations.  Additionally, the Bank's officers

and directors repeatedly increased, extended, and/or renewed expired and deteriorating loans to enable continued funding of interest reserves, delaying losses and defaults and increasing the losses on the loans.

6.      Former Bank officers administered and funded the construction and asset based loans in violation of major loan terms, Bank policies and procedures, and prudent lending and administration standards. These violations included: (1) continued funding of asset based loans despite receipt of reports showing dilution and aging of accounts receivable, violations of borrower covenants and loan agreements, ineligible collateral, and other severe collateral impairment; (2) unilateral and unauthorized waiver of key borrower financial covenants relating to working capital, net adjusted equity value, and cash flow ratios; (3) manipulation of Bank loan monitoring systems so as not to reflect continuing deterioration of collateral and ineligible collateral; (4) funding of construction loans despite borrower defaults on key loan approval terms and Bank policy requirements; and (5) extensions and continued funding of expired loans, delaying losses and defaults, despite the borrower's failure to cure defaults, significant cost overruns, lack of progress in construction, and other clear indications of the infeasibility of the project.

7.      A former Bank director, Defendant Cornelius Tamboer ("Tamboer"), failed to disclose his substantial *de facto* personal financial interest in a $12 million CRE loan prior to its approval, in violation of Bank policies and federal regulations and in breach of his fiduciary duties owed to Westernbank.

8.      The director Defendants failed to heed and act upon examiner and auditor warnings of deficiencies in commercial lending and administration, and continued approving, increasing, extending, and/or renewing loans in the face of those deficiencies and warnings.

4

9.     The officer and director Defendants' actions and inactions constituted gross negligence, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason. These actions and inactions were the direct and proximate cause of the damages FDIC now seeks to recover.

## INTERVENTION AND REMOVAL

10.     On October 6, 2011, W Holding and individual plaintiffs Frank C. Stipes Garcia ("Stipes"), Juan Carlos Frontera Garcia ("Frontera"), Héctor L. Del Río Torres ("Del Río"), William M. Vidal Carvajal ("Vidal"), Cesar A. Ruiz Rodriguez ("Ruiz"), and Pedro R. Dominguez Zayas ("Dominguez") (collectively, the "Individual Plaintiffs"), commenced this action in the Puerto Rico Commonwealth Court (the "State Court Action"). The Individual Plaintiffs are former officers and/or directors of Westernbank. In the State Court Action, the Individual Plaintiffs asserted claims against Defendant Chartis Insurance Company of Puerto Rico, f/k/a American International Insurance Company of Puerto Rico ("Chartis"), for declarations of coverage under insurance policies (the "policies") issued by Chartis and covering Westernbank's officers and directors for their liabilities to the Receiver.

11.     The Puerto Rico Direct Action Statute, P.R. Laws Ann. tit. 26, §§ 2001, 2003, grants the Receiver a direct interest in the proceeds of the insurance policies that are the subject of this action, and a substantive cause and right of direct action against the insurance carriers that issued the policies. In the direct action, all issues of liability and insurance coverage are decided in a single action.

12.     Pursuant to Rule 21.1 of the Puerto Rico Rules of Civil Procedure, a third person having an interest in a pending action may intervene as a matter of right whenever the law

confers an unconditional right to intervene or when a person claims a right or interest relating to the property or transaction that is the subject of the action that may as a practical matter be affected by the final disposition of the action.

13.     Because the instant action seeks a declaration of Chartis' contractual obligations under the policies, including its obligations to cover and pay the Receiver's claims, the outcome of the action may, as a practical matter, affect and impair the Receiver's rights and interests in and to the policies and its rights and claims against Chartis. Further, the exclusion of the Receiver from this action would lead to duplicative litigation and potentially inconsistent and conflicting adjudications of the same factual and legal issues in different courts.

14.     On December 30, 2011, FDIC, as Receiver of Westernbank, intervened as a plaintiff in the State Court Action as matter of law and right, to protect and assert its substantive rights and interests in and to the policies and its claims against Chartis under the Puerto Rico Direct Action Statute.

15.     FDIC, as Receiver of Westernbank, incorporates by reference its original Complaint in Intervention as though set forth herein in its entirety.

16.     FDIC, as Receiver, removed the case to this Court on December 30, 2011, pursuant to 12 U.S.C. § 1819(b)(2)(B).

### JURISDICTION AND VENUE

17.     Pursuant to 12 U.S.C. § 1819(b)(2)(A) and (B), with certain exceptions not applicable to this case, all civil lawsuits in which FDIC, in any capacity, is a party are deemed to arise under the laws of the United States. Pursuant to 12 U.S.C. § 1819 and 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action.

6

18.     This Court has personal jurisdiction over the Defendants who at all relevant times were residents of and conducted the business of the Bank in Puerto Rico, or issued policies of liability insurance in Puerto Rico covering the Bank and its officers and directors.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1446(a) as this Court is the United States District Court for the district and division in which the State Court Action was pending when FDIC removed it to this Court.  Additionally, the events giving rise to this case occurred in this district.

20.     FDIC asserts the following additional claims:

## THE PARTIES

### Plaintiff Intervenor - FDIC

21.     FDIC is a corporation organized and existing under the laws of the United States of America with its principal place of business in Washington, D.C.  12 U.S.C. § 1811, *et. seq.*  FDIC is an instrumentality of the United States of America and is charged with, among other things, the orderly liquidation of failed banks.  12 U.S.C. § 1821(d).  The OCFI appointed FDIC as Receiver of Westernbank on April 30, 2010, pursuant to 12 U.S.C. § 1821(c).  On that date, pursuant to 12 U.S.C. § 1821(d)(2)(A) and § 1823(d)(3)(A), the Receiver succeeded to all rights, claims, titles, powers, privileges, and assets of Westernbank and its stockholders, members, account holders, depositors, officers, or directors of Westernbank with respect to the institution and the assets of the institution, including the right to bring this action against the former officers and directors of Westernbank.

### Cross Claim Defendants

FDIC names the Individual Plaintiffs as Cross Claim Defendants, as follows:

22.     Cross Claim Defendant Stipes was Chairman of the Board of the Bank from 1990 to April 30, 2010, and was President and Chief Executive Officer ("CEO") from 1992 to July 10, 2005, and again from March 31, 2007, to April 30, 2010. He also was a member of both the Bank's Senior Lending Committee ("SLC") and its Senior Credit Committee ("SCC") from January 1, 2004, until the Bank failed. Stipes is currently the Chairman of the Board, CEO, and President of W Holding. As of March 30, 2007, he owned 11,738,531 shares (7.12 percent) of W Holding's stock. Stipes is a resident of Puerto Rico residing in Mayaguez.

23.     Cross Claim Defendant Frontera was a director of both the Bank and W Holding from October 2003, Secretary of both the Bank and W Holding Boards from February 2007, a member of the SLC from January 1, 2004, and a member of the SCC from July 29, 2004, until the Bank failed. As of March 30, 2007, he owned 1,584,668 shares (0.96 percent) of W Holding's stock. Frontera is a resident of Puerto Rico residing in Mayaguez.

24.     Cross Claim Defendant Del Rio was a director of the Bank and of W Holding from October 2003, a member of the SLC from January 1, 2004, and a member of the SCC from July 29, 2004, until the Bank failed. As of March 30, 2007, he owned 108,573 shares (0.07 percent) of W Holding's stock. Del Rio is a resident of Puerto Rico residing in Mayaguez.

25.     Cross Claim Defendant Vidal was Vice President ("VP") of Commercial Credit and was Chief Lending Officer ("CLO") of the Bank's Northern Region from June 26, 2000, to August 31, 2008. He was Executive VP ("EVP") and Chief Banking Officer ("CBO") from September 1, 2008, until the Bank failed. Vidal also was a member of the SCC and SLC from January 1, 2004, until April 30, 2010. As of March 30, 2007, he owned 182,045 shares (0.11 percent) of W Holding's stock. Vidal is a resident of Puerto Rico residing in San Juan.

8

26.     Cross Claim Defendant Ruiz was a director of the Bank and of W Holding from 1999 to December 31, 2008, and Secretary of both the Bank and W Holding Boards from April 2001, to February 28, 2007. As of March 30, 2007, he owned 125,337 shares (0.08 percent) of W Holding's stock. Ruiz is a resident of Puerto Rico residing in Mayaguez.

27.     Cross Claim Defendant Dominguez was VP of Commercial Credit and CLO for the Bank's Southern Region from September 25, 1989, until the Bank failed, and he also was a director of the Bank from 1992 until the Bank failed. He was a member of the SCC and SLC from January 1, 2004, until the Bank failed. He was a director of W Holding from 1999 to April 30, 2010. As of March 30, 2007, he owned 1,287,302 shares (0.78 percent) of W Holding's stock. Dominguez is a resident of Puerto Rico residing in Ponce.

### Previously Joined Defendant - Chartis

28.     Defendant Chartis is a Puerto Rico insurance corporation which issued policies of insurance covering the individual Defendants for their liabilities to the Receiver. FDIC asserts claims against Chartis under the policies pursuant to the Puerto Rico Direct Action Statute.

### Additional Defendants

FDIC joins, as additional defendants (1) the spouses and conjugal partnerships of the Cross Claim Defendants as required by Puerto Rico law, (2) additional former officers and directors of Westernbank, and their spouses and conjugal partnerships, and (3) additional insurance carrier defendants, as follows. FDIC joins the spouses of the officer and director Defendants as representatives of the conjugal partnerships, and in their individual capacity to the extent that they may be liable if the conjugal partnership does not have sufficient funds to satisfy a judgment in this case. The responsible Defendants acted in the course and scope of their duties

as former officers and directors of the Bank, resulting in economic gain attributable to the conjugal partnerships.

29.     Defendant Marlene Cruz Caballero is the spouse of Cross Claim Defendant Frontera.

30.     Defendant Frontera-Cruz is the Conjugal Partnership formed by Cross Claim Defendant Frontera and Defendant Marlene Cruz Cabellero.

31.     Defendant Lilliam Diaz Cabassa is the spouse of Cross Claim Defendant Del Rio.

32.     Defendant Del Rio-Diaz is the Conjugal Partnership formed by Cross Claim Defendant Del Rio and Defendant Lilliam Diaz Cabassa.

33.     Defendant Gladys Barletta Segarra is the spouse of Cross Claim Defendant Vidal.

34.     Defendant Vidal-Barletta is the Conjugal Partnership formed by Cross Claim Defendant Vidal and Defendant Gladys Barletta Segarra.

35.     Defendant Hannalore Schmidt Michels is the spouse of Cross Claim Defendant Ruiz.

36.     Defendant Ruiz-Schmidt is the Conjugal Partnership formed by Cross Claim Defendant Ruiz and Defendant Hannalore Schmidt Michels.

37.     Defendant Sonia Sotomayor Vicenty is the spouse of Cross Claim Defendant Dominguez.

38.     Defendant Dominguez-Sotomayor is the Conjugal Partnership formed by Cross Claim Defendant Dominguez and Defendant Sonia Sotomayor Vicenty.

39.     Defendant Jose M. Biaggi Landron ("Biaggi") succeeded Stipes as President and CEO of the Bank on July 11, 2005, while Stipes continued as Chairman.  Biaggi was President and CEO until Stipes forced him to resign in lieu of termination on March 30, 2007.  Thereafter,

Stipes resumed the offices of President and CEO of the Bank. Biaggi was a director of the Bank from July 11, 2005, to March 30, 2007, a member of the SLC from July 11, 2005, to March 30, 2007, and a member of the SCC from September 20, 2005, to March 30, 2007. As of March 31, 2006, he owned 167,900 shares (0.10 percent) of W Holding's stock. Biaggi is a resident of Puerto Rico residing in Mayaguez.

40.     Defendant Jane Doe is the spouse of Defendant Biaggi.

41.     Defendant Biaggi-Doe is the Conjugal Partnership formed by Defendant Biaggi and Defendant Jane Doe.

42.     Defendant Ricardo Cortina Cruz ("Cortina") was VP of Commercial Credit and Chief Construction Officer ("CCO") of the Bank, and was CLO for the Western Region of the Bank, from May 10, 1999, to August 31, 2008. He was Senior VP ("SVP") of Commercial Credit from September 1, 2008, to June 14, 2009, and SVP of Commercial Credit for the Northwest Region from June 15, 2009, until Westernbank failed. He also was a member of the SLC from January 1, 2004, until February 19, 2009. As of January 17, 2006, he owned 17,404 shares (0.01 percent) of W Holding's stock. Cortina is a resident of Puerto Rico residing in Mayaguez.

43.     Defendant Elizabeth Aldebol de Cortina is the spouse of Defendant Cortina.

44.     Defendant Cortina-Aldebol is the Conjugal Partnership formed by Defendant Cortina and Defendant Elizabeth Aldebol de Cortina.

45.     Defendant Miguel A. Vazquez Seijo ("Vazquez") was the President of the Business Credit Division ("BCD") of the Bank from June 1, 2001, until he was terminated on November 1, 2007. Vazquez was a member of the SCC during that same period. As of March

11

21, 2006, he owned 144,058 shares (0.09 percent) of W Holding's stock. Vazquez is a resident of Puerto Rico residing in San Juan.

46.     Defendant Sharon McDowell Nixon is the spouse of Defendant Vazquez.

47.     Defendant Vazquez-McDowell is the Conjugal Partnership formed by Defendant Vazquez and Defendant Sharon McDowell Nixon.

48.     Defendant Julia Fuentes del Collado ("Fuentes") was VP of the BCD from June 18, 2001, to January 9, 2002. She was SVP of the BCD from January 10, 2002, to January 9, 2005. She was SVP - Portfolio Manager of the BCD from January 10, 2005, until she resigned on December 12, 2007. During that period, she was the second most senior officer in the BCD, next to Vazquez. She also was a member of the SCC from January 1, 2004, to December 12, 2007. Fuentes is a resident of Puerto Rico residing in San Juan.

49.     Defendant Mario A. Ramirez Matos ("Ramirez") was the Bank's VP of Construction Lending from January 9, 2007, to July 13, 2008, and VP and CCO from July 14, 2008, until the Bank failed. Ramirez is a resident of Puerto Rico residing in San Juan.

50.     Defendant Tamboer was a director of the Bank and of W Holding from 1999 to January 19, 2010, and a member of the SCC and of the SLC from January 1, 2004, until Westernbank failed. As of March 30, 2007, he owned 5,880,144 shares (3.57 percent) of W Holding's stock. Tamboer is a resident of Puerto Rico residing in Mayaguez.

51.     Defendant Olga Morales Perez is the spouse of Defendant Tamboer.

52.     Defendant Tamboer-Morales is the Conjugal Partnership formed by Defendant Tamboer and Defendant Olga Morales Perez.

53.     Defendant XL Specialty Insurance Company ("XL") is an insurance corporation authorized to do and doing business in Puerto Rico which issued a policy or policies of insurance

covering the individual Defendants for their liabilities to the Receiver.  FDIC asserts claims against XL under the policies pursuant to the Puerto Rico Direct Action Statute.

54.     Defendant Liberty Mutual Insurance Company ("Liberty") is an insurance corporation authorized to do and doing business in Puerto Rico which issued a policy or policies of insurance covering the individual Defendants for their liabilities to the Receiver.  FDIC asserts claims against Liberty under the policies pursuant to the Puerto Rico Direct Action Statute.

55.     Defendant ACE Insurance Company ("ACE") is an insurance corporation authorized to do and doing business in Puerto Rico which issued a policy or policies of insurance covering the individual Defendants for their liabilities to the Receiver.  FDIC asserts claims against ACE under the policies pursuant to the Puerto Rico Direct Action Statute.

55(A). Defendant Luis Bartoleme Rivera Cuebas, in his capacity as Trustee of the Socio Cultural Conservation Trust, is the Trustee of a family trust named the "Socio Cultural Conservation Trust," settled by Defendant Stipes and to which he transferred substantial assets without consideration.

55(B). Defendant John Doe, in his capacity as Trustee of the Dominguez Sotomayor Family Trust, is the Trustee of a family trust named the "Dominguez Sotomayor Family Trust," to which Defendant Dominguez transferred substantial assets without consideration.

55(C). Defendant Jane Doe, in her capacity as Trustee of the  CT Family Trust, is the Trustee of a family trust named the "CT Family Trust," to which Defendant Tamboer transferred substantial assets without consideration.

## BACKGROUND

56.     Westernbank opened to the public on March 1, 1958, as a Puerto Rico chartered savings institution with its principal place of business in Mayaguez, Puerto Rico.  On November

13

30, 1994, it converted its charter to become a full service commercial bank under the laws of Puerto Rico. Under Stipes's leadership, from 1999 through 2009, the Bank grew over 526 percent from $3.4 billion to $17.9 billion in assets. During this rapid growth period, the officer and director Defendants, driven by the desire for short term income and profits, approved and/or administered numerous CRE, construction, and asset based commercial loans in violation of Bank policies, federal safety and soundness regulations, and prudent banking practices. Stipes and Tamboer received millions of dollars in dividends from their W Holding stock during this period, attributable to the income generated by these poorly underwritten and administered loans. Other Defendants likewise received substantial stock dividends resulting from the loans. When Westernbank failed, it was the second largest bank in Puerto Rico, with 45 branches located throughout the island.

57.    Beginning in 2001, the Board gave Vazquez, President of the BCD, unfettered control over asset-based lending. The BCD was responsible for origination of asset based loans. Between 2001 and 2007, the Bank paid Vazquez substantial bonuses based upon the short term income and profits generated by the BCD's loan originations. Vazquez tightly controlled asset based lending, directed loan administration, supervised numerous employees, and reported to Stipes and the Board. However, Vazquez, driven by the desire for short term profit and compensation, ignored loan policy requirements, regulations, and principles of safety and soundness. Vazquez dismissed the warnings of his subordinate, Fuentes, regarding these deficiencies and directed her to continue funding the loans (which she then did). Vazquez also repeatedly directed increases to interest reserves to fund deteriorating loans, delaying losses and defaults and increasing the losses on the loans.

58. Similarly, the Bank's CRE and construction loans lacked financial support, lacked global cash flow and debt service analyses, exceeded LTV ratio limits, and were based on unrealistic appraisals. Construction loans were administered, extended, and funded in violation of key loan approval terms and Bank policies.

59. In November 2005, Biaggi advised Stipes and Dominguez to slow the Bank's growth until severe deficiencies in the Bank's commercial lending and administration could be corrected. Notwithstanding his knowledge of these deficiencies, Biaggi approved four of the Loss Loans between October 28, 2005, and September 5, 2006. On March 30, 2007, Stipes directed Biaggi to resign in lieu of termination. Stipes and Dominguez failed to take corrective action commensurate with the Bank's growth, as Biaggi had cautioned. As the result, between March 31, 2006, and June 30, 2008, Westernbank's adversely classified loans increased from $176 million to $1.61 billion (a 915 percent increase).

60. The responsible officer and director Defendants approved, increased, renewed and/or extended the Loss Loans in the face of mounting examiner and auditor warnings of problems in the commercial loan portfolio. In the 2005 Report of Examination ("RoE"), FDIC examiners cited management's failure to correct deficiencies in loan administration and review cited in the prior year's examination. On April 13, 2006, the Bank's auditors, Deloitte & Touche LLP ("Deloitte"), warned Bank management of "significant deficiencies," including insufficient analysis and documentation of impaired loans.

61. The 2006 FDIC RoE warned of significant increases in adversely classified loans and again criticized commercial loan administration, quoting from Deloitte's April 13, 2006, management letter. The examiners warned management that the Bank's internal loan review function had identified only $28.5 million in adversely classified and special mention BCD

loans, while the examiners had identified $330.4 million of such loans in the same period – more than an elevenfold difference. The examiners adversely classified $211 million of the Bank's assets, nearly triple the amount from the preceding year.

62.     The 2007 FDIC RoE again extensively criticized commercial lending and administration and management's failure to correct the deficiencies cited in the previous examinations. The examiners adversely classified $536 million of the Bank's assets as of June 30, 2007, a 254 percent increase from the prior year. The 2008 FDIC RoE repeated the criticisms of commercial lending and administration and the failure to correct previously cited deficiencies. The examiners also criticized the Bank's continued funding of interest reserves on troubled projects. The examiners adversely classified $1.8 billion of the Bank's assets, a more than 300 percent increase from the prior year. FDIC issued a Cease and Desist Order to the Bank on May 22, 2009, and the OCFI closed the Bank on April 30, 2010, and appointed FDIC as Receiver.

63.     Despite these warnings, the responsible Defendants approved, increased, renewed, and/or extended Loss Loans in violation of the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices.

64.     In a restated Form 10-K for 2007, filed on March 16, 2009, with the Securities and Exchange Commission ("SEC"), the W Holding Board, which at that time included Stipes, Dominguez, Del Rio, Frontera, and Tamboer, acknowledged the Bank's failures to correct the deficiencies previously cited by auditors and examiners. They acknowledged that (i) the Bank approved and funded loans that "did not comply with . . . underwriting criteria;" (ii) loans were "approved or extended . . . on the basis of poorly supported analysis of the repayment capacity of the borrower;" (iii) the Bank "made significant use of interest reserve advances to cover interest

payments on delinquent loans or on loans to borrowers with financial difficulties;" and (iv) the
Bank failed to "obtain updated appraisal reports for classified loans." This acknowledged
conduct amounted to gross negligence, including reckless indifference to or deliberate disregard
of the welfare of the Bank and its depositors, or actions which were without the bounds of
reason, causing the Bank damages exceeding $176.02 million.

65.     Pursuant to Westernbank's Commercial Loan Policy ("Loan Policy"), the SLC
was responsible for evaluation and approval of CRE and construction loans. The Board also was
responsible for evaluation and approval of CRE and construction loans of over $50 million.
During all or part of the relevant time period, Defendants Stipes, Biaggi, Tamboer, Del Rio,
Dominguez, Frontera, Cortina, and Vidal were members of the SLC.

66.     The Bank had a separate policy manual for the BCD governing asset based
lending (the "BCD Policy"). Pursuant to the BCD Policy, the SCC was responsible for
evaluation and approval of asset based loans. The Board also was responsible for evaluation and
approval of asset based loans of over $50 million. During all or part of the relevant time period,
Defendants Stipes, Dominguez, Vidal, Tamboer, Del Rio, Frontera, Vazquez, Fuentes, and
Biaggi were members of the SCC.

67.     All Defendants who were members of the SLC, SCC, and/or the Board (for loans
over $50 million) were responsible for analyzing supporting information so as to ensure that
loans complied with the Bank's policies and procedures and prudent banking practices. The
responsible Defendants failed to so reasonably inform themselves of material information or
alternatives or to engage in due analysis and deliberation. Instead, they approved the Loss Loans
in violation of the Bank's policies and procedures, federal safety and soundness regulations, and

prudent banking practices. In so acting and failing to act, the responsible Defendants breached their duties to Westernbank.

68.     The director Defendants were responsible for heeding examiner and auditor warnings of deficiencies in lending and loan administration and correcting those deficiencies. They failed to do so, and instead continued to approve, increase, extend, and/or renew Loss Loans in violation of Bank approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. In so acting and failing to act, the director Defendants breached their duties to Westernbank.

69.     As President and CEO of the Bank from 1992 to July 10, 2005, and again from March 31, 2007 through the Bank's failure, Stipes was responsible for ensuring that the Bank's commercial lending and administration complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. He also was responsible for heeding examiner and auditor warnings of deficiencies in commercial lending and administration and correcting those deficiencies. Stipes breached those duties to Westernbank.

70.     As President and CEO of the Bank from July 11, 2005, to March 30, 2007, Biaggi was responsible for ensuring that the commercial loans he approved complied with the Bank's policies and procedures, federal safety and soundness regulations, and prudent banking practices. Biaggi breached those duties to Westernbank.

71.     As President of the BCD from 2001 to November 1, 2007, Vazquez was responsible for ensuring that the BCD's asset based lending and administration complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. Vazquez breached those duties to Westernbank.

72.     As SVP - Portfolio Manager of the BCD from January 10, 2005, to December 12, 2007, Fuentes was responsible for ensuring that the BCD's asset based lending and administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. Fuentes breached those duties to Westernbank.

73.     As CLO of the Bank's Northern Region from June 26, 2000, to August 31, 2008, Vidal was responsible for ensuring that the Bank's commercial lending and administration within that region complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. As the Bank's CBO from September 1, 2008, until the Bank's failure, Vidal was responsible for ensuring that the Bank's commercial loan administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. Vidal breached those duties to Westernbank.

74.     As CLO of the Bank's Southern Region from September 25, 1989, until the Bank's failure, Dominguez was responsible for ensuring that the Bank's commercial lending and administration within that region complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. Dominguez breached those duties to Westernbank.

75.     As the Bank's CCO from May 10, 1999, to August 31, 2008, Cortina was responsible for ensuring that the Bank's construction lending and administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. As CLO of the Bank's Western Region from May 10, 1999, to August 31, 2008, Cortina was responsible for ensuring that the Bank's

commercial lending and administration within that region complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. Cortina breached those duties to Westernbank.

76. As the Bank's CCO from July 14, 2008, until the Bank's failure, Ramirez was responsible for ensuring that the Bank's construction loan administration during that period complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices. Ramirez breached those duties to Westernbank.

## THE LOSS LOANS

77. The CRE Loss Loans include the Bank's loans to Museum Towers LP ("Museum Towers"), Yasscar Development Corporation ("Yasscar Development"), Yasscar Caguas Development Corporation ("Yasscar Caguas"), and its $8 million loan to Sabana Del Palmar, Inc. ("Sabana"). The construction Loss Loans include the Bank's construction loans to Plaza CCD Development Corporation ("Plaza CCD") and its $42.5 million loan to Sabana. Each of these Loss Loans violated one or more of the following applicable requirements of Westernbank's Loan Policy:

- The importance of evaluating a borrower's character and creditworthiness "cannot be overstated."
- All credit extensions must be supported by current financial statements that are certified by the borrowers and guarantors and updated annually.
- Credit officers must ensure completeness of required documentation before disbursement and should annually review loans and prepare statements regarding borrower compliance with terms and covenants.
- For secured commercial loans, current appraisal reports (within the past 12 months) must be obtained prior to closing of loans or loan increases.
- LTV ratio limits were: 50 percent (65 percent as of January 2006) for undeveloped land; 75 percent for secured commercial land development loans; 80 percent for commercial construction loans; and 85 percent for improved properties.
- Exceptions to LTV ratio requirements should be identified in the Bank's records and reported to the Board of Directors.
- To obtain a second or subsequent renewal of a commercial loan, the borrower must pay down at least 20 percent.

- When repayment of construction loans depends upon unit sales, refinancing, or income producing property, at least 50 percent of the interim credit facility must be recoverable from committed pre-sale revenues.
- Prior to disbursement of a construction loan, the borrower must invest at least 10 percent upfront equity in the form of cash, land, or prepaid plans and specifications.
- Completion/payment bonds must be in place prior to commencement of construction.
- Borrowers/guarantors must covenant to immediately fund cost overruns.

78.     The asset based Loss Loans include the Bank's loans to Inyx, Inc. ("Inyx") and to

Intercoffee, Inc. ("Intercoffee"). Each of these Loss Loans violated one or more of the following

requirements of the BCD Policy:

- Disbursements are to be made only after review of collateral availability.
- Each loan officer is responsible for assigned clients. The administration of the account will be based on the terms of the financing as outlined in the credit line authorization and the client resume. Any variances between these two forms must be immediately reported to Senior Management.
- Loan officers must alert their supervisors (Portfolio Managers) to any deteriorating loan along with recommendations for when such loans should be placed in a non-performing status (*i.e.,* cash basis) or when write-offs or reserves are warranted. Portfolio Managers should report these loans and recommendations to the Division President, WB Risk Management Officer, or the Chairman of the Senior Credit Committee.
- Credit is extended only to borrowers of good character and for legitimate purposes. Information establishing the character and reputation of prospective borrowers should be confirmed by appropriate investigation early in the due diligence process and prior to submission to the Credit Committee.

79.     The following table lists the Defendants who were responsible for approving the

Loss Loans. Loss Loans include original loans, additional credits (increases), and/or extensions

of construction loans enabling continued funding. The table also lists the Defendants who were

responsible for post-approval administration and funding of the Plaza CCD construction loan line

and the Inyx asset based line of credit.

| Borrower | Loan Amount ($ millions) | Approval Date | Loss ($ millions) | Loan Approvals and Funding | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Stipes | Biaggi | Dominguez | Del Río | Frontera | Ruiz | Tamboer | Vazquez | Vidal | Fuentes | Cortina | Ramirez |
| 1. Sabana | $42.5[i] | Jan. 28, 2004 | $19.3 | x | | x | | | | x | | | | x | |
| Sabana | $4.59[a] | May 8, 2006 | | x | x | x | x | | | x | | | | x | |
| Sabana | $3.21[a] | May 15, 2007 | | x | | x | x | | | x | | x | | x | |
| Sabana | $2.9[a] | May 15, 2008 | | x | | x | | | | | | x | | x | |
| 2. Sabana | $8.0 | May 15, 2007 | $8.0 | | | x | x | | | x | | x | | | |
| 3. Inyx | $36.5[a] | June 15, 2005 | $56.72 | | | | | | | | af | | af | | |
| Inyx | $15.0[a] | Jan. 17, 2006 | | | | | | | | | x | | x | | |
| Inyx | $12.5[a] | Sept. 5, 2006 | | | | | | | | | x | | x | | |
| Inyx | $10.0[a] | Nov. 7, 2006 | | | | | | | | | x | | x | | |
| 4. Intercoffee | $106.1[i] | Oct. 28, 2005 | $34.8 | x | x | x | x | x | x | x | x | x | | | |
| Intercoffee | $13.0[a] | Sept. 5, 2006 | | x | x | | x | x | | x | x | x | | | |
| Intercoffee | $10.5[a] | Sept. 28, 2007 | | x | | | x | x | x | x | | x | | x | |
| 5. Plaza CCD | $62.25[i] | Apr. 28, 2006 | $37.3 | | | | | | | | | | af | x | |
| Plaza CCD | $4.91[e] | Apr. 24, 2008 | | x | | x | x | | | | x | x | | x | |
| Plaza CCD | $2.1[e] | Sept. 18, 2008 | | | | | x | x | | x | | x | | x | af |
| Plaza CCD | $4.7[e] | Dec. 1, 2008 | | x | | x | | | | | | x | | | af |
| Plaza CCD | $1.9[e] | Mar. 19, 2009 | | x | | | x | x | | x | | x | | | af |
| Plaza CCD | $0.2[e] | June 9, 2009 | | x | | | x | x | | x | | x | | | af |
| 6. Museum Towers | $12.0 | Apr. 5, 2006 | $7.6 | x | x | x | | x | | | | x | | x | |
| 7. Yasscar Develop. | $13.6 | May 15, 2007 | $5.8 | x | | x | x | | | x | | | | x | |
| 8. Yasscar Caguas | $16.6 | Oct. 10, 2007 | $6.5 | | | | x | | | x | | x | | x | |
| TOTAL | $383.06 | | $176.02 | | | | | | | | | | | | |

*Key to column 2 of the table: "i" = initial loan; "a" = additional credit; "e" = extension of construction loan enabling continued funding.

*Key to "Loan Approvals and Funding" columns of the table: "x" = approval; "af" = post-approval administration and funding.

80.     The Loss Loans had key deficiencies in underwriting and/or administration that were readily apparent to the Defendants who approved and/or administered them, including, but not limited to:

A. Sabana ($42.5 million) and increases:

- lack of required pre-sales;

- LTV ratio of 90.5%, in excess of Bank LTV ratio limits;

- grossly inadequate financial analysis of guarantors;

- multiple loan increases (as set forth in the foregoing table), without an updated appraisal, in order to fund interest reserves and cost overruns, delaying losses and default until within one year before the Bank's failure, increasing the losses on the loan.

B. Sabana ($8 million):

- faltering economy;

- secured only by the pledge of speculative future profits from two distressed borrower projects also financed by the Bank;

- no appraisals obtained to support collateral values;

- while the loan was approved for "capital to various construction projects in Puerto Rico," the borrower used $3.5 million of the loan proceeds to purchase an option on property in Tampa, Florida;

- multiple loan renewals and extensions, on May 15, 2008, September 17, 2009, and November 19, 2009, without obtaining additional collateral or repayment, delaying losses and default on the loan until within one year before the Bank's failure and increasing the losses on the loan.

C. Inyx and increases:

- Vazquez and Fuentes approved multiple loan increases (as set forth in the foregoing table) and funded over $56 million in loan proceeds despite receipt of multiple reports showing dilution and aging of accounts receivable and other major violations of loan agreements, borrower covenants and bank policy, including ineligible collateral, borrower re-aging of ineligible collateral, cash diversions, a negative borrowing base, and other severe collateral impairment;

- Vazquez unilaterally and without authorization waived key borrower financial covenants requiring borrower working capital, net adjusted equity value, and cash flow ratios, and advanced $21 million over the authorized credit limit;

- Vazquez and Fuentes manipulated Bank loan monitoring systems so as not to reflect continuing deterioration of the collateral, ineligible collateral, and related major violations of borrower covenants and loan agreements;

- Vazquez and Fuentes failed to disclose to the Bank's directors the foregoing severe deficiencies and problems with the loan, the collateral, and the borrower. As a result of these failures to disclose, the Board did not learn of Vazquez's and Fuentes's grossly negligent and reckless mismanagement of the line of credit until after May of 2007.

D. Intercoffee and increases:

- bad borrower character;

- failure to evaluate borrower creditworthiness and repayment ability;

- multiple loan increases and additional loans (as set forth in the foregoing table) to cover delinquencies and fund interest reserves, despite knowledge of the borrower's inability to service the debt and its diversions of loan proceeds to pay for personal and family expenses, increasing the losses on the loan. The Board approved the September 28, 2007 increase in the amount of $10.5 million because it was part of a $92 million credit facility transferred to the Bank's commercial credit department.

E. Plaza CCD and extensions:

- under Cortina's administration, the Bank disbursed $26.9 million in draws despite borrower defaults on major loan approval terms and Bank policy requirements, including the borrower's failure to provide required ten percent equity contributions, unit pre-sales, construction contracts, bonds, or funding of cost overruns;

- under Ramirez's administration, the Bank disbursed another $10.4 million in draws despite the borrower's failure to cure the foregoing major defaults and policy violations, lack of progress beyond foundation work, and significant unfunded cost overruns;

- the responsible Defendants approved multiple extensions to enable continued funding after expiration of the original loan term (as set forth in the foregoing table), thereby delaying losses and default until within one year before the Bank's failure and increasing the losses on the loan. They approved the extensions and continued funding despite the borrower's continued failure to cure the major defaults and policy violations, significant unfunded cost overruns, lack of progress in construction, a faltering economy, and other clear indications of the infeasibility of the project. The responsible Defendants funded $28.7 million of the loan proceeds within three years before the Bank's failure;

- the Bank disbursed over $45.8 million of a $62.25 million credit facility, including $2.4 million in "administration and supervision" fees to the borrower, on a project that is less than one third complete -- a shell of rusting beams in downtown San Juan.

F.  Museum Towers:

- the purported "as is" appraisal relied upon an estimated future "as completed" value, in violation of appraisal standards and federal regulations;

- the borrower retained the appraiser, in violation of federal appraiser independence regulations and Bank policy;

- the appraised value of $9.4 million was over twice the acquisition price a year earlier -- an obviously unrealistic appreciation;

- the LTV ratios of 96 percent for the term loan and 128 percent for the entire facility both exceeded the Bank's LTV ratio limits;

- repayment was dependent on numerous uncertain future contingencies, including a future take-out construction loan and speculative future zoning changes;

- notwithstanding management's lack of understanding of the Florida real estate market, the Bank failed to obtain a feasibility study of the project;

- the analysis of the repayment ability of the borrower and guarantors was grossly inadequate.  One of the guarantors had placed virtually all of his assets in an asset protection trust; the other guarantors' assets consisted principally of investments in start-up companies or other illiquid interests;

- Tamboer's daughter was a principal of the borrower.  Although she guaranteed the loan, she had virtually no repayment ability;

- Tamboer failed to disclose to the Board his *de facto* 50 percent interest in the borrower and the loan, in violation of federal regulations and Bank policies;

- the other 50 percent interest holder in the borrower, Michael Scarfia, Sr. ("Scarfia"), had loaned substantial sums to Tamboer and had close business relationships with him.  Tamboer approved approximately $150 million in other Bank loans to Scarfia-controlled entities, including the Loss Loans to Sabana, Yasscar Development, and Yasscar Caguas, without fully disclosing his dealings with Scarfia.  Scarfia owed $142 million to the Bank at the time of its failure;

- the responsible Defendants repeatedly extended and/or renewed the loan, on June 19, 2008, July 22, 2009, and November 19, 2009, based on a stale appraisal, delaying losses and default on the loan through the Bank's failure and increasing the losses on the loan;

- Tamboer voted to approve the extensions and renewals of the loan notwithstanding his and his daughter's interests in the borrower and the loan;

- the project was never developed.

G. Yasscar Development:

- the LTV ratio of 103% exceeded the Bank's LTV ratio limits;

- the faulty appraisal assumed that all permits were obtained (when they were not). Permitting for commercial development in Puerto Rico is an uncertain process that may take years;

- financial analysis of the guarantors was grossly inadequate;

- the responsible Defendants renewed the loan on November 19, 2009, based on a stale appraisal in the face of a severe decline in market conditions, delaying losses and default on the loan until within one year before the Bank's failure and increasing the losses on the loan.

H. Yasscar Caguas:

- the LTV ratio exceeded the Bank's LTV ratio limits;

- the faulty appraisal assumed that all permits were in place (when they were not);

- financial analysis of the guarantors was grossly inadequate;

- the responsible Defendants renewed the loan on November 19, 2009, based on a stale appraisal and despite a severe decline in market conditions, delaying losses and default on the loan until within one year before the Bank's failure and increasing the losses on the loan.

81.   In approving, increasing, renewing, extending and/or administering and funding the Loss Loans in the face of the foregoing gross and obvious deficiencies, the responsible Defendants were grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason. The responsible Defendants' gross negligence proximately caused the Bank damages exceeding $176.02 million.

### TAMBOER'S BREACH OF FIDUCIARY DUTY

82.     As a director, Tamboer owed the Bank fiduciary duties of loyalty, fidelity, and good faith. These duties included, at a minimum, the duty to safeguard the interests of the Bank, to avoid conflicts of interest, self dealing, or other personal benefit arising from his position as a director, and to fully disclose any and all actual and/or *de facto* interests he may have had in borrowers, projects, and/or loans funded with federally insured dollars. By failing to disclose his *de facto* 50 percent interest in the Bank's $12 million loan to Museum Towers, and by voting for multiple extensions and/or renewals of the loan for his own and his daughter's benefit, Tamboer breached his fiduciary duties of loyalty, fidelity and good faith owed to Westernbank. Alternatively, in so acting and failing to act, Tamboer was grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason. Had Tamboer fully disclosed his interests in the loan, it would not have been approved, funded, renewed or extended. Hence Tamboer is liable solidarily for all losses suffered by the Bank on the loan.

### CLAIMS FOR RELIEF

#### Count 1 - Gross Negligence Against All Defendants

83.     FDIC incorporates by reference as though set forth in full the allegations of paragraphs 1 through 82 herein.

84.     By their actions and inactions, as described specifically and generally herein, the officer and director Defendants were grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason. These acts of gross negligence included:

- pursuing an aggressive and reckless growth and lending strategy that placed short term income and profits ahead of the safety and soundness of the federally insured depositor funds entrusted to the officer and director Defendants;

- permitting the Bank's commercial loan portfolio to deteriorate due to continued approvals, increases, extensions, and renewals of poorly underwritten, high risk commercial loans in violation of Bank policies, procedures, federal regulations, and prudent banking practices, thereby jeopardizing the Bank's financial health and causing it to fail;

- failing to reasonably inform themselves of material information or alternatives or to engage in due analysis or deliberation as to the extreme risks of such strategies, actions, and failures to act;

- as members of the SLC, SCC and/or Board (for loans over $50 million), failing to analyze supporting information so as to ensure that loans complied with the Bank's policies and procedures and prudent banking practices, and failing to otherwise reasonably inform themselves of material information or alternatives, or to engage in due analysis or deliberation as to the extreme risks inherent in those loans;

- approving the Loss Loans in violation of the Bank's policies and procedures, federal safety and soundness regulations, and prudent banking practices;

- approving multiple increases, extensions and/or renewals of delinquent and defaulted Loss Loans in order to fund interest reserves and continue to derive short term income and profits at the expense of the safety and soundness of federally insured depositor funds, delaying losses and defaults and increasing the losses on the loans;

- failing to heed examiner and auditor warnings of deficiencies in lending and loan administration, failing to correct those deficiencies, and approving, increasing, extending, and/or renewing Loss Loans despite those warnings;

- as senior executive officers, failing to ensure that lending and administration within each officer's respective area of responsibility complied with the Bank's approval terms, policies and procedures, federal safety and soundness regulations, and prudent banking practices;

- as senior asset based lending officers, administering and funding asset based loans despite receipt of reports showing borrower defaults on key loan approval terms and severe collateral impairment; unilateral and unauthorized waiver of key borrower financial covenants designed to protect the Bank; manipulation of Bank loan monitoring systems so as not to reflect continuing deterioration of collateral, ineligible collateral, and violations of covenants and loan agreements; and advancing sums above authorized credit limits;

- as senior construction officers, administering and funding construction loans despite borrower defaults on key loan approval terms and Bank policy requirements,

significant cost overruns, lack of progress in construction, and other clear indications of the infeasibility of the project;

- other acts and omissions to be discovered through pretrial discovery and at trial.

85.    The officer and director Defendants' grossly negligent acts and omissions proximately caused at least $176.02 million in damages to Westernbank, or such other amount as may be proven at trial.

86.    The officer and director Defendants are liable, solidarily, for all damages proximately caused by their grossly negligent acts and omissions.

### Count 2   Breach of Fiduciary Duty Against Tamboer

87.    Tamboer breached his fiduciary duties of loyalty, fidelity, and good faith owed to Westernbank by:

- failing to safeguard the interests of the Bank;

- placing his personal interests ahead of the Bank's interests;

- failing to avoid conflicts of interest, self dealing, or other personal benefit arising from his position as a director;

- failing to disclose his *de facto* 50 percent interest in the Bank's $12 million loan to Museum Towers;

- voting for multiple extensions and/or renewals of the loan for his own and his daughter's benefit;

- other acts and omissions to be discovered through pretrial discovery and at trial.

Alternatively, Tamboer was grossly negligent, amounting to reckless indifference to or deliberate disregard of the welfare of the Bank and its depositors, or actions which were without the bounds of reason.

88.    Had Tamboer fully disclosed his interests in the Museum Towers loan, it would not have been approved, funded, renewed, and/or extended.  Hence, in addition to the other

losses for which he is proximately liable, Tamboer is liable solidarily for all losses suffered by the Bank on the Museum Towers loan.

### Count 3 – Adverse Domination

89.     FDIC incorporates by reference as though set forth in full the allegations of paragraphs 1 through 88 herein.

90.     The officer and director Defendants adversely controlled and dominated Westernbank at all times relevant to this action, thereby preventing the Bank from taking legal action against the Defendants prior to the failure of the Bank and appointment of FDIC as Receiver. Alternatively, the repeated increases, renewals, extensions, administration, and funding of Loss Loans constituted continuing, separate and distinct tortious acts causing additional damages. Those repeated acts delayed losses and defaults on the loans until within one year before the Bank's failure, preventing the commencement or running of applicable statutes of limitation, if any.

### Count 4 - Fraudulent Conveyance Claim Against Stipes

91.     On or about September 15, 2010, over four months after FDIC was appointed Receiver of Westernbank, Stipes transferred approximately $7.44 million in assets to the "Socio Cultural Conservation Trust," a family trust which he settled and controls and of which he is the primary beneficiary. Defendant Luis Bartoleme Rivera Cuebas, in his capacity as Trustee of the Socio Cultural Conservation Trust, is the Trustee of this family trust. There was no consideration for the transfers.

92.     At the time of the asset transfers, Stipes knew of his liabilities to FDIC arising from his grossly negligent acts as a former officer and director of Westernbank, and of his liabilities to other creditors. At the time of the transfers, Stipes was a debtor of FDIC and other

creditors and was insolvent in that he lacked assets sufficient to pay FDIC's claims against him. Stipes made the transfers in fraud of FDIC. Stipes knew or should have known that the transfers would make it impossible for FDIC to enforce and recover on its claims against him. FDIC has been injured by the transfers because they are designed so as to hinder and prevent FDIC from recovering on its claims against Stipes. FDIC has no other remedy to recover on its claims against Stipes. The transfers also constitute contracts in prejudice of FDIC's rights and claims. FDIC therefore is entitled to judgment invalidating, voiding and rescinding the transfers under both Puerto Rico and federal law.

93. Alternatively, FDIC is entitled to judgment annulling the trust established by Stipes because it was established in fraud of FDIC. In the further alternative, FDIC is entitled to judgment establishing a constructive trust over the assets of Stipes, including the assets which he fraudulently conveyed to the family trust.

### Count 5 - Fraudulent Conveyance Claim Against Tamboer

94. On or about December 1, 2010, over seven months after FDIC was appointed Receiver of Westernbank, Tamboer transferred approximately $3.55 million in assets to the "CT Family Trust." Defendant Jane Doe, in her capacity as Trustee of the CT Family Trust, is the Trustee of this trust. There was no consideration for the transfers.

95. At the time of the asset transfers, Tamboer knew of his liabilities to FDIC arising from his grossly negligent acts and breach of fiduciary duty as a former director of Westernbank, and of his liabilities to other creditors. At the time of the transfers, Tamboer was a debtor of FDIC and other creditors and was insolvent in that he lacked assets sufficient to pay FDIC's claims against him. Tamboer made the transfers in fraud of FDIC. Tamboer knew or should have known that the transfers would make it impossible for FDIC to enforce and recover on its

claims against him. FDIC has been injured by the transfers because they are designed so as to hinder and prevent FDIC from recovering on its claims against Tamboer. FDIC has no other remedy to recover on its claims against Tamboer. The transfers also constitute contracts in prejudice of FDIC's rights and claims. FDIC therefore is entitled to judgment invalidating, voiding and rescinding the transfers under both Puerto Rico and federal law.

96.     Alternatively, FDIC is entitled to judgment annulling the trust. In the further alternative, FDIC is entitled to judgment establishing a constructive trust over the assets of Tamboer, including the assets which he fraudulently conveyed to the family trust.

### Count 6 - Fraudulent Conveyance Claim Against Dominguez

97.     On or about December 28, 2010, over seven months after FDIC was appointed Receiver of Westernbank, Dominguez transferred approximately $745,000 in assets to the "Dominguez Sotomayor Family Trust." Defendant John Doe, in his capacity as Trustee of the Dominguez Sotomayor Family Trust, is the Trustee of this trust. There was no consideration for the transfers.

98.     At the time of the asset transfers, Dominguez knew of his liabilities to FDIC arising from his grossly negligent acts as a former officer and director of Westernbank, and of his liabilities to other creditors. At the time of the transfers, Dominguez was a debtor of FDIC and other creditors and was insolvent in that he lacked assets sufficient to pay FDIC's claims against him. Dominguez made the transfers in fraud of FDIC. Dominguez knew or should have known that the transfers would make it impossible for FDIC to enforce and recover on its claims against him. FDIC has been injured by the transfers because they are designed so as to hinder and prevent FDIC from recovering on its claims against Dominguez. FDIC has no other remedy to recover on its claims against Dominguez. The transfers also constitute contracts in prejudice

of FDIC's rights and claims. FDIC therefore is entitled to judgment invalidating, voiding and rescinding the transfers under both Puerto Rico and federal law.

99.     Alternatively, FDIC is entitled to judgment annulling the trust. In the further alternative, FDIC is entitled to judgment establishing a constructive trust over the assets of Dominguez, including the assets which he fraudulently conveyed to the family trust.

### Count 7 -- Direct Action Claims Against Insurance Carriers

100.    Defendants Chartis, XL, Liberty and ACE issued policies of insurance covering the individual officer and director Defendants for their liabilities to the Receiver. FDIC and the Defendants timely reported claims to these carriers within the claim reporting periods under the policies. Pursuant to the Puerto Rico Direct Action Statute, FDIC is entitled to judgment against Chartis, XL, Liberty and ACE in the full amount of the policies.

### RELIEF REQUESTED

I. Pursuant to Federal Rule of Civil Procedure 38, FDIC demands a trial by jury on all claims.

II. FDIC prays that summons issue against all newly added Defendants, to be served upon them with this Amended and Restated Complaint in Intervention in accordance with law.

III. FDIC prays for judgment against all Defendants, solidarily, in the amounts to be proven as to each Defendant at trial, with interest pursuant to 12 U.S.C. § 1821(l), the costs of this action, and such other legal, general, and equitable relief to which FDIC is entitled.

In San Juan, Puerto Rico, on May 16, 2012.

RESPECTFULLY SUBMITTED.

**TORO, COLON, MULLET, RIVERA & SIFRE, PSC**
Post Office Box 195383
San Juan, Puerto Rico  00919-5383
Telephone:    (787) 751-8999
Facsimile:    (787) 763-7760

/s/MANUEL FERNÁNDEZ-BARED
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204204
E-mail: mfb@tcmrslaw.com

/s/JANE PATRICIA VAN KIRK
JANE PATRICIA VAN KIRK
USDC No. 220510
E-mail: jvankirk@tcmrslaw.com

**LISKOW & LEWIS, PLC**
One Shell Square
701 Poydras St., Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:  (504) 581-7979
Facsimile:  (504) 556-4108

/s/James A. Brown/
James A. Brown, T.A. (Bar # 14101)
(*pro hac vice*) jabrown@liskow.com

/s/George Denegre, Jr./
George Denegre, Jr. (Bar # 8387)
(*pro hac vice*) gdenegre@liskow.com

/s/Erin L. Delatte/
Erin L. Delatte (Bar #33088)
(*pro hac vice*) eldelatte@liskow.com

**Attorneys for the Federal Deposit Insurance Corporation**

34

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 16 day of May, 2012, I electronically filed the forgoing

document with the Clerk of Court by using the CM/ECF system, and a copy of the foregoing

pleading has been electronically mailed to all attorneys of record.

/s/ERIN L. DELATTE
Erin L. Delatte (Bar #33088)
*(pro hac vice)* eldelatte@liskow.com

1126391-1

35

# Exhibit B



...pes represents up to at least $100,000 per insured bank

...g management | Consumer Protection | Industry Analysis

...tions Handbook

The Federal Deposit Insurance Corporation (FDIC) learned many lessons about resolving failing financial institutions as it managed the banking crisis of the 1980's and 1990's. The number of failing institutions, their varied businesses, and asset sizes afforded the FDIC a wide range of resolution experiences. Because the crisis lasted a relatively long time, the FDIC had to conduct resolutions at all phases of various economic cycles. Following is a handbook which is a compilation of the lessons learned by the FDIC during those crisis years.

All links on this page reference Portable Document Format (PDF) files. Adobe Acrobat, a reader available for free on the Internet, is required to display or print PDF files. You may also request a printed copy of these files.

## Table of Contents

### CHAPTERS

|  | PAGE# |
|---|---|
| Chapter 1 – Introduction (PDF file - 21 kb) | 1 |
| Chapter 2 – The Resolutions Process (PDF file - 44 kb) | 5 |
| Resolution Strategies | 6 |
| Marketing a Failing Institution | 9 |
| Bid Submission | 13 |
| Least Cost Analysis | 13 |
| Calculation of Cash Amount Due to Acquirer | 15 |
| FDIC Board of Directors Approval | 16 |
| Closing the Institution | 16 |
| Resolution Timeline | 17 |
| Resolution Process Calendar |  |
| Chapter 3 – Purchase and Assumption Transactions (PDF file - 44 kb) | 19 |
| Structure of a Purchase & Assumption Transaction | 19 |
| Types of Purchase and Assumption Transactions | 23 |
| Chapter 4 – Deposit Payoffs (PDF file - 35 kb) | 41 |
| Structure of a Deposit Payoff | 41 |
| Straight Deposit Payoff | 41 |
| Insured Deposit Transfer | 45 |
| Chapter 5 – Open Bank Assistance Transactions (PDF file - 43 kb) | 47 |
| Structure of an Open Bank Assistance Transaction | 47 |
| Assistance to Continental Illinois National Bank and Trust Company | 51 |
| Results of Open Bank Assistance | 53 |
| Chapter 6 – Other Resolution Alternatives (PDF file - 32 kb) | 57 |
| Net Worth Certificate Program | 57 |
| Income Maintenance Agreements | 60 |
| Capital Forbearance Program and Loan Loss Amortization Program | 61 |
| Resolution of Savings and Loan Associations Prior to FIRREA | 62 |
| Management Control | 65 |
| Chapter 7 – The FDIC's Role as Receiver (PDF file - 35 kb) | 67 |
| Comparison with Bankruptcy Law | 67 |
| Why the FDIC Acts as Receiver | 68 |
| How the FDIC Becomes a Receiver | 69 |
| The FDIC's Functions as Receiver | 70 |
| The FDIC's Closing Function | 71 |

3/20/13                                                    FDIC: Resolutions Handbook

Resolution of Claims against the Failed Institution          71
Payment of Claims                                           72
Special Receivership Powers                                 73
Settlement with the Assuming Institution                    75
Disposal of Assets and Termination of Receivership          75
Chapter 8 – Other Significant Issues (PDF file - 14 kb)     77
Maintaining Public Confidence in the Banking System         77
Adequacy of Insurance Funds                                 77
Other Resolution Concerns                                   77
Receivership Issues                                         79
Overview – The Resolutions Handbook at a Glance (PDF file - 14 kb)   81
The Resolutions Process                                     81
Purchase and Assumption Transactions                        82
Deposit Payoffs                                             83
Open Bank Assistance Transactions                           83
Other Resolution Alternatives                               83
The FDIC's Role as Receiver                                 84
Other Significant Issues                                    87

Glossary (PDF file- 33 kb)

Last Updated 04/02/2003

Home | Contact Us | Search | Help | SiteMap | Forms | En Español
Website Policies | Privacy Policy | Plain Writing Act of 2010 | USA.gov | FDIC Office of Inspector General
Freedom of Information Act (FOIA) Service Center | FDIC Open Government Webpage | No Fear Act Data

# OVERVIEW:
# THE RESOLUTION HANDBOOK AT A GLANCE

The Federal Deposit Insurance Corporation (FDIC) learned many lessons about resolving failing financial institutions as it managed the crisis. The sheer number of failing institutions and their varied businesses and asset sizes afforded the FDIC a wide range of resolution experiences. Finally, because the crisis lasted a relatively long time, the FDIC had to conduct resolutions at all phases of various economic cycles. Following is a brief outline of the material presented in this handbook which is a compilation of the lessons learned by the FDIC during those crisis years.

## The Resolution Process

In order to minimize disruption to the local community, the resolution process must be performed as quickly and smoothly as possible. The FDIC employed three basic resolution methods: purchase and assumption (P&A) transactions, deposit payoffs, and open bank assistance transactions.

### Resolution Strategy

The FDIC's resolution activities begin with the receipt of the Failing Bank Letter. After a planning team has contacted the chief executive officer of the failing bank or thrift, the FDIC sends in a team of specialists to complete an information package. Part of the information package is an asset valuation review. The appropriate resolution structures are then chosen, and the FDIC conducts an on-site analysis to prepare and plan for the closing.

### Marketing a Failing Institution

Once all the possible resolution methods have been selected, the FDIC begins to market the failing bank or thrift as widely as possible to encourage competition among bidders. An information meeting is held to discuss the details of the failing institution with the approved bidders. All bidders performing due diligence are provided the same information, so no one bidder has an advantage.

### Bid Submission

Bids are submitted in two parts: the first amount is the premium for the franchise value of the failed institution's deposits, and the second amount is for all or part of the institution's assets.

### Least Cost Analysis

In 1991, to comply with legislation, the FDIC amended its failure resolution procedures to decrease the costs to the deposit insurance funds. The new procedures require the FDIC to choose the resolution

alternative that is least costly to the deposit insurance fund of all possible methods for resolving the failed institution. Bids are forwarded to FDIC headquarters where the bids are reviewed and the least cost determination is made.

*Calculation of Cash Amount Due to Acquirer*

The FDIC in its corporate capacity transfers cash to an acquiring or agent institution in an amount equal to the liabilities assumed, minus the amount of assets purchased, and minus the amount of the premium (if any).

*FDIC Board of Directors Approval*

The FDIC staff submits a written recommendation to the FDIC Board of Directors requesting approval of the resolution transaction. The FDIC Board of Directors may direct that the winning bid determination be delegated to the appropriate division director. Once the FDIC Board of Directors has approved the transaction, FDIC staff notifies the acquirer(s), all unsuccessful bidders, and their respective regulatory agencies.

*Closing the Institution*

The final step in the resolution process occurs when the institution is closed and the assets and deposits are passed to the acquirer. The chartering authority closes the institution and appoints the FDIC as receiver.

*Resolution Time Line*

The entire resolution process is generally carried out in 90 to 100 days, not including the post-closing settlement timeframes.

## Purchase and Assumption Transactions

The most common resolution method for failing banks and thrifts is the P&A transaction. In a P&A transaction, a healthy institution assumes certain liabilities of the failed institution in exchange for certain assets of the failed institution plus financial assistance from the FDIC in its corporate capacity. There have been a variety of P&A transactions as the basic agreement is conducive to change. Since each failed bank situation is unique, the terms of the agreements should be flexible enough to obtain the highest value for the receivership. Variations include loan purchase P&As, modified P&As, P&As with put options, P&As with asset pools, and whole bank P&As. Two of the more specialized P&As are loss sharing transactions and bridge banks.

Loss sharing was designed to address the problems associated with marketing large banks with sizeable commercial loan and commercial real estate portfolios by limiting the downside risk of those portfolios to the

acquirers. In a loss sharing transaction, for a specified period of time, the FDIC absorbs a significant portion (typically 80 percent) of credit losses on shared loss assets, usually commercial loans and commercial real estate loans, and acquiring institutions assume the remaining 20 percent of loss. In turn, the FDIC generally receives 80 percent of the recovery on those shared loss assets and the acquirer retains 20 percent. A bridge bank is a full-service national bank chartered by the Office of the Comptroller of the Currency and controlled by the FDIC. It can be operated for two years, with three one-year extensions. A bridge bank provides the FDIC time to arrange a permanent transaction and is especially useful in situations where the failing bank is large or unusually complex.

## Deposit Payoffs

A deposit payoff is only executed if the FDIC does not receive a bid for a P&A transaction that meets the least cost test. There are two types of deposit payoffs. The first type is a straight deposit payoff, in which the FDIC in its corporate capacity ensures that each depositor is paid the amount due, up to the insured limit. Depositors may come to the failed bank premises to collect their checks, or the FDIC may mail the checks to the depositors. The second type is an insured deposit transfer, in which insured deposits and secured liabilities of a failed bank or thrift are transferred to a healthy institution, and service to insured depositors is uninterrupted.

## Open Bank Assistance Transactions

The FDIC may provide open bank assistance to prevent an insured depository institution from closing; however, such proposals face significant policy, cost, and administrative obstacles when compared to alternative types of transactions. As a result, open bank assistance has not been used since 1992.

## Other Resolution Alternatives

### Net Worth Certificate Program

Net worth certificates were used to provide noncash assistance to troubled institutions. The purpose of this program was to buy time for banks, thrifts, and savings banks to correct temporary problems caused by interest rate imbalances.

### Income Maintenance Agreements

Income maintenance agreements were used to adjust for the effect that deregulation of interest rates was having on some of the larger savings banks. The FDIC used income maintenance agreements to facilitate mergers of troubled savings banks with healthy institutions.

*Capital Forbearance Program and Loan Loss-Amortization Program*

The FDIC implemented these two programs to assist well-managed, economically sound institutions that were suffering because of the agricultural or energy crises.

*Resolution of Savings and Loan Associations Prior to FIRREA*

Mergers were a common method of resolution for the Federal Savings and Loan Insurance Corporation (FSLIC). Assistance in mergers included yield maintenance, which guaranteed a market rate of return on nonperforming assets; capital loss coverage on certain assets, which reimbursed the acquirer for losses that occurred when the assets were sold; negative net worth payments, which made the assets and liabilities of a failed thrift balance for the acquirer; and indemnifications, which protected the acquirer for legal expenses.

*Control of Management*

In 1985, a new FSLIC program called the Management Consignment Program placed troubled thrifts under new management in an attempt to strengthen the financial positions of the institutions for future sales or mergers.

## The FDIC's Role as Receiver

The federal statutory framework governing the resolution of failed depository institutions promotes the sound and effective operation of receiverships, with the goal of reducing losses to depositors and creditors. The FDIC plays a predominant role as principal administrator of the resolutions of insured institutions.

*Comparison with Bankruptcy Law*

See special receivership powers.

*Why the FDIC Acts as Receiver*

Prior to the creation of the FDIC, the Office of the Comptroller of the Currency supervised national bank liquidations. Liquidations of state banks varied considerably from state to state, but most were handled under the provisions for general banking insolvencies. The U.S. Congress created the FDIC in an effort to simplify the procedures; to eliminate duplication of records; and to vest responsibility for liquidation in the largest creditor, whose interest was to obtain the maximum possible recovery.

*How the FDIC Becomes a Receiver*

The FDIC must be appointed as receiver for insured federal savings associations and national banks. For state chartered and Federal Reserve member banks, the chartering authority has the option of appointing the FDIC as receiver, although rarely has another entity been appointed. In certain instances, the FDIC may appoint itself as receiver for a depository institution. Courts have long recognized the dual and separate functions of the FDIC in its corporate capacity as insurer and as receiver.

*The FDIC's Functions as Receiver*

The FDIC is expected to maximize the return on the assets of the failed bank or thrift and to minimize any loss to the insurance fund that may result from closing the institution. A receivership is designed to market the institution's assets, liquidate them, and distribute the proceeds to the institution's creditors. The FDIC as receiver succeeds to the rights, powers, and privileges of the institution and its stockholders, officers, and directors. A receiver also has the power to merge a failed institution with another depository institution or to form a new nationally chartered institution, known as a bridge bank. The receiver is not subject to the direction or supervision of any other regulatory authority.

*The FDIC's Closing Function*

After failure, the first task of the receiver is to take custody of the failed institution's premises and all its records. The next step is to inform the public of the institution's closing. The FDIC closing staff works to bring the general ledger in balance as of the closing date and, when there is an assuming institution, creates two sets of books: one for the assuming institution and one for the receivership.

*Resolution of Claims Against the Failed Institution*

All claimants must file proof of their claims with the receiver by a specified deadline. Once a claim has been filed, the receiver has 180 days to determine if the claim should be allowed. If the claim is allowed, the claim will be paid on a pro rata basis with other allowed claims of the same class. If the claim is denied, the claimant may file suit or continue pending litigation.

*Payment of Claims*

The National Depositor Preference Amendment and related statutory provisions provide that claims are to be paid in the following order:

1. Administrative expenses of the receiver,
2. Deposit liability claims (the FDIC claim takes the position of the insured deposits),
3. Other general or senior liabilities of the institution,
4. Subordinated obligations, and
5. Shareholder claims.

Claimants are sometimes issued an advance dividend based on the projected recovery value of the failed institution's assets.  Advance dividends usually range between 50 cents and 80 cents on the dollar of receivership claims.

*Special Receivership Powers*

The FDIC as receiver has a number of special powers that have been granted by federal law,

- A receiver may repudiate contracts of the depository institution that it deems are burdensome.

- The receiver is substituted as a party in litigation pending against the bank or thrift.  However, a court must stay the litigation at the request of the receiver; this allows the receiver to evaluate the facts to decide how to proceed.  The receiver also has the right to remove litigation from state court to federal court.

- The receiver has the power to avoid certain fraudulent transfers made by an institution's obligors within the period beginning five years before and ending five years after the receiver's appointment if there was an intent to hinder, delay, or defraud the institution.

- Federal statutes provide certain "special defenses" to the FDIC in its role as receiver to allow for the efficient resolution of a failed institution's affairs.  Both statutes and court decisions recognize that, unless an agreement is properly documented in the institution's records, it cannot be enforced against the receiver, either to make a claim or to defend against a claim by the receiver.  The U.S. Congress also provided the FDIC as receiver with additional protection by prohibiting courts from issuing injunctions or similar equitable relief to restrain the receiver from completing its resolution or liquidation activities.

*Settlement with the Assuming Institution*

A settlement date may be from 180 days to 360 days after the bank or thrift closing, depending on the institution's size.

*Disposal of Assets and Termination of Receivership*

In order to have funds to disburse, the FDIC works to dispose of the remaining assets of a failed institution in a timely manner through a variety of methods. Receivership termination represents the final process of winding up the affairs of the failed institution.

## Other Significant Issues

The FDIC discovered many significant issues that arose while it resolved failing institutions during the bank and thrift crisis that began in 1980. Some of these issues include the following:

*Maintaining Public Confidence in the Banking System*

One of the FDIC's primary missions is to maintain public confidence in the U.S. financial system. When a bank fails, the FDIC accomplishes this mission through prompt and efficient payment of insured deposits and by minimizing the impact of an institution's failure on the local economy.

*Adequacy of Insurance Funds*

Ideally, adequate insurance funds should be available for resolving failing financial institutions. When such funds are not available, officials should focus on alternatives that minimize delay in resolutions.

*Other Resolution Concerns*

Failing financial institutions should be resolved as quickly as possible to preserve franchise values. Bidders' due diligence should be monitored to ensure equitable treatment among all bidders. A resolution process that most closely resembles a free market will yield the best economic results for all involved. Resolution structures that provide assistance over a period of time must be carefully crafted to provide appropriate incentives.

*Receivership Issues*

Assistance can be gained and goodwill can be created by sharing information with the local media about how a resolution will be conducted. When planning for any closing, whether there is to be an acquiring

institution or not, it is important to make arrangements for direct deposits coming into the failing bank or thrift and to coordinate with the on-line debit servicers concerning ATM transactions.  Arrangements must be made to take care of the failed institution's customers who have concerns about uninsured deposits and loans retained by the receiver.   Consideration must be given to ongoing business concerns and the availability of other credit sources in the local area. The creation of policies for dealing with borrowers of failed institutions is critical to maximizing recovery on their loans.