# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER OF WESTERNBANK PUERTO RICO,<br><br>    plaintiff intervenor,<br><br>v.<br><br>FRANK C. STIPES, *et al*., | CIVIL ACTION NO. 11-02271 (GAG/BJM)<br><br>RE: DECLARATORY JUDGMENT |

## THE D&OS'[1] MOTION TO COMPEL THE FDIC'S RULE 30(B)(6) DEPOSITION TESTIMONY AND FOR SANCTIONS

A defendant haled into court by a plaintiff seeking 178 million dollars isn't required to guess why he is being sued. The Federal Rules of Civil Procedure put an end to "trial by ambush"[2] decades ago, and make no exception for the FDIC. After nearly four years of investigation, three years of litigation, and millions of dollars in fees, it was past time "for the FDIC to get very specific about the loans for which it is claiming damages, about its contentions regarding why defendants are liable for those damages and about the amount of loss claimed for each loan."[3] Unforgivably, at its corporate representative deposition, the FDIC wasn't specific about much of anything.

Though the FDIC has long had the information advantage from years of investigation, sole possession of the Bank's files, and countless hours of deposition testimony, the FDIC corporate representative couldn't even begin to explain any of the so-called "key deficiencies" it alleged in its complaint *two years ago*. It couldn't explain why these "deficiencies" constituted

---

[1] The "D&Os" are Frank C. Stipes, Juan C. Frontera García, Héctor Del Río Torres, William Vidal Carvajal, César Ruiz, and Pedro R. Domínguez Zayas.
[2] *See Garrett v. Tandy Corp.*, 215 F.R.D. 15, 19 (D. Me. 2003) ("an important object of [the Federal Rules of Civil Procedure] is to avoid trial by ambush . . . .") (citing *Macaulay v. Anas*, 321 F.3d 45, 50 (1st Cir. 2003)).
[3] *FDIC v. Butcher*, 116 F.R.D. 196, 201 (E.D. Tenn. 1986).

"gross negligence," why some were more important than others, or why some of its allegations were just flat out wrong. It didn't even know which D&Os were liable for what, on which loans, and for what acts, which is no surprise when the (1) FDIC's complaint says one thing, (2) its interrogatory answers say another, and (3) its expert report is completely off the map.

Worst of all, the FDIC couldn't even remember how much it was suing the D&Os for. A review of the transcript reveals a bunch of "I don't know," "I'm not sure," "I would have to go back and look at the documents," or "I would like to defer to the Clabby Report," which is the FDIC's expert report.[4] For even basic questions, like "can Mr. Stipes see into the future" the FDIC played keep away, very clearly trying to "run out the clock" on the D&Os' allotted 18 hours. This game continued throughout the deposition, violating the rule that the FDIC answer questions "directly and without evasion, in accordance with the information the deposed party possesses, after due inquiry." *Mitsui & Co. (U.S.A.), Inc. v. P. R. Water Res. Auth.*, 93 F.R.D. 62, 66 (D.P.R. 1981). The FDIC's evasion had the intended result, preventing the D&Os from questioning the FDIC in depth about the majority of its allegations, and leaving parties being sued for 176 million dollars without the "ability to defend themselves in court" and the

---

[4] There are at least 200 insufficient responses. We list just a few: M. Potts Tr. 60:22, attached as Exhibits A (Part 1), Exhibit B (Part 2), and Exhibit C (Part 3) (the FDIC doesn't know why it listed two dates for grossly negligent votes approving loans for Sabana); 79:16-18 (the FDIC doesn't know when the presale requirement kicked in for the Sabana loan); 83:9 (the FDIC doesn't know whether the presale requirement was ever met on the Sabana loan); 113:25 (the FDIC doesn't know what evidence the FDIC has regarding 91 options purchased as of May 2006 for the Sabana development); 115:18 (the FDIC doesn't know whether FDIC has evidence to question the validity of 64 options purchased for the Sabana development in May 2007); 118:15-18 (the FDIC doesn't know whether the Bank failed to adequately analyze the options obtained for the Sabana development); 131:18 (the FDIC doesn't know whether Mr. Scarfia invested $3.28 million in equity for the Sabana loan); 150:6 (FDIC doesn't know the amount of upfront equity in place for the Sabana loan); 204:12 (the FDIC doesn't know what policy, if any, imposed a requirement to "cross paper" loan files with financials of borrowers); 208:25 (the FDIC doesn't know whether an FDIC regulation, which the FDIC stated the D&Os violated, was in effect at the time of the alleged violation); 220:15 (the FDIC doesn't know if it has a fact witness to state that Westernbank did not verify financials for the Sabana loan); 284:20-21 (the FDIC doesn't know whether the D&Os had a $10 million appraisal when Plaza CCD was approved); 288:12 (the FDIC doesn't know whether there was a breakdown of upfront equity for the Plaza CCD loan); 295:5-6 (FDIC doesn't know whether a $1.5 million payment had been paid by the borrowers in Plaza CCD); 316:4 (the FDIC doesn't know whether a loan disbursement sheet with Mr. Cortina's name on it existed).

"opportunity to directly confront the entity that haled them into court." Order at 4, dated January 2, 2014, at D.E. 749 (the "January 2d Order").

Mediation is scheduled for tomorrow, and was supposed to occur after the D&Os had a chance to confront their accuser, and test the FDIC's allegations, which, as we demonstrate below, do not withstand scrutiny. But the D&Os are back before this Court because the FDIC has failed to produce a corporate representative capable of testifying about basic information that it had more than two years to develop. We didn't expect the FDIC to produce a representative that had "superhuman" memory capabilities, but it's inexcusable to produce a representative that doesn't remember anything at all, including answers to fundamental questions like what its allegations are, who it, in fact, is suing (and for what), and the actual damage amount. The FDIC should not be allowed to "escape its discovery obligations due to the complexity of its claims," because as this Court ordered, such games "would allow clever and ingenious plaintiffs to escape their discovery obligations and limit their opponents." *Id*. So it is here.

Accordingly, we have no choice but to seek another order compelling the FDIC to comply with its discovery obligations. We respectfully request an order compelling the FDIC to produce a representative capable of testifying about its allegations against the D&Os. Specifically, we ***only request*** that the Court order the FDIC to produce a representative that can testify as to the so-called "key deficiencies" that the FDIC alleged more than two years ago at paragraph 80 of its complaint, which the Court relied on in denying the D&Os' motion to dismiss. We also respectfully request leave to complete the FDIC's corporate representative deposition outside of the discovery period on a mutually agreeable time and date.

3

1.       **Background**

When the Court granted in part, and denied in part, the FDIC's motion for protective order, it rejected the FDIC's argument that its case was too complex for the FDIC to designate a Rule 30(b)(6) designee. It also said that the FDIC's complaint, discovery responses, court filings, and expert report were no substitutes for deposition testimony. The Court held that even though this "case is complex," and "the FDIC's corporate designee(s) will undoubtedly be burdened with the task of testifying to a substantial amount of information," the FDIC made this case complex and must abide by the consequences of its decision. *See* January 2d Order at 4. Thus, the FDIC was under court order to designate a corporate representative capable of discussing its allegations in the Third Complaint.[5] For three days, the FDIC ignored the Court's order, producing a designee named Ms. Mary Potts, who provided little, if any, specifics about the FDIC's allegations.

2.       **Ms. Potts was Unprepared to Answer Questions Relating to the FDIC's Allegations**

Because the FDIC was evasive in its responses, the D&Os were only able cover a fraction of the FDIC's so-called "key deficiencies." And as to those allegations the D&Os were able to cover, the FDIC responded mostly with "I don't know," or some variation, many times. We discuss below a few examples that are representative of the entire deposition:

A.       ***Ms. Potts could not answer questions related to the Sabana loan***

Sabana del Palmar ("Sabana") is one of the FDIC's eight so-called "loss loans." It alleges that so-called "key deficiencies in underwriting and/or administration were readily apparent to the Defendants who approved and/or administered" the loan. Yet the FDIC couldn't even begin to explain the "key deficiencies."

---

[5] Second Amended and Restated Complaint in Intervention at D.E. 186 (the "Third Complaint").

*(i)      Alleged "lack of required presales"*

One of the "key deficiencies" was an alleged "lack of required presales." Third Complaint at ¶ 80(a). The timing for this purported requirement is critical, because the presales were in place before closing. Thus, the D&Os asked if the presales had to happen (a) at the time the D&Os approved the loan, (b) prior to closing, (c) prior to disbursing money, or (d) at some other time. Ms. Potts could not answer this question:

> Q:      All right. This is critical. I need to understand the FDIC's position --
> A:      I understand.
> Q:      About when the presale requirement kicks in. Do you understand?
>          And if I am understanding you, it's the FDIC's position that the presale requirement kicks in on the first date that a committee of the bank votes to approve that loan, is that right?
> A:      I don't know.
> Q:      You don't know?
> A:      I don't know.

M. Potts Tr. at 79:6-18.

Ms. Potts didn't even know if this "key deficiency" was ever met, even though she agreed she should know the answer to this question before alleging the D&Os supposedly committed "gross negligence":

> Q:      Does -- do you know that the presales requirement was met before -- before September 23rd, 2004? Does the FDIC know that?
> A:      I don't know that.
> Q:      When -- according to the FDIC when, if ever, were the presales made in this case?
> A:      I am not aware that they were.
> Q:      Is it the FDIC's position that the presales requirement was never made -- never accomplished?
> A:      ***I don't believe they were, but I don't know for certain.***
> Q:      Is it the FDIC's position it doesn't matter if they were ever met?
> A:      Oh, I think the FDIC's position is it would matter if they were met.

M. Potts Tr. at 83:6-21 (emphasis added).

*(ii)     Allegedly grossly negligent loan increases*

The FDIC says that the D&Os also were grossly negligent in approving loan increases for Sabana. Third Complaint ¶ 80(a). Is this allegation based on the same "key deficiencies" or some other ones? The FDIC doesn't know:

> Q:      Does the FDIC concede that it repeats key deficiencies as to increase, or is its position that the key deficiencies are not the basis for its allegations on increases? It's got to be one way or the other.
>
> A:      The allegation is increases are made despite material violations.
>
> Q:      Stated above, including the presale obligation, right? Three bullet points above.
>
> A:      It says "despite material violations above." It doesn't say that they were all of those at the increases. It doesn't...
>
> Q:      Does that -- is it the FDIC's position that when it makes allegations that the defendants are left to guess which ones count and which ones don't count?
>
> A:      No. The allegations are that the defendants voted to approve these loans that had significant deficiencies on them and/or approved increases in extensions that also had deficiencies on them.

M. Potts Tr. at 110:19-23; 111:1-16. The D&Os are left guessing.

>          (iii)    Supposed "lack of upfront equity"

In response to the D&Os' Interrogatories, the FDIC tried to amend without leave its complaint, which is improper and another violation of the Federal Rules.[6] It said for the first time that the D&Os "approved the first Sabana del Pamar loan despite" a lack of upfront equity. The D&Os asked Ms. Potts what the FDIC considered to be upfront equity and what evidence it has to suggest there was a lack of it. Ms. Potts didn't know:

> Q:      My question is: Does the FDIC have evidence now, when it is supposed to be talking about these allegations, about whether the total of 7.7 percent was paid upfront within the definition of front equity or does it not? It is just a question of whether the evidence -- what is the evidence?
>
> A:      Off the top of my head, as I said, I have not memorized any document relating to this case. I would have to defer to our answers to discovery and to our expert report.

---

[6] See, e.g., FDIC Responses to F. Stipes First Set of Interrogatories, dated April 29, 2013, at 20. We will leave for another day the FDIC's improper attempt to amend its pleadings (for a fourth time) through responses to the D&Os' Interrogatories. Suffice it to say, we object, and reserve our rights to seek all appropriate relief.

M. Potts Tr. at 135:13-23.

The D&Os then asked if the FDIC had any evidence that the D&Os did not make an exception to the upfront equity requirement—which is permitted under Westernbank's loan policy—prior to the approval of the loan. Again, Ms. Potts declined to answer, improperly referring to the Clabby Report,[7] and then admitting that there may be documents she has not seen that would answer the question:

> Q:    Do you have any evidence -- does the FDIC have any evidence that these defendants failed, with regard to the policy, that they had to be consulted and that they had to approve an exception?
> A:    The exception should be consulted and approved, and there should be something noted in the CAM, in the minutes, that this exception was mitigated and discussed.
> Q:    So let me break it down. The answer to my question, if I understand, does the FDIC have evidence that the defendants did not comply with the requirement that they had to be consulted and that they had to be approved, that the FDIC has, is that it's not noted in either the credit approval memorandum or in minutes of the meeting? Is that what you are saying? That is the evidence.
> A:    The fact that the 10 percent upfront equity was not invested in the project.
> Q:    My question is: Is the FDIC's evidence for that proposition that they failed to meet this policy requirement found at page 22 of Defendant's 164, the absence of a notation either in the credit approval memorandum or the minutes of January 28, 2004 meeting? Is that the evidence?
> A:    I will refer to our answers and our expert reports. Certainly that would be part of it.
> Q:    What is the other part?
> A:    There may be other documents that I haven't seen or memorized that may list it in -- I may have to look at the policy to see in general if there is another notation regarding exceptions.

M. Potts Tr. at 143:6-10, 12-25; 144:1-18.

> *(iv)    Allegedly excessive "loan-to-value" ratio*

---

[7] We further discuss Ms. Potts improperly referring the D&Os to the Clabby Report for answers to their questions in Section 4(a) below.

Another alleged "key deficiency" was a loan-to-value ratio of 90.5 percent. Third

Complaint ¶ 80(a). The D&Os asked the FDIC what it considered to be an acceptable loan-to-

value ratio. After several evasive answers, Ms. Potts said 85 percent:

> Q:    Okay. Let me ask you a question. You're the FDIC. What was the
>        applicable LTV on the Sabana loan that you all say we were grossly
>        negligent about as to LTV? It's a very straightforward question.
>        You guys have had three years to figure it out. Can you answer that
>        question, please?
> A:    For construction on the one to four family I do believe it's 85 percent.

M. Potts Tr. at 156:1-9. That's interesting, because the FDIC has said for years that the proper

loan to value was **80 percent**. Which one is it? Ms. Potts had no idea:

> Q:    Okay. So why is the FDIC saying 80 percent for all this time, three years
>        later?
> A:    You know, I would have to go back to when this loan originated in 2004,
>        because I know some of these LTVs did change, and I would have to
>        double check to see the exact numbers on it.
> Q:    So the FDIC today, the FDIC today cannot state what the applicable LTV
>        was? I would be very happy to take an answer, really, really --
> A:    I would like to defer to Mr. Clabby's report that does set forth the proper
>        LTV on this loan after reviewing all of the documents
>        that I just don't have in front of me.

M. Potts Tr. at 156:10-11, 13-20, 22-25; 157:1-2.

> (v)     Allegedly "grossly inadequate financial analysis of guarantors"

Another "key deficiency" was "grossly inadequate financial analysis of guarantors."

Third Complaint ¶ 80(a). The D&Os showed Ms. Potts the financial statements of the guarantor,

Mr. Scarfia, and asked why they were grossly inadequate. Ms. Potts responded that the financial

analysis was "not complete to the extent that this was not a complete certification by Mr.

Scarfia." M. Potts Tr. at 217:13-17. The D&Os then asked Ms. Potts whether the FDIC has any

witness who can testify that Westernbank did not verify the accuracy and completeness of the

financial statements. Ms. Potts, again, did not know:

> Q:      Is it a fair statement, does the FDIC concede it doesn't have a witness, a fact witness, that says the bank did not perform the procedures required to verify the accuracy either of the statements reflected in 190 or the statements reflected in 189?
>
> A:      Off the top of my head, I don't know.

M. Potts Tr. at 220:9-15.

### B.      *Ms. Potts was unprepared to answer questions relating to the Plaza CCD Loan*

Plaza CCD Development Corporation ("Plaza CCD") is another so-called "loss loan." As we've explained before, it was to be the anchor for what is called the "Golden Triangle," which was to "strengthen Puerto Rico's position as the international hub for foreign trade, while enhancing the competitive advantages of doing business on the island . . . ."[8] Despite the FDIC touting it to be the second largest loan at issue, it was woefully unprepared to discuss the so-called "key deficiencies" regarding the loan. Below are a few examples.

#### (i)      *Ms. Potts didn't know whether the FDIC alleged that the D&Os were grossly negligent for requiring additional "retainage" equity in excess of front equity*

The FDIC alleges that the "Bank disbursed $26.9 million in draws despite . . . the borrower's failure to provided required ten percent equity contributions . . . ." Third Complaint ¶ 80(e). This allegation ignores that the D&Os actually required ***more* than 10% equity in the form of** "an additional 10 percent of 'retainage' equity over the life of the loan for a total equity requirement of **17 percent** . . . ." M. Potts Tr. at 300:5-10 (emphasis added). How could requiring *more* equity over the life of the loan be "grossly negligent?" Ms. Potts did her best to evade this question, squandering precious time with non-answers:

> Q:      This is the last try. I just have to make a last try on this key deficiency. Then I will have to take it up with the court. I don't have any other choice.

---

[8] *See* D&Os' Opposition to GDB's Motion to Quash at 1, D.E. 746 (citing http://www.prnewswire.com/news-releases/puerto-rico-golden-triangle-initiative-expected-to-boost-businessand-tourism-74541432.html, last visited December 27, 2013).

> I am asking about a key deficiency alleged -- alleged key deficiency according to the FDIC. It's the language of the FDIC. Is it the FDIC's contention that by making exceptions on the Plaza CCD loan from 10 percent front equity to 7 percent in exchange for 10 percent retainage from the borrower, for a total of 17 percent equity from the borrower, the directors and officers were acting in a grossly negligent fashion?

A:    Again, as I stated, the FDIC's position is in the totality of the loan approval. It is not taking isolated deficiencies one by one.

M. Potts Tr. at 300:24-301:18.

> (ii)    *Ms. Potts didn't know whether the FDIC has any evidence that the borrower for the Plaza CCD loan failed to put up $1.5 million as front equity for the loan*

Ms. Potts told the D&Os that equity from a borrower is important to "demonstrate[] his or her commitment to the project" because they "hav[e] some skin in the game, an incentive to follow through with it." M. Potts Tr. at 151:5-9. However, when the D&Os asked Ms. Potts whether the FDIC had any evidence that the Plaza CCD borrower failed to pay a specific $1.5 million amount as front equity at the time the loan was approved, Ms. Potts didn't know:

> Q:    What evidence does the FDIC have that the balance of the equity, when one removes retainage, and the land equity referred to there, the $1.5 million balance had not been paid by Rubi and/or his companies as of the time of the approval vote?

A:    I can't say for certain that we have something that shows it was not paid.

M. Potts Tr. at 294:24-25, 295:1-6.

> (iii)    *Ms. Potts couldn't tell the D&Os when the "grossly negligent" acts occurred regarding a Plaza CCD loan extension*

The D&Os asked Ms. Potts why the FDIC couldn't keep its facts straight, alleging in the Third Complaint a "grossly negligent" approval on April 24, 2008, but then responding to interrogatories that the "grossly negligent" approval happened on May 23, 2008. Ms. Potts could neither explain the discrepancy, nor tell the D&Os what day the alleged "grossly negligent" conduct occurred:

Q:    Do you know why this variance between the complaint and interrogatory
      response?

A:    No, I don't.

Q:    The alleged grossly negligent act is the vote of the -- of the individuals
      listed in the complaint with the "X"s next to this April 24, 17 2008, but
      that that it was a vote on -- of the meeting of the board of directors
      on May 23, 2008? Is that what it means?

A:    I just said I can't explain the discrepancy to you.

Q:    But that one I need to know. I need to have an understanding --

A:    I have not seen this before, so I -- to note this discrepancy, so I can't tell
      you.

Q:    Okay. I need to know what to defend against, so I guess the only way to
      crystallize this is to ask, on the $4.91 million loan, what day is the FDIC
      saying that my clients or any of the defendants did a grossly negligent act?
      So I can figure out how to defend.

A:    As I say, this is the first I have seen the two different dates. And I am
      going to have to defer to the complaint and the answers to interrogatories,
      augment the complaint

M. Potts Tr. at 319:11-25, 320:1-10.

### C.    *Ms. Potts couldn't explain what it is that Cesar Ruiz did that was "grossly negligent"*

For three years, the FDIC has dragged Mr. Ruiz along with this case, alleging he voted on

the Intercoffee loan on two separate dates—October 28, 2005, and September 28, 2007. Third

Complaint ¶ 79. Yet when the FDIC served its expert report, on December 2, 2013, it vastly

expanded its allegations, claiming that Mr. Ruiz was liable for additional votes not alleged in the

Third Complaint. This unapproved amendment (without the required leave of Court), of course,

leaves Mr. Ruiz guessing what the FDIC is suing him for and greatly complicated his defense

three months after the start of discovery. To clear this up, the D&Os asked Ms. Potts for what the

FDIC is suing Mr. Ruiz. She didn't know the answer:

Q:    My question is simple. What does the FDIC say today that Mr. Ruiz did
      wrong? I need to know that. I'm allowed to know that. The court ordered
      you to tell me that. What is the answer?

A:    The wrongdoing by Mr. Ruiz on the InterCoffee loan would have been for
      his vote to approve the loan and any increases thereto.

Q:    So the FDIC's position now is that all these six dates that are reflected on
      pages 76 and 77 are now alleged as wrongful acts of Mr. Ruiz?

A:    As far as increases in the loan, that he voted on, yes.

Q:    Will the FDIC admit that nowhere in this case, prior to pages 76 and 77 of
      this November 25 report, has that ever been alleged?

A:    I -- I can't admit to this. I would have to look through --

Q:    Has the FDIC ever, before the November 25 report and now today, relying
      on the November 25 report, said that it's alleging wrongdoing by Mr. Ruiz
      for all the six dates that are listed at pages 76 and 77 of the Clabby report?

A:    The FDIC's claim against Mr. Ruiz is for votes to approve the loan and
      increases thereto, that he voted on.

Q:    Was that ever stated as to all of the items listed on pages 76 and 77 of the
      Clabby report before you said it today for the FDIC?

A:    I don't know.

M. Potts Tr. at 526:19-23; 527:1-16.

### D.    The FDIC was unprepared on the issue of damages

Finally, as required by the Court's January 2d Order, Ms. Potts was to answer the D&Os'

questions related to the FDIC's calculations of its damages. Unfortunately, Ms. Potts wasn't sure

how much the FDIC is suing for:

Q:    All right. How much is the FDIC seek -- seeking in damages in this case?

A:    As stated, the amount in the complaint and if there was any augmentation
      of that in the responses to discovery.

Q:    Could you tell me the dollar amount that the FDIC is seeking, if it's
      something different than what's in the complaint?

A:    As I stated, it would be -- it would be this 176 million and if there was
      anything further in -- in response to discovery. But I'll say 176 million, as
      in the chart.

Q:    Okay. Can I rely, as the attorney for Mr. Biaggi, that the FDIC is not
      seeking anything in addition to $176 million from this group of named
      defendants?

A:    As I stated, $176 million. If it was augmented further in our responses to
      discovery, I think we have to look at that whole picture.

M. Potts Tr. at 629:3-18, 21-24. Of course, since Ms. Potts didn't know how much the FDIC is

suing the D&Os for, she certainly wasn't prepared to tell the D&Os how the damages were

calculated:

Q:    Well, I want to know how you -- how the FDIC calculated this 176
      million-dollar damages number. I think you've testified that was the

> book value. I think I'm entitled to know, then, so that we are ultimately getting to my answer of how did you calculate your damages, how was book value calculated?
>
> A:    The FDI [sic] receiver reconciles, with the Westernbank books, what the book value was as of April 30.
>
> Q:    And how did it do it in this case? Do you know?
>
> A:    I was not on the accounting side to specifically know all of the intricacies of their accounting reconciliation. No.
>
> Q:    Well, I don't really want to know the intricacies. I just want to know the methodology and how -- how this 176 million-dollar figure was determined. Do you know that?
>
> A:    I don't know any more on that than what I've told you.
>
> *    *    *
>
> Q:    In light of all that has just been stated, Ms. Potts, again, I'm at a loss here to spend a lot of time on this if -- and I can't argue about what you know and don't know and what you've been prepared for. Do we agree that you do not have an understanding of how the FDIC calculated that 176.02 million-dollar claim that has been made against these named defendants?
>
> A:    Aside from what I've said, I have nothing to add.

M. Potts Tr. at 634:12-19; 635:1-15; 637:13-21, 24-25.

**3.**    **Ms. Potts was Required to Answer Questions Related to the Examination Topics, and it was Improper for her to Direct the D&Os to an Expert Report or to the FDIC's Discovery Responses**

When Ms. Potts didn't know the answer to a question, which was often, she frequently directed the D&Os to the FDIC's discovery responses and the Clabby Report. This is improper.

### A.    *Experts provide opinions, not facts, and cannot substitute 30(b)(6) testimony*

As shown above, Ms. Potts repeatedly deferred to the Clabby Report for answers. In fact, after an extended break, Ms. Potts' answer changed from "I don't know" to "I will defer to the Clabby Report." This was her answer to at least 10 critical questions on the first day alone:

> Q:    By my account, madam, as the FDIC corporate representative, just in the first day of this deposition, there were ten different instances when you relied on the Clabby report on factual regulatory matters. Does that sound about right?
>
> A:    As I said, it is one of the many pieces of information that the FDIC is relying on.

M. Potts Tr. at 529:4-11.

An expert can never substitute as proper Rule 30(b)(6) testimony. It's hornbook law that an expert witness is "not called upon to testify as to facts known to an organization, but are instead called upon to offer *opinion* based on facts provided." *MP NexLevel, LLC v. Codale Elec. Supply, Inc.*, 2012 WL 2368138, *2 (D. Utah 2012) (citing Fed. R. Evid. 702; *Daubert v. Merrel Dow Pharmaceuticals,* 509 U.S. 579, 589–590 (1993)). The FDIC fed Mr. Clabby its version of the "facts," which he accepted as true in rendering his opinion. The D&Os are entitled to examine and test the sufficiency of the FDIC's allegations at a 30(b)(6) deposition. *See id.* ("Corporate witnesses under Rule 30(b)(6) are representatives of the organization and are charged with testifying on behalf of the organization about facts known or reasonably known."). It defies common sense to defer to the FDIC's expert report, when all he can testify about is his opinion based on a distorted version of the facts. Therefore, it is wholly improper for the FDIC to say "you'll have to read the Clabby Report for an answer." *See NexLevel, LLC*, 2012 WL 2368138, at *2 (holding that expert testimony is not a substitute for a corporate 30(b)(6) deposition). Simply put—Mr. Clabby is not the FDIC, is not suing the D&Os, and cannot speak on behalf of the FDIC.

### B.     The Court ruled that the FDIC had to designate a 30(b)(6) representative, and rejected the FDIC's argument that the complaint and interrogatory responses could substitute for a Rule 30(b)(6) deposition

Ms. Potts also frequently deferred to the FDIC's discovery responses for answers. The Court has already rejected that dodge, stating "depositions by oral examination are an important and preferred method of examination because they allow the parties to question and cross-examine the deponent like no other method." Order at 4. The FDIC should not be allowed to flout that order by referring the D&Os to interrogatory responses during the Rule 30(b)(6) deposition. The D&Os are entitled the "opportunity to directly confront the entity that haled

14

them into court," (Order at 4) and get answers about the FDIC allegations, which is crucial to their "ability to defend themselves in court." *Id*.

4.    **Sanctions are Appropriate due to Ms. Potts' lack of Preparation and Evasive Answers, which Burned Crucial Time, Limiting the D&Os' Questions**

The FDIC has had years to learn its case and months to prepare its corporate representative to answer questions about its lawsuit. However, when it came time to get specific about its allegations, the FDIC couldn't answer why it alleged "key deficiencies" on the loans, how much it was suing for, or even which D&Os were accused of what. Either the FDIC has no idea why it brought this lawsuit or it completely failed to produce a knowledgeable Rule 30(b)(6) corporate representative, either of which warrants sanctions. *Starlight Intern. Inc. v. Herlihy*, 186 F.R.D. 626, 639 (D. Kan. 1999) ("Fed. R. Civ. P. 37(d) permits the imposition of sanctions when a party or person designated under Rule 30(b)(6) fails 'to appear before the officer who is to take the deposition, after being served with proper notice . . . [p]roducing an unprepared witness is tantamount to a failure to appear at a deposition'"). (citing *United States v. Taylor,* 166 F.R.D. 356, 363 (M.D.N.C.).

The FDIC also shouldn't be allowed to game the Federal Rules, which required the FDIC's representative to answer questions "directly and without evasion, in accordance with the information the deposed party possesses, after due inquiry." *Mitsui & Co. (U.S.A.), Inc. v. P. R. Water Res. Auth.*, 93 F.R.D. 62, 66 (D.P.R. 1981). When the Court granted the D&Os 18 hours to depose the FDIC's corporate representative, it was understood that the FDIC would abide by the rules of this Court, and not spend, at times, almost half an hour to answer basic, uncontroversial questions. The FDIC's conduct in this regard was inexcusable and further warrants sanctions, or at a minimum, additional time.

5.      **Conclusion**

The FDIC had over three years to learn the facts of its case, and when it came time for the

D&Os to question it regarding its allegations, the FDIC mostly responded "I don't know." This

is improper and the D&Os respectfully request that this Court order the FDIC to adequately

prepare a Rule 30(b)(6) designee to answer the D&Os' questions related to the allegations in its

complaint, and for the Court to enter all appropriate sanctions against the FDIC.

**RESPECTFULLY SUBMITTED** in San Juan, Puerto Rico, on February 18, 2014.

RIVERO MESTRE LLP
*Attorneys for Frank C. Stipes, Juan C.*
*Frontera-Garcia, Hector del Rio, William*
*Vidal-Carvajal, Cesar Ruiz, Pedro R.*
*Dominguez*
2525 Ponce de Leon Boulevard
Suite 1000
Miami, Florida 33134
Telephone:  (305) 445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
          paguila@riveromestre.com
          cwhorton@riveromestre.com


By: ____s/ Andrés Rivero_____
          ANDRÉS RIVERO (PHV)
          Florida Bar No. 613819
          ALAN H. ROLNICK (PHV)
          Florida Bar No. 715085
          CHARLES E. WHORTON (PHV)
          Florida Bar No. 46894
          M. PAULA AGUILA (PHV)
          Florida Bar No. 43135

RAUL GONZALEZ TORO
LAW OFFICES, L.L.C.
*Attorneys for Frank C. Stipes, Juan*
*C. Frontera-Garcia, Hector del Rio,*
*William Vidal-Carvajal, Cesar Ruiz,*
*Pedro R. Dominguez*
Banco Popular Center Bldg.
208 Ponce de León Ave., Suite 1028
San Juan, PR 00918

PO Box 270343
San Juan, PR 00927-0343
Telephone: (787) 753-6090
Fax: (787) 294-5759
Email: rgtlaw@ymail.com
          rgonzaleztoro@yahoo.com


By: ____s/ Raúl González-Toro_____
          RAUL GONZALEZ TORO
          USDCPR No. 213305

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on February 18, 2014, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record either by transmission of Notices of Electronic Filing generated by CM/ECF or by U.S. Mail.

_____s/Andrés Rivero_____
ANDRÉS RIVERO