IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| W HOLDING CO., INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>AIG INS. CO., et al.,<br><br>Defendants. | Civil No. 11-2271 (GAG) |

## MEMORANDUM OPINION

The court addresses four motions concerning the applicability of several insurance policies the D&Os had with AIG (previously Chartis) and excess insurers. (See Docket Nos. 881, 890, 895, & 906.) The motions at Docket Nos. 881 and 890 ask the court to enforce the liability policies, while the motions at Docket Nos. 895 and 906 ask that they not be enforced or be enforced in a certain way. The only question the court is faced with is thus whether the D&Os and the FDIC are entitled to the coverage they seek. In attempting to answer that question, the motions all raise the same two issues: (1) whether the Insured v. Insured Exclusion ("Exclusion") applies, and (2) under what coverage period, if any, the FDIC's claims fall. The court addresses these two arguments. The motions mirror one another and comprise substantially similar legal and factual arguments. A grant or denial of one party's motion necessitates the opposite holding for its competing motion, i.e., granting a motion in favor of the D&Os requires denying the corresponding insurer's motion.

For the following reasons, the motions for summary judgment filed by AIG and the excess insurers at Docket Nos. 895 and 906 are **DENIED** and the motions for clarification and summary judgment filed by the D&Os at Docket Nos. 881 and 890 are **GRANTED** with the **CLARIFICATION** that the claims against the D&Os for gross negligence concerning only the

Inyx loans are covered by the 2006-2007 policy, but that the rest of the claims concerning other borrowers are covered by the 2009-2010 policy.

I.      **Insured v. Insured Exclusion**

AIG first poses a question the court already addressed: whether the Exclusion prevents the FDIC from recovering on the D&O's liability policies. (See Docket Nos. 304 at 16-19; 906.) The Exclusion is described as follows: "Director and officer liability insurance policies commonly feature so-called insured vs. insured exclusions that exclude from coverage losses for claims brought by one 'insured' against another 'insured," which includes "current and former [D&Os] as well as the corporation itself . . . to limit moral hazard. Without such an exclusion, a D&O policy could require the insurer to pay for the business mistakes of insured directors and officers if the corporation . . . or if former officers or directors brought suit . . ." (Id. at 16-17 (citation omitted).)

The court discussed competing caselaw surrounding the Exclusion's applicability to FDIC claims. (Id.) Some courts have found that the Exclusion prevents FDIC suits because the FDIC steps into the shoes of the failed bank and effectively becomes an insured, while other courts hold that the FDIC is statutorily and practically distinct from insured parties because it represents depositors, account holders, and the depositors insurance fund ("DIF"). (Id.) The court then stated: "The obvious intent behind the Exclusion is to protect insurance companies from collusive suits among insured parties. Here, the FDIC reaps no benefits comparable to those enjoyed by collusive actors who seek to swindle insurance companies." (Id. at 18.) The court concluded the FDIC sued "on behalf of depositors, account holders, and a depleted insurance fund" in a role as a "regulator [that] sufficiently distinguishes it from those whom the parties intended to prevent from bringing claims under the Exclusion." (Id. at 19.)

AIG argues that the FDIC does not represent depositors and account holders because it failed to marshal any evidence identifying the depositors and account holders it purports to represent. (Docket No. 906 at 4-6.) The court finds AIG's argument unpersuasive. The FDIC

derives its statutory authority to sue the D&Os from 12 U.S.C. § 1821(k) and any action it brings must be "prosecuted wholly or partially for the benefit of the Corporation acting as . . . receiver of such institution." 12 U.S.C. § 1821(k)(1). The FDIC submits evidence that the DIF suffered a loss approximated at $3.357 billion. See 76 Fed. Reg. 50733 (Aug. 16, 2011) ("As of May 31, 2011, the value of assets available for distribution by the Receiver . . . was $4,673,843,188 [with administrative expenses and depositor liabilities equal to $8,031,697,095, exceeding available assets and potential recoveries by $3,357,853,907.]"). Certainly, the FDIC would be required to prove all of this at trial. At this stage, however, the DIF's depletion and the FDIC's purported representation of its interests pose a genuine issue of material fact. The FDIC is not suing on behalf of an "Insured" or an "Organization," as discussed above and in the original opinion on the matter. It thus does not run afoul of the Exclusion. (See Docket No. 304 at 16-19.) Indeed, its governing statute goes into greater detail about where the money goes if it prevails. See 12 U.S.C. § (1821)(d)(11) (first, administrative expenses of the receiver, then any deposit liability of the institution, followed by any other general or senior liability of the institution, then any obligation subordinated to depositors or general creditors). Therefore, the court does not accept AIG's argument that the FDIC fails to specify who or what it represents and that such failure merits summary judgment.

Second, the parties debate the ambiguity of the Exclusion's applicability to FDIC claims. In its previous opinion, the court discussed the unsettled nature of the Exclusion. (Docket No. 304 at 16-19.) The First Circuit agreed that there are no binding cases on the subject. W Holding Co. v. AIG Ins., 748 F.3d 377, 385-86 (1st Cir. 2014). Moreover, said court emphasized its "obligation to resolve any doubts in the insured's favor" under Puerto Rico law, and, as such, the ambiguities here fall in the D&O's favor. Id. at 386 (citation omitted).

The First Circuit further made it clear at several points in the opinion that distinguishing between the "likelihood of success" on the question of whether the Exclusion applies and actual

success was imperative because it was analyzing the matter in the context of injunctive relief. Id. at 385-86. The court makes the jump from "likelihood of success" to "actually succeeds." The Exclusion does not prevent the FDIC from seeking enforcement of the policies. In the alternative, the Exclusion's applicability is unclear, which weighs in favor of finding for the insured parties. Id.; see also Marin v. American Int'l Ins. Co. of P.R., 137 D.P.R. 356, 361-62 (1994) ("[E]xclusionary clauses must be restrictively construed so that the policy's purpose of protecting the insured is met. Any ambiguity must be resolved in favor of the insured.").

**II.     Applicability of the 2006-2007 Coverage Period to the FDIC's Claims**

The insurers next assert the 2006-2007 year of coverage ("tower") of the liability policies applies to the FDIC's claims. (See Docket No. 895.) The D&Os were purportedly derelict in loan approvals and administration surrounding the Inyx loans and faced suit in this court in Hildenbrand v. W Holding, Saavedra v. W Holding, Civ. No. 07-1886 (the two were consolidated in Hildenbrand), Wylie v. Stipes, Civ. No. 08-1036, and Westernbank Puerto Rico v. Kachkar, Civ. No. 07-1606 ("Prior Suits") in 2007 and 2008. They invoked their policies at a time when they would be covered under the 2006-2007 tower. To the insurers, this meant that the D&Os triggered a notice provision in the policies that limited any claims arising from grossly negligent approval and administration of all loans (not just the Inyx loans) to coverage only under the 2006-2007 tower.

The D&Os and the FDIC object to this conclusion. The D&Os received a substantial sum of insurance money to resolve the Prior Suits. That dispersal diminished the amount remaining in the 2006-2007 tower and not enough remains to mollify the FDIC. The D&Os and the FDIC consequently tried to distinguish why the FDIC's claims are distinct from the claims lodged in the Prior Suits so that their claims fall under the 2009-2010 tower. The FDIC complained that the D&Os approved and administered loans with gross negligence between January 28, 2004 until June 9, 2009 to the following eight borrowers: Sabana I, Sabana II, Inyx, Intercoffee, Plaza

CCD, Museum Towers, Yasscar Development, and Yasscar Caguas. (Docket No. 182 at 22.) In contrast, the Prior Suits concerned the alleged gross negligence surrounding only the Inyx loans. (See, e.g., Hildenbrand, Civ. No. 07-1886, Docket No. 6; see also Wylie, Civ. No. 08-1036, Docket No. 1.)

To ascertain whether the claims should fall under the same tower, the court turns to the terms of the liability policy. The D&O's liability policy with AIG defines "Claim" as "a written demand" or "a civil . . . proceeding" and it defines "Wrongful Act" as "any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act . . . ." (Docket No. 901-15 at 5, 8.) Its notice provision reads, in relevant part:

> If written notice of a Claim has been given to the Insurer . . . then a Claim which is subsequently made against an Insured and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered related to the first Claim and made at the time such notice was given.

(Docket No. 901-15 at 12.)

The Puerto Rico Supreme Court has held:

> With regard to the construction of insurance contracts . . . the language used in the same must ordinarily be construed within its common and usual meaning, not paying much attention to grammatical rigour, but to the general use and popular meaning of the idioms. We have also stated that exclusionary clauses must be restrictively construed so that the policy's purpose of protecting the insured is met. Any ambiguity must be resolved in favor of the insured. This rule, however, does not bind the court to construe in favor of the insured a clause that clearly and unambiguously favors the insurer in the controversy in question.

Guerrido Garcia v. UCB, 143 D.P.R. 337 (1997) (quoting Marin, 137 D.P.R. at 361-62 (citations omitted)).

1       Under this logic, AIG and the excess insurers assert that the FDIC claim should be covered under the 2006-2007 tower. The claim's facts are attributable to, and the wrongful acts are related to, those set forth in the Prior Suits, i.e, the D&Os approved and administered loans with gross negligence during the time that the 2006-2007 tower covered their behavior, so they say. They claim that the general pattern of grossly negligent behavior and the FDIC's specific examples thereof trigger the notice provision. This rationale, however, applies only to the Inyx loans. See Fin. Mgmt. Advisors, LLC v. Am. Int'l Specialty Lines Ins. Co., 506 F.3d 922, 926 (9th Cir. 2007) ("We do not believe . . . [two claims are] logically related simply because both claimants blamed the same bad actor.").

       The notice clause requires the claims to be linked by "facts alleged." (Docket No. 901-15 at 12.) The only factually specific allegation here that relates to the facts alleged in the Prior Suits is the Inyx loan approval and administration process, as the insurers reveal by their own descriptions of the disputes in the Prior Suits. (See Docket Nos. 1003-2 at 130-43 (classifying Prior Suits as disputes concerning only Inyx loans and including none of other seven loans FDIC complains about).) Indeed, even the formal letter to the D&Os informing them of the decision to treat the FDIC's claim as falling within the 2006-2007 tower fails to identify any loans outside of the Inyx loans: "The focal point of the [Prior Suits] and the FDIC['s letter demanding insurance coverage] is the inadequate controls at Westernbank that resulted in the loan to Inyx, Inc. (and others) . . . ." (Docket No. 1021-5 at 3.) In hindsight, it is easy to lump in the other seven borrowers with Inyx as "related" to the "facts alleged" in the Prior Suits, but referring to the other loans as "(others)" does not indicate that the "facts alleged" extend beyond the Inyx loans. This is important because these unique facts comprise the breach element of a tort. See generally Fin. Mgmt. Advisors, 506 F.3d at 923-26. Therefore, the 2009-2010 tower covers D&O liability for the remaining seven borrowers, while the 2006-2007 tower covers the Inyx loans.

AIG and the excess insurers rely on Fed. Ins. Co. v. Raytheon Co., 426 F.3d 491 (1st Cir. 2005), to support a different reading of whether the facts alleged are based upon or related to the previous claim or wrongful act.[1] In Raytheon, the First Circuit held that "[o]nly with a substantial overlap can the first complaint be said to be a 'foundation or logical basis' for the second," and "the appropriate inquiry is whether the second complaint substantially overlaps the first with respect to relevant facts, without regard to whether the first complaint substantially overlaps the second." 426 F.3d at 499. While the complaint here substantially overlaps with the complaints in the Prior Suits regarding general allegations of grossly negligent practices, Raytheon held that the notice provision could not "by itself be read to refer to [substantial similarity between just] the 'demand, suit, or other proceeding,'" rather, the new complaint had to be "substantially similar to" any "facts, circumstances, or situation" in the prior complaint. Id. at 498.

The Raytheon court found substantial overlap among two complaints that both alleged stock was overvalued due to cost overruns in defense contracts, improper accounting for losses on major contracts, premature recognition of revenues, improper recognition of revenues on existing contracts, and failure to disclose cost overruns and delays affecting projects related to a specific endeavor. Id. at 500. The second Raytheon complaint alleged the exact same improper accounting for losses on the same major contracts, the same improper recognition of revenues on existing contracts, and the same failure to disclose cost overruns and delays affecting projects related to a specific endeavor. 426 F.3d at 500. The court held that the specific contracts and project surrounding the alleged improper conduct alleged in both complaints were substantially similar, if not identical, thus allotting coverage under the first tower. Id.

---

[1] Raytheon interpreted an insurance contract under Massachusetts law. See 426 F.3d at 491-501. This case concerns Puerto Rico insurance law; however, a panel of the Puerto Rico Court of Appeals has construed Raytheon as applicable to and representative of Puerto Rico insurance law. See Oriental Group v. Diaz Lopez, KLCE20091773, 2010 WL 3070057, *13 (P.R. Cir. Mar. 30, 2010).

That is not the case here. While the D&O's general course of conduct is similar, with the degree of overlap debatably nearing "substantial," the only specific factual allegations in the FDIC's complaint and the Prior Suits meriting a comparable reading concern the Inyx loans. Several of the alleged loans separate from the Inyx loans were either issued or administered by D&Os before and after the Inyx loans, and six of the seven non-Inyx loans orginated or were administered in the commercial real estate and construction departments, not the asset-based lending department. (See Docket Nos. 182 at 22; 1004 at 22.) The court provides a chart highlighting the factual allegations in the complaints in this case and the Prior Suits as an appendix to better clarify the similarities and differences and elucidate why the current claims fall under the 2009-2010 tower. See App'x. 1.

Nonetheless, "acknowledging that there are substantial areas of non-overlap does not" necessarily "defeat the fact . . . that there [may be] substantial overlap between the two complaints." Raytheon, 426 F.3d at 500. While similarity between the complaints in this case and the Prior Suits is not substantial, to the extent the Prior Suits' complaints highlight the same course of grossly negligent conduct regarding the Inyx loans, there is a simple solution rooted in law the FDIC provides: sever the Inyx loans from coverage under the 2009-2010 tower to remain in the 2006-2007 tower. (See Docket No. 1003 at 10-11 (citing cases).) This seemingly conforms with Raytheon's directive to look to the facts, Judge Howard's concerns in his dissent, and the parties' intentions in signing the policies. Id. at 501-02 (Howard, J., dissenting) ("The [majority's] formulation . . . works to deny the insured a defense . . . for claims made within the policy period [based on facts alleged] that ha[ve] never been the subject of a demand or suit."). In this light, the court also agrees with the rationale espoused in Eureka Federal Savings v. Gilliam, 873 F.2d 229, 234-25 (9th Cir. 1989): "[T]he fact that all loan losses arguably originated from one loan policy does not require finding only one loss" where "there were numerous intervening business decisions that took place after the loan policy was initiated that

required the exercise of independent judgment," so "the decision to implement the aggressive loan policy did not cause the losses, rather it was the alleged negligence on the part of the . . . defendants in making or approving the individual transactions." Indeed, the Gilliam court held that "the mere existence of an aggressive loan policy is insufficient as a matter of law to transform disparate acts and omissions made by five directors in connection with issuance of loans to [many] borrowers into a single loss." Id. at 235. Such is the case here.

The FDIC specifically stated allegations against all of the individuals who approved or administered each loan, the grossly negligent conduct in which they engaged, and the time frame in which they engaged in it. (Docket No. 182 at 22-26.) The Prior Suits do so as well, but only in the context of the Inyx loans. To find the complaints substantially related would ignore the diverging fact-specific nature of the FDIC's claims. Denying coverage because of the form by which the FDIC notified AIG and the excess insurers of the various instances of gross negligence ignores the distinct "facts alleged" in each scenario and would result in numerous subsequent individual lawsuits that would eventually be consolidated under Rule 42 or lead to piecemeal litigation accompanied by redundant discovery. See FED. R. CIV. P. 42.

AIG and the excess insurers knew or reasonably should have known they were assuming a great risk by insuring the D&Os. Either the previously discussed actions against them in 2007 and 2008 or various FDIC examiner's reports discussed in the FDIC's complaint should have given any reasonably prudent insurance company cause for concern. (See generally Docket No. 182.) Indeed, it seems they were aware of the risk, as AIG's predecessor offered $20 million in coverage for a $413,000 premium in 2006-2007 and a reduced $10 million policy for $750,000 in 2009-2010. (Docket Nos. 906-3 at 1-2; 906-4 at 1-2.) In reviewing this case on the question of cost advancement, the First Circuit pointed out that "the policy neither mentions the FDIC nor bars coverage for suits by FDIC-type regulators like some policies do." W Holding, 748 F.3d at 379 & n.2. Indeed, AIG's predecessor from whom it took over this action sold a "Broad Form"

that "expressly exclude[d] coverage for claims 'brought by or on behalf of . . . any State or Federal regulatory or administrative agency . . . in its capacity as receiver . . . .'" that was not a part of the underlying policy. Id. at n.2.

While the presence *vel non* of a Regulatory Exclusion does not impact the court's assessment of whether the claims relate to, are based on, or arise from facts alleged in the Prior Suits or are related to other wrongful acts, the Regulatory Exclusion is a clear-cut method for prohibiting D&Os and the FDIC from invoking insurance policies in gross negligence suits. (See Docket No. 1008 at 8-9) (cases citing Regulatory Exclusion.) Furthermore, it would not have been difficult to expressly exclude from future policies any subsequent claims for conduct that arose during the 2006-2007 coverage period, as demonstrated by inclusion of new provisions and exclusions in the 2009-2010 policy. (Docket No. 1003 at 4.)

The motions for summary judgment at Docket Nos. 895 and 906 are **DENIED** and the motions for clarification and summary judgment at Docket Nos. 881 and 890 are **GRANTED** with the **CLARIFICATION** that the claims against the D&Os for gross negligence concerning the Inyx loans are covered by the 2006-2007 policies, and the rest of the claims concerning other borrowers are covered by the 2009-2010 policies.

**SO ORDERED.**

In San Juan, Puerto Rico this 9th day of July, 2014.

*S/Gustavo A.Gelpí*
GUSTAVO A. GELPI
United States District Judge

**Appendix 1**

**FDIC: General (11-2271 Docket No. 182)**

- Claim based on losses from four commercial real estate loans, ten construction loans, and seven asset based loans from Jan. 28, 2004 to Nov. 19, 2009.
- Approved and administered the loans pursuant to aggressive and reckless growth strategy.
- Violated Bank's Loan to Value ratio limits.
- Lacked required borrower equity.
- Inadequate real estate appraisals.
- Insufficient analyses of collateral or inadequate collateral.
- Insufficient borrower repayment information and repayment sources.
- Questionable character of borrower or guarantor.
- Repeated increase, extension, or renewal of expired or deteriorating loans to enable continued funding of interest reserves, delaying losses and defaults and increasing the losses on the loans.
- Continued funding asset based loans despite reports showing violations of borrower covenants and loan agreements, ineligible collateral.
- Unilateral waiver of key borrower financial covenants, net adjusted equity value, and cash flow ratios.
- Manipulation of monitoring systems.
- Funding construction loans despite borrower defaults.
- Director's substantial personal financial interest in a CRE loan and failure to disclose.

**FDIC: Specific (Docket No. 182 at 22-26)**

- Sabana ($42.5 million) and increases: comprised lack of required pre-sales, loan-to-value ratio of 90.5% in excess of the Bank's ratio limits, grossly inadequate financial analysis of guarantors, and multiple loan increases without an updated appraisal to fund interest reserves and cost overruns.
- Sabana ($8 million)**:** comprised a faltering economy (ostensible failure to take this into account), secured only by pledge of speculative future profits from distressed projects, no appraisals obtained to support collateral values, unapproved use of loan money, renewals without obtaining additional collateral or repayment.
- Inyx: A cursory review of the various complaints and counterclaims clearly establishes that the allegations in each substantially overlap regarding the Inyx loans and need not be repeated here.
- Intercoffee and increases: Bad borrower character, failure to evaluate borrower repayment ability, multiple loan increases to cover fund interest reserves despite knowing borrower's inability to service debt.
- Plaza CCD and extensions: Cortina administered despite borrower defaults on major loan approval terms, including failure to post ten perfect equity contributions, unit pre-sales, construction contracts, bonds, or funding of cost orverruns, Ramirez administered despite failure to cure major defaults and lack of progress beyond foundation work, and funding continued despite lack of progress in construction.
- Museum Towers: Violated appraisal standards and federal regulations, borrower retained appraiser, appraised value was twice the acquisition price a year earlier, the loan-to-value ratios were excessive, repayment was dependent on numerous uncertain contingencies such as a future construction loan and speculative future zoning changes, failure to obtain feasibility study, inadequate analysis of repayment ability, as one of guarantors placed all assets in protection trust and other guarantor kept assets in start-up companies or illiquid interests, Tamboer's daughter was a principal of the borrower and he failed to disclose, loans were issued to delay poor loss reports, and the project was never developed.
- Yasscar Development**:** Loan-to-value ratio exceed Bank's limits, faulty appraisal assumed all permits were obtained and they were not, grossly inadequate financial analysis of the guarantors, loan renewal based on stale appraisal and made despite continuing losses.
- Yasscar Caguas: Loan-to-value ratio exceed limits, grossly inadequate appraisal and financial analysis of guarantors, renewal based on stale appraisal despite continuing losses.

11

**Wylie (08-1036 Docket No. 1)**
- Failure to timely write-down loans to Inyx despite knowing of failure to be able to pay back and improper collateral.
- Violate generally accepted accounting practices.
- Fraudulently report inflated value in government-required filings regarding Inyx loans.
- Collateral deficiency in Inyx loans as disclosed in SEC filing.
- American Banker article cited stating there may be "more to come" than the Inyx loan and the recession in Puerto Rico put pressure on banks.
- Failure to comply with account practices in submitting SEC filings.
- Damages to the company incurred by improper statements, failure to write-down loans that were impaired, investigating litigation, and damage to corporate image and goodwill.
- Misrepresentation of financial health in publicly reported financial results surrounding Inyx loans.
- Waste of corporate assets
- Unjust enrichment.

**Hildenbrand (07-1886 Docket No. 6.)**
- Artificially inflated financial results due to failure to write-down Inyx loans and failure to likely collect on Inyx loans.
- Improper delay of recognition of impaired assets to inflate reported income and asset quality.
- Regulatory capital claimed was overstated.
- Book value per share materially overstated and violation of accounting practices.
- Repeat of SEC disclosure allegations in Wylie and American Banker article, which called to question risk management capabilities as "suspect."
- Repeated allegations of falsified financial statements due to Inyx loss.
- Repeat of general allegation of misrepresentation.

**Kachkar (Inyx) (07-1606 Docket No. 396: Counterclaim)**
- Other counterclaims at Docket Nos. 397-98 are nearly identical with immaterial differences.

- At the outset, it bears noting that this counterclaim is an intriguing story about international business manipulation that involves the son of former Libyan dictator Muammar Gaddafi. A substantial portion of the operative facts in the claim concern the D&O's alleged efforts to swindle more money out of Inyx through an intricate scheme to hinder its businesses, both domestic and abroad. Pressure was apparently brought to bear on certain Inyx representatives and they alleged losses in the millions. A less significant portion of the facts concern the same general allegations set forth in the other complaints and relate only to Inyx, which the court highlights below. Specifically, the counterclaimants asserted that the Bank knew its loans to Inyx violated various laws and policies.
- Inyx violated working capital, cash flow, and tangible net worth financial covenants contained in its loan agreements. Westernbank waived these covenant defaults.
- Westernbank fraudulently secured guarantees and other collateral for the Inyx loans.
- Westernbank was aware that Inyx's billings were not immediately collectible.
- Westernbank knew the bank was under-collateralized and avoided taking reserves and reporting infirmities of its loan portfolio.
- Westernbank failed to reserve "one dollar" for Inyx.
- Inyx exhibited weaknesses known to Westernbank.
- Stipes unilaterally made the decision to continue loaning to Inyx and was assisted by Vazquez, Montanez, Maldonado, Vidal, and Rivera.
- Approved $3 million extension to Inyx that no one ever actually reported to Inyx and which Inyx never used.
- Breached confidentiality in reporting attempted deal with son of Muammar Gaddafi.
- Attempted to cover up reckless lending practice by requesting additional capital and not calling the loans in exchange for loan renewals.
- Repeat of intentional delay of disclosing important of the Inyx loans.

12