## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

W HOLDING CO., INC. et al.,

Plaintiffs,

v.

AIG INSUR. CO., et al.,

Defendants.

Civil No. 11-2271 (GAG)

## OPINION AND ORDER

1    The FDIC became Westernbank's receiver on April 30, 2010.  (Docket No. 182 ¶ 1.)  W

2  Holding Company ("W Holding") owned all outstanding shares of Westernbank's corporate

3  stock when the FDIC assumed receivership.  (Id.)  The FDIC alleges Westernbank's and W

4  Holding's  directors  and  officers  ("D&Os")[1]  irresponsibly  governed  Westernbank's  loan

5  approvals  and  administration,  thereby  violating  several  Puerto  Rico  and  federal  laws.  (See

6  generally Docket No. 182.)  The D&Os assert the FDIC's claims are time-barred and move for

---

[1] The D&Os comprise Frank C. Stipes-Garcia, Juan Carlos Frontera-Garcia, Hector L. Del Rio-Torres, William M. Vidal-Carvajal, Cesar A. Ruiz-Rodriguez, and Pedro R. Dominguez-Zayas. The complaint lays out their respective roles within Westernbank during the time frame of the alleged grossly negligent behavior.  Certain D&Os served on Westernbank's Senior Lending Committee ("SLC")  and Senior Credit Committee ("SCC").  The FDIC asserts claims against the following former D&Os, as well: Jose Biaggi-Landron, Ricardo Cortina-Cruz, Miguel A. Vazquez-Seijo, Julia Fuentes del Collado, Mario A. Ramirez-Matos, and Cornelius Tamboer. The conjugal partnerships joined also include Marlene Cruz-Caballero, Lilliam Diaz-Cabassa, Gladys Barletta-Segarra, Hannalore Schmidt-Michels, Sonia Sotomayor-Vicenty, the partner of Jose Biaggi-Landron (referred to as Jane Doe in the complaint), Elizabeth Aldebol de Cortina, Sharon McDowell-Nixon, and Olga Morales-Perez.

CIVIL NO. 11-2271 (GAG) (BJM)

summary judgment, attaching memoranda of law.  (See Docket Nos. 893, 894, 913, & 914.)  For the following reasons, the court **DENIES** the motions for summary judgment at Docket Nos. 893 and 913.

**I.      Factual and Procedural Background**

The D&Os argue that the FDIC's claims for gross negligence are time-barred because the Puerto Rico statute of limitations for claims against D&Os elapsed before the FDIC took over as Westernbank's receiver.  (See Docket Nos. 893 & 913.)  The court addressed this issue without discussing the facts and found the claims were not time-barred under 12 U.S.C. § 1821(d)(14).  (See Docket No. 683 at 2-4.)

The relevant portion of the opinion at Docket No. 683 states:

> The FDIC timely filed these claims pursuant to [the Financial Institutions Recovery, Reform, and Enforcement Act ("FIRREA"),] 12 U.S.C. § 1821(d)(14)(A)-(B).  Subsection (A) states: "[T]he applicable statute of limitations with regard to any action brought by the Corporation as conservator or receiver shall be – in the case of any tort claim, the longer of – the three-year period beginning on the date the claim accrues; or the period applicable under state law."  12 U.S.C. § 1821(d)(14)(A)(ii).  The officers argue that the period applicable under state law is one year.  But this argument neglects to consider "the three-year period beginning on the date the claim accrues" in subsection (A)(ii)(I).  The officers argue that the various claims against them accrued throughout prior litigation and FDIC examinations from 2005 to 2008.  This may be true as a matter of fact, but not as a matter of law.
>
> Subsection (B) is titled: "Determination of the date on which the claim accrues."  The subsection states: "For the purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim described in such subparagraph shall be the later of – (i) the date of the appointment of the Corporation as conservator or receiver; or (ii) the date on which the cause of action accrues."  12 U.S.C. § 1821(d)(14)(B)(i)-(ii).  The officers claim that the FDIC knew or reasonably should have known of the allegedly grossly negligent behavior through its various

CIVIL NO. 11-2271 (GAG) (BJM)

examinations and prior litigation from 2005 to 2008.  This may be so.  However, the statute provides that claims accrue as a matter of law on the later date of when: (1) they factually accrue, or; (2) the FDIC is appointed as receiver.  Here, the later date was when the FDIC was appointed as receiver on April 30, 2010, which is thus the date upon which the claims accrued.

Based on the above, the FDIC had a three-year period beginning on April 30, 2010 and ending in April 2013 to file its claims.  The FDIC filed the initial Complaint in 2011 and the Second Amended Complaint in 2012.  Therefore, the FDIC's claims were timely filed and the motion is thus **DENIED.**

The court, in making the instant ruling, distinguishes this case from RTC v. Seale, 13 F.3d 850, 853 (5th Cir. 1994).  In said case, the Fifth Circuit noted that "this approach would permit the [FDIC] to resurrect claims stale from [many years ago, and that t]he evidence that Congress intended such a sweeping recovery right is not persuasive." Id. (citing cases).  The timing of the Fifth Circuit's opinion, however, is important.  It decided Seale in 1994 on the heels of FIRREA's 1989 codification, concerned with whether to apply FIRREA's FDIC-tilted limitation period retroactively.  The opinion is narrowly tailored in that regard: "The FIRREA limitations period applies to claims that were alive on August 9, 1989, when FIRREA took effect, but not to claims that had expired before then." Id.  The timeframe here, however, falls well after FIRREA's effective date.  The allegedly grossly negligent loans were made and administered in the 2000's.  The critical holding in Seale is that the "FIRREA limitations period applies to claims that were alive on August 9, 1989, when FIRREA took effect . . . ." Id.  The claims in the case at bar were indeed alive after FIRREA's effective date.

Other courts have implied that all claims rendered stale under state limitations periods cannot be resuscitated through receivership, even those post-dating FIRREA's effective date. See FDIC v. Regier Carr & Monroe, 996 F.2d 222, 225-26 (10th Cir. 1993).  The court disagrees.  The plain meaning of subsections (A) and (B) indicates that the FDIC must be afforded at least three years from the date it assumes receivership to bring tort claims, regardless of the state limitations period.

(Docket No. 683 at 2-4.)

3

CIVIL NO. 11-2271 (GAG) (BJM)

1       The D&Os thoroughly briefed the court at Docket Nos. 894 and 914 in an attempt to

2   convince the court it erred in its previous opinion and denial of a subsequent motion for

3   summary judgment on the matter at Docket No. 893.  (<u>See</u> Docket No. 971.)   In light of further

4   research and discovery, the court agreed it had erred and vacated these holdings pursuant to Fed.

5   R. Civ. P. 60(b)(6) at Docket No 974.  The court elaborates.

6   **II.      Discussion**

7        "The federal limitations period [in section 1821(d)(14)] does not . . . operate to extend

8   claims that have already lapsed under the state limitations period before the FDIC has acquired

9   them." <u>FDIC v. Torrefaccion Café Cialitos</u>, 62 F.3d 439, 442 (1st Cir. 1995) (citing <u>FDIC v.</u>

10  <u>Barrera</u>, 595 F. Supp. 894, 898 (D.P.R. 1984)).  Any stale claim that reaches the FDIC thus

11  cannot be resuscitated by the generous federal limitations period.  This squarely resolves the

12  matter for a district court in the First Circuit.  The court follows this directive, addresses some

13  concerns, and turns to the implications of this rule.

14       The origin of <u>Torrefaccion</u>'s logic is interesting.  <u>Torrefaccion</u> relied on <u>Barrera</u>, a

15  Puerto Rico District Court case, to support the proposition that FIRREA does not revive stale

16  state law claims.  <u>Torrefaccion</u>, 62 F.3d at 442.  <u>Barrera</u> interpreted 28 U.S.C. § 2415(b), not

17  section 1821(d)(14).[2]  <u>Barrera</u>, 595 F. Supp. at 898.  The <u>Barrera</u> court stated: "The mere fact of

---

[2] This section states that "every action for money damages brought by . . . an [agency of the United States] which if founded upon a tort shall be barred unless the complaint is filed within three years after the right of action first accrues . . . ." 28 U.S.C. § 2415(b).  Subsection (g) states: "Any right of action subject to the provisions of this section which accrued prior to the date of enactment of this Act shall, for purposes of this section, be deemed to have accrued on the date of enactment of this Act."  28 U.S.C. § 2415(g).

1    the acquisition of the claims asserted in this action by the FDIC would not revive any claim

2    which was already time-barred by a Puerto Rican statute of limitations." Id.

3          To support this holding, the Barrera court relied on another opinion from the District of

4    Puerto Rico, FDIC v. Bird. Id. Bird's identical holding also concerned 28 U.S.C. § 2415. 516

5    F. Supp. 647, 650 (D.P.R. 1981). The Bird court stated: "[T]he mere fact of the acquisition of

6    the claims asserted in this action by the FDIC would not revive any claim which was already

7    time barred by a Puerto Rican statute of limitations." Id.[3] The Bird court relied on three

8    opinions in reaching this conclusion: one Supreme Court case and two district court cases. Id.

9    The district court cases looked to the Supreme Court case to conclude the same thing the Bird

10   court concluded. Id. The case is Guaranty Trust Co. v. United States, 304 U.S. 126, 141-42

11   (1938). According to the Supreme Court's reading of Guaranty Trust,

12                [T]he United States was proceeding as the assignee of the Soviet
13                Government and sought to collect under state law. The petitioner
14                argued that the statute of limitations had run, and the United States
15                asserted, among other defenses, that it was not bound by state
16                statutes of limitations. We found that the circumstances of the case
17                admit[ted] of no appeal to such a policy.
18
19   United States v. California, 507 U.S. 746, 757 (1993) (quoting Guaranty Trust, 304 U.S. at 141)

20   (quote marks omitted). The Court held: "Even if the United States had a right to be free from the

21   statute of limitations, it was deprived of no right on those facts," and, "[t]he United States never

22   acquired a right free of a pre-existing infirmity, the running of limitations against its assignor,

23   which public policy does not forbid." Id. (quoting Guaranty Trust, 304 U.S. at 142) (quote

_____

[3] The First Circuit agreed, stating: "We think the district court correctly held in *Bird* that 'the mere fact of the acquisition of the claims asserted in the action by the FDIC would not revive any claim which was already time barred by a Puerto Rico statute of limitations.'" FDIC v. Cardona, 723 F.2d 132, 134 (1st Cir. 1983).

5

CIVIL NO. 11-2271 (GAG) (BJM)

1   marks omitted).  Courts such as <u>Bird</u> have taken this to mean that claims which are stale under

2   state limitations periods cannot be revived when the government takes over as receiver.  <u>See,</u>

3   <u>e.g.</u>, <u>Bird</u>, 516 F. Supp. at 650.  This is the origin of <u>Torrefaccion</u>'s holding.

4          The <u>California</u> Court, however, brought to light Supreme Court cases deciphering the

5   different instances in which the federal government would and would not be subjected to state

6   limitations periods, 507 U.S. at 757, cases which <u>Torrefaccion</u> and <u>Cardona</u> did not expressly

7   consider.

8                    The traditional rules of subrogation . . . do not necessarily apply to
9                    the Government. <u>But cf.</u> <u>United States v. Standard Oil Co. of Cal.</u>,
10                   332 U.S. 301 (1947) (suggesting that state law controls "where the
11                   Government has simply substituted itself for others as successor to
12                   rights governed by state law"). The Government argues
13                   strenuously that, at the very least, state statutes of limitations do
14                   not bind it. It cites three cases to support this position. <u>See</u> <u>United</u>
15                   <u>States v. Summerlin</u>, 310 U.S. 414, 416 (1940); <u>Bd. of Comm'rs of</u>
16                   <u>Jackson Cnty. v. United States</u>, 308 U.S. 343, 351 (1939); <u>United</u>
17                   <u>States v. John Hancock Mut. Life Ins. Co.</u>, 364 U.S. 301, 308
18                   (1960). In the cases the Government cites, however, either the right
19                   at issue was obtained by the Government through, or created by, a
20                   federal statute, <u>see</u> <u>Summerlin</u>, <u>supra</u>, at 416 (United States suing
21                   under claim received by assignment pursuant to Act of June 27,
22                   1934, 48 Stat. 1246); <u>Bd. of Comm'rs</u>, <u>supra</u>, at 349-350 (United
23                   States suing as Indian trustee pursuant to congressional statute); or
24                   a federal statute provided the statute of limitations, <u>see</u> <u>John</u>
25                   <u>Hancock</u>, <u>supra</u>, at 301 (United States redeeming mortgage
26                   foreclosure pursuant to statute of limitations in 28 U.S.C. §
27                   2410(c)). Moreover, in each case, the Government was proceeding
28                   in its sovereign capacity. As the Government rightly notes: When
29                   the United States becomes entitled to a claim, acting in its
30                   governmental capacity, and asserts its claim in that right, it cannot
31                   be deemed to have abdicated its governmental authority so as to
32                   become subject to a state statute putting a time limit upon
33                   enforcement. <u>Summerlin</u>, <u>supra</u>, at 417.
34

1    507 U.S. at 757.  When "the right at issue was obtained by the Government through, or created

2    by, a federal statute," or "a federal statute provided the statute of limitations period," then the

3    federal government was not subjected to the state limitations period.  Id.

4           In this case, "a federal statute[, section 1821(d)(14),] provided the statute of limitations,"

5    id. (citing John Hancock, 364 U.S. at 301), and the John Hancock Court stated that Guaranty

6    Trust provides "one of the several special rules which favor the United States in preference to

7    other plaintiffs—the rule that the United States is not subject to local statutes of limitations."

8    John Hancock, 364 U.S. at 308 (citing Summerlin, 310 U.S. at 416-17).  Therefore, under this

9    logic, the FDIC should not be at the mercy of state statutes of limitation when its claims fall

10   under the auspices of section 1821(d)(14), a federally created limitations period.

11          A critical difference between John Hancock and the other cases California cites lies in the

12   FDIC's role as stepping into the shoes of the faded institution and the government's sovereign

13   role in the previous cases.  Furthermore, a 1994 amendment addressed the applicability of state

14   statutes of limitation in FIRREA's scheme. This amendment, titled "Revival of expired State

15   causes of action," states:

16                    (i) In the case of any tort claim described in clause (ii) for which
17                    the statute of limitation applicable under State law with respect to
18                    such claim has expired not more than 5 years before the
19                    appointment of the Corporation as conservator or receiver, the
20                    Corporation may bring an action as conservator or receiver on such
21                    claim without regard to the expiration of the statute of limitation
22                    applicable under State law.
23
24                    ….
25
26                    (ii) A tort claim . . . is a claim arising from fraud, intentional
27                    misconduct resulting in unjust enrichment, or intentional
28                    misconduct resulting in substantial loss to the institution.
29

7

1    12 U.S.C. 1821(d)(14)(C).  Subsection (C) specifically identifies the types of torts and the dates

2    of expiration on which the FDIC may base its claims.  Missing from this compilation is the tort

3    of gross negligence, the alleged offense here.  *Inclusio unius est exclusio alterius.*

4            Indeed, inspection of the legislation's corresponding House Report seems to solidify this

5    perspective:

6            [Subsection (C)] would permit the FDIC or the RTC, as
7            conservator or receiver of a failed depository institution, to
8            "revive" under certain circumstances, certain tort claims that had
9            expired under a State statute of limitations within five years of the
10           appointment of the conservator or receiver. This provision does not
11           affect other applicable State laws concerning the running or the
12           tolling of statutes of limitations (by reason of adverse domination
13           or otherwise), nor does it alter section 11(k) of the Federal Deposit
14           Insurance Act, 12 U.S.C. 1821(k), as amended by the Financial
15           Institutions Reform, Recovery and Enforcement Act of 1989.
16
17           The revival of expired claims is an extraordinary remedy because it
18           is a form of the retroactive application of law which the courts and
19           Congress have generally disfavored. Accordingly, section 201
20           would limit this extraordinary remedy to claims arising from an
21           egregious class of conduce, i.e., fraud, intentional misconduct
22           resulting in unjust enrichment, and intentional misconduct
23           resulting in substantial loss to the institution. This three-pronged,
24           fraud/intentional misconduct standard is precisely the same as the
25           one that Congress adopted last year, after considerable debate, with
26           respect to a retroactive statute of limitations extension in the
27           Resolution Trust Corporation Completion Act of 1993.
28
29           As with last year's reauthorization of the RTC, the intentional
30           misconduct standard for revival in this provision is not intended to
31           apply to claims arising from negligence, whether pleaded as
32           simple, ordinary, or gross negligence. Claims arising from such
33           negligent conduct by directors, officers, and outside professionals,
34           such as negligent approval or review of loan applications, do not
35           warrant the extraordinary remedy of revival if it is in the
36           contravention of State law.
37
38           Section 201 would recognize that there is a level of misconduct
39           which justifies Congressional actions to retroactively set aside a

1    State statute of limitations, particularly where, for example, this
2    misconduct involves individuals who improperly manipulated
3    institutional affairs to prevent themselves from being brought to
4    justice before the State period of limitations expired. This level of
5    misconduct is reflected in particular forms of intentional behavior.
6    The intentional misconduct standard is written to specifically
7    include conduct such as self-dealing that result in unjust
8    enrichment or a substantial loss to the institution, manipulation by
9    institution insiders that results in a running of a statute of
10   limitations, falsifying financial records that disguises increased
11   financial loss, and conspiracy to violate banking rules or
12   regulations.
13
14   H.R. Rep. 103-651, Title II General Provisions, Interstate Banking Efficiency Act (Aug. 2,

15   1994). This report directly contradicts the principle that stale claims for gross negligence may be

16   resuscitated by section 1821(d)(14). It makes clear that the "provision does not affect other

17   applicable State laws concerning the running . . . of statutes of limitations" aside from intentional

18   torts, and specifically excludes gross negligence. Id.

19        Because the language in Torrefaccion is unambiguous and Congress was abundantly

20   clear in House Report 103-651, the court holds that stale state law claims cannot be revived by

21   invoking section 1821(d)(14). However, this holding seems to offend the plain reading of the

22   statute. 12 U.S.C. § 1821(d)(14)(B)(i). Subsections (A) and (B) of the statute do not distinguish

23   between stale and timely claims under state law and Torrefaccion's history rests on an interesting

24   interpretation of Supreme Court cases.

25   **III.    When the Claims Accrued under Puerto Rico Law**

26        Because of the rationale espoused in Torrefaccion and Cardona, substantial portions of

27   the FDIC's case may be time-barred under state law, a matter which the court investigates.

28        A.    Governing Statutes

9

1           **i.**       **Directors**

2    Puerto Rico law states:

3           The directors and officers shall be bound to dedicate to the affairs
4           of the corporation and to the exercise of their duties the attention
5           and care which in a similar position and under analogous
6           circumstances a responsible and competent director or officer
7           would execute in applying his/her business judgment in good faith
8           or his/her best judgment in the case of nonprofit corporations. Only
9           gross negligence in the exercise of the duties and obligations
10          mentioned above shall result in personal liability.

11

12   P.R. LAWS. ANN. tit. 14 § 3563.  The limitations period for gross negligence claims against

13   directors and stockholders is three years.  P.R. LAWS. ANN. tit. 32 § 261.  That statute states that

14   "such action must be brought within three (3) years after the discovery by the aggrieved party of

15   the facts upon which the penalty or forfeiture attached or the liability was created," if the

16   "liability is created by law."  Id.[4]

17          As discussed, the federal limitations period provides three years for the FDIC to bring a

18   tort claim from the date it takes over as receiver.  12 U.S.C. § 1821(d)(14)(A)-(B).  In this case,

19   the FDIC took over as receiver on April 30, 2010.  (See Docket No. 182.)  That means that the

---

[4] The parties strenuously argue whether section 3563 constitutes liability created by law or common law, claiming a meaningful distinction between the two exists.  (See, e.g., Docket No. 343.)  The court found there was none because the Puerto Rico legislature saw fit to codify the common law Business Judgment Rule in section 3563, thus creating the liability at law.  (See Docket No. 361); but see FDIC v. McSweeney, 976 F.2d 532, 536 n.3 (9th Cir. 1992) (holding that liability is not created by law where legislature has codified common law).  To supplement its conclusion, therefore, the court also finds "liability created by law" in 12 U.S.C. § 1821(k) ("A director or officer . . . may be held personally liable . . . for gross negligence.").  Furthermore, Puerto Rico is a civil code system.  To distinguish between "law" and "common law" here technically requires distinguishing between law and a non-existent legal principle.  Therefore, the court is not persuaded by this argument.

1    FDIC could bring claims for gross negligence against the directors for actions that accrued, at the

2    latest, three years prior.  P.R. LAWS. ANN. tit. 32 § 261.

3         The D&Os asked the court to find the FDIC's claims time-barred on several occasions,

4    arguing the FDIC had actual or constructive notice of the allegedly grossly negligent behavior

5    more than three years before taking over as receiver.  (See, e.g., Docket Nos. 198 at 33-43, 343,

6    556, 894, & 904.)   In those filings, the D&Os laid out a series of events that would have

7    triggered the state limitations period, citing cases and examination reports.  (Id.)  The D&Os fall

8    short of referencing any triggering event that occurred before May 2007.  (See generally id.; see

9    also Docket Nos. 891-1 & 915.)   The first factual instances on the record that trigger the

10   limitations period are the press release and form 8-k filing revealing difficulties with the Inyx

11   and Intercoffee loans from late June 2007, less than three years before the FDIC assumed

12   receivership.  (See Docket No. 891-1  ¶¶ 29-30 (discussing how these events "brought to light"

13   alleged indiscretions occurring outside limitations period).)   Indeed, Defendant Vidal filed a

14   motion for judgment on the pleadings with a subheading that reads, in relevant part, "[t]he one-

15   year limitations period began to run as early as June 26, 2007."  (Docket No. 556 at 2.)  The

16   D&Os initially relied on nothing indicating that the FDIC knew or reasonably should have

17   known about their alleged gross negligence more than three years from the time it took over as

18   receiver; therefore, the court held its claims were not time-barred.

19        After the parties submitted motions for summary judgment, the court ordered them to

20   inform it of any events that would have started the limitations clock before April 30, 2007.

21   (Docket No. 982.) The D&Os filed several motions at Docket Nos. 1048, 1052, 1057, and 1058

22   to attempt to demonstrate why the claims accrued more than three years before the date of

11

CIVIL NO. 11-2271 (GAG) (BJM)

1   receivership. They reference the FDIC's Inspector General material loss review from December

2   2010 that specifically discusses the 2006 FDIC examiner's report. FDIC Office of the Inspector

3   General, Office of Material Loss Reviews, Report No. MLPR-11-007, Material Loss Review of

4   Westernbank Puerto Rico, Mayaguez, Puerto Rico, available at http://www.fdicoig.gov/

5   reports11%5C11-007.pdf. The report states: "Each examination from 2005 to 2008 reported

6   weaknesses in the bank's loan review program, including the lack of analyses of current financial

7   statements . . . and reviews of borrowers' compliance with outstanding loan covenants," and,

8   "[b]oth the 2005 and 2006 examinations reported that the internal loan review process was in

9   need of improvement and both examinations made specific recommendations in these areas." Id.

10  at 14, 22. This review interprets specific examination reports, however, and solely relying on it

11  without reviewing the content of the particular reports to start the clock at an earlier time would

12  mean reaching a conclusion without thoroughly assessing all of the relevant facts.

13      In the 2006 examination, "repeated weaknesses were identified in the underwriting and

14  administration of the [asset-based lending] portfolio . . ." and "a strong internal loan review and

15  grading system were needed to ensure timely identification of developing problems . . . ." Id. at

16  18. The FDIC Examiner in Charge, Ronald Porrata, testified that the D&Os ignored the FDIC's

17  recommendations:

18          In 2006 the bank – in the 2006 examination the bank already had
19          failed to implement a recommendation that was made in a 2005
20          and 2004 examination, which was to implement an adequate loan
21          review program . . . . [I]t appears that the bank was just basically -
22          - the bank and the board of directors and executive management
23          was – were ignoring that recommendation. If [the D&Os] would
24          have implemented an adequate [] program commensurate with the
25          risks that they were undertaking, possibly we wouldn't be here
26          today, quite possibly. Because the problems would have been
27          identified early on. Underwriting deficiencies would have been

12

CIVIL NO. 11-2271 (GAG) (BJM)

1    identified early on.  Perhaps a lot of these issues would have been
2    addressed.   And my recommendations were contained –
3    recommendations regarding the loan review program, and the loan
4    review program is the eyes and ears of the board of directors into
5    the bank's lending portfolio . . . . So I have to, unfortunately, say
6    that the board of directors saw our recommendations, and for some
7    reason or another they chose not to implement that program, the
8    adequate loan review program.
9
10   (Docket No. 1048-2 at 3-4.)   Additionally, prior examination reports state that Westernbank's

11   "internal loan review reports do not provide a narrative analysis of the borrower's background,

12   the adequacy of collateral coverage and the obligor's financial data," elaborating that the

13   "internal loan review process" needed a "separate and independent loan review department."

14   (Docket No. 1048-3 at 10.)

15          These observations, however, do not paint a full picture of the examination reports.  The

16   reports state several other factors that weigh in favor of and against the FDIC, specifically, that

17   the "bank's overall financial condition [was] satisfactory," and that "risk management practices

18   need[ed] improvement particularly in the area[] of . . . loan administration." (Docket No. 1048-

19   1 at 5.)   The reports classified capital, asset quality, earnings performance, liquidity, and

20   sensitivity to market risk as "satisfactory."  (Docket No. 1048-1 at 5.)   The section discussing

21   the bank's loan administration stated that it "need[ed] to be improved" and identified "15 loans

22   and/or commitments which were either adversely classified or scheduled for Special Mention in

23   the aggregate amount of $330.4 million," though the Inyx loan was not included.  (Id. at 6.)  The

24   report went on to state, furthermore, that "[c]apital is satisfactory in relation to the bank's risk

25   profile" and that the "overall performance of operating management and the Board of Directors

26   is satisfactory; however, risk management practices need improvement."  (Id. at 7.)   The

1    examiner found that liquidity and sensitivity to market risk were satisfactory and adequate,

2    respectively, and that allowances for loan and lease losses were adequate and that management

3    should enhance the documentation for loss factors used on the unclassified loan portfolio.  (Id. at

4    8-9.)  The examiner also cited the bank as vulnerable to rising interest rates.  (Id. at 9.)

5         With these strengths and weaknesses in mind, the examiner recommended to the D&Os a

6    resolution to address the weaknesses.  (Docket No. 1048-1 at 11.)  The directors adopted the

7    resolution as recommended, effectively representing that they would implement the

8    recommended changes to amend their standard operating procedures.  (Id.)  The examiner thus

9    concluded that risk management processes were adequate in relation to economic conditions and

10   asset concentration, as well as for the credit function.  (Id. at 12.)  While the examination

11   included several strengths and brought to the fore a number of weaknesses, it is clear that the

12   FDIC believed Westernbank could "adequately" and "satisfactorily" confront hardship in 2006.

13   (Id.)  The evidence raises certain red flags, but to deem it as starting the limitations clock ignores

14   the comprehensiveness of the report.

15        Interestingly, the D&Os proceed to proclaim that the FDIC's 2004-2006 reports actually

16   praise the bank's growth plans and note growth strategy without criticism.  (Docket No. 1048 at

17   5.)  This supports the FDIC's position that, like everyone else, it was not yet aware of the alleged

18   gross negligence.  Indeed, Freddy Maldonado, W Holding's Chief Financial Officer, wrote: "On

19   June 19, 2007, [W Holding] . . . determined that one of the larger asset-based lending

20   relationships, known as the 'Inyx loan,' originated by its asset-based lending division . . . was

21   impaired."  (Docket No. 1058-18 at 3.)  The memorandum elaborated that its purpose was "to

22   document" the "facts and events relating to the Inyx loan and to conclude as to the basis and the

14

1   date when the loan was impaired," and that "the loan should have been classified as impaired

2   beginning in the fourth quarter of 2005."   (Id.)   W Holding itself thus admits it either was

3   unaware of the impairment or refused to publicize it before June 2007.

4        The D&Os also previously argued that the dates by which the FDIC had sufficient notice

5   of the allegedly grossly negligent behavior were June 25, 2007, June 27, 2007, and February

6   2008, and that the "public record makes it obvious that the FDIC had legally sufficient notice in

7   June 2007." (Docket No. 636 at 26-27, 33.)  The D&O's own words make it clear that they did

8   not classify the alleged loss loans as impaired until June 2007.  Furthermore, the Inyx loan was

9   not a part of the 2006 examination, according to the FDIC's examiner.  (Docket No. 1048-4 at

10   6.)  Starting the clock when the D&Os ask thus goes too far.

11        Some federal courts interpreting the state laws of their respective jurisdictions have held

12   that the limitations period for bringing gross negligence claims on loan approvals and

13   administration begins when the loans are made and some courts say they accrue when the

14   aggrieved party endures their impact or learns of the harm.  Cf., FDIC v. Jackson, 133 F.3d 694,

15   696-97 (9th Cir. 1998) (when money leaves bank under Arizona law); RTC v. Seale, 13 F.3d

16   850, 851 (5th Cir. 1994) (same under Texas law); RTC v. Artley, 28 F.3d 1099, 1102 (11th Cir.

17   1994) (same under Georgia law); RTC v. Farmer, 865 F. Supp. 1143, 1150 (E.D. Pa. 1994)

18   (same under Pennsylvania law); with FDIC v. Stahl, 89 F.3d 1510, 1522 n.15 (11th Cir. 1996)

19   (when harm learned of under Florida law); RTC v. Bernard, 1995 U.S. Dist. LEXIS 12819, *7

20   (M.D.N.C. Aug. 8, 1995) (same under North Carolina law).  While the statutory interpretation

21   lessons these courts offer provide beneficial insight, the ultimately correct conclusion rests on

22   accurately determining when Puerto Rico's accrual date for its limitations period begins in this

15

1  specific context.  Neither side cites dispositive, controlling law on the matter.  That does not

2  mean, however, that the answer is unattainable. No brightline rule is necessary; the court need

3  not announce that the claim accrues when the money leaves the bank, when the bank suffered the

4  harm, or when the various loans went into default.  The circumstances should dictate the accrual

5  period, particularly when holding otherwise would impose an absolute rule in an area dictated by

6  factual circumstances.[5]

7           **ii.    Officers**

8           Noticeably absent from the limitations period in section 261 is the term "officers."  P.R.

9  LAWS. ANN. tit. 32 § 261 ("This part does not affect actions against **directors** or **stockholders** of

10  a corporation . . . .") (emphasis added).  The officers argue this omission indicates the Puerto

11  Rico legislature never meant to carve out a special limitations period for officers separate from

12  the one-year period found in its general tort statute which, the officers assert, applies to them.

13  P.R. LAWS. ANN. tit. 31 § 5298.

14          The Puerto Rico legislature took section 261's language verbatim from California's

15  codified Business Judgment Rule in 1904.  2 CAL. CODE CIV. P. § 359 (same language).  As

---

[5] The California Supreme Court discussed the history of its analogue to section 261, which the Puerto Rico legislature took directly from California ("section 359").  Hoover v. Galbraith, 498 P.2d 981 (Cal. 1972).  It held that its limitation period "commences when the liability was created not when the cause of action thereon accrues . . . . [and the liability] is created by the consummation of the contract, act, or omission by which the liability is incurred."  Hoover v. Galbraith 498 P.2d 981, 984 (Cal. 1972) (internal citations and quote marks omitted).  The court elaborated: "Section 359 differs from usual statutes of limitation which commence when the cause of action accrues.  The history of this section is well known . . . . It was intended to place reasonable limits upon the time within which the direct primary liability of the shareholders could be enforced  . . . ."  Id. (internal citations and quote marks omitted).  Puerto Rico law on accrual of damages markedly differs from this perspective because it necessitates examining the facts of each case to ascertain actual or "deemed" (constructive) knowledge of the harm.  See Rodriguez-Suris v. Montesinos, 123 F.3d 10, 13-17 (1st Cir. 1997).

1   recently as 2012, a California appeals court stated: "Section 359 does not address an officer's

2   liability." Sarenstone Corp. v. Jewelinski, G044543, 2012 WL 2513469, *11 (Cal. App. June 28,

3   2012).  Puerto Rico's corporate statutes reveal that its legislature also knows how to impose

4   duties on, create rules for, or reference corporate officers.  See P.R. LAWS. ANN. tit. 14 §§ 451,

5   452, 454, 3503, 3507, 3508, 3521, 3522, 3523, 3525, 3545, 3561-3568, 3586, 3591, 3600, 3642,

6   3643, 3649, 3650, 3653, 3655, 3657, 3660, 3703, 3705, 3736, 3761, 3762, 3781, 3783, 3784,

7   3785, 3787, 3801, 3811, 3813, 3830, 3851, 3872, 3875, 3876, 3879, 3924, 3925, 3926, 3929,

8   3935, 3977, 3978, 3979, 4062.

9       Puerto Rico corporate law professor Carlos Diaz Olivo writes, in contrast, that section

10   261 includes officers.  Carlos E. Diaz Olivo, Corporaciones 288 (ed. 2008) (English translation

11   at Docket No. 600-1 at 2.)  Furthermore, this court has interpreted section 261 to include officers.

12   See Segarra-Miranda v. Perez-Padro, 482 B.R. 59, 69-70 (D.P.R. 2012).  Lastly, Delaware law

13   has also been interpreted to impose a three-year limitations period on both directors and officers,

14   and Puerto Rico corporate law closely mirrors Delaware's corporate law.  See Graulich v. Dell,

15   Civ. No. 5846-CC, 2011 WL 1843813, *26 (Del. Ch. Ct. May 16, 2011) ("A three-year statute of

16   limitations 'almost universally' applies . . . for alleged breaches of fiduciary duty in Delaware.")

17   (citing 10 Del. C. § 8106); see also Marquis Theatre Corp. v. Condado Mini Cinema, 846 F.2d

18   86, 91 (1st Cir. 1988) ([T]he law of corporations in [Puerto Rico] is closely patterned after

19   Delaware corporate law.).

20       Balancing these authorities is not an easy task.  The Puerto Rico legislature took the

21   language directly from the California Code and the California courts have interpreted it not to

22   include officers.  The Puerto Rico legislature also clearly knows how to distinguish between

17

1   directors and officers.  However, this court has held that the three-year term applies to officers,

2   as has a noted legal scholar in this jurisdiction.  Furthermore, Delaware law encompasses officers

3   in its three-year limitations period.  Neither side cites a dispositive or persuasive Puerto Rico

4   case interpreting the statutes at issue.  Neither Puerto Rico's legislature nor its judiciary has

5   clarified this matter.  The court finds no controlling or compelling reason to distinguish between

6   directors and officers.  Employing the practical logic that directors may and frequently do

7   simultaneously serve as officers, and that distinguishing between the two would encourage all

8   directors to classify themselves as officers to avoid the three-year limitations period, the court

9   holds that section 261's three-year limitations period encompasses officers.  See FDA v. Brown

10  & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000) ("A court must . . . interpret the

11  statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a

12  harmonious whole."); see also Michigan v. Bay Mills Indian Cmty., No. 12-515, 572 U.S. ___,

13  ___, slip op. at 10 (May 27, 2014) (Courts should not "revise legislation . . . just because the text

14  as written creates an apparent anomaly as to some subject it does not address . . . . [because] such

15  anomalies often arise from statute, if for no other reason than that [legislatures] typically

16  legislate[] by parts  . . . .").  The motions for summary judgment at Docket Nos. 893 & 913 as to

17  the officers are thus also **DENIED**.

18                          **iii.      Adverse Domination and Equitable Tolling**

19         The FDIC has claimed that adverse domination should toll the running of the limitations

20  period.  In previous opinions and orders, the court discussed the principle of adverse domination.

21                    Adverse domination is "an equitable doctrine which operates to
22                    toll the statute of limitations for a corporation's claims against its
23                    officers or directors when the persons in charge of the corporation
24                    cannot be expected to pursue claims adverse to their own

interests." In re Payroll Express Corp., 186 F.3d 196, 205 (2nd Cir. 1999). This court decided the seminal case on adverse domination in FDIC v. Bird. 516 F. Supp. 647 (D.P.R. 1981). In Bird, the district court crafted the principle the court follows today: "Control of the association by culpable directors and officers precludes the possibility of filing suit because these individuals can hardly be expected to sue themselves or to 'initiate any action contrary to their own interests.'" FSLIC v. Williams, 599 F. Supp. 1184, 1194 (D. Md.) (quoting Bird, 516 F. Supp. at 651-52). Several courts adopt this rationale and cite Bird to justify their decisions. See e.g., FDIC v. Manatt, 723 F. Supp. 99, 105 (E.D. Ark. 1989); FDIC v. Appling, 992 F.2d 1109, 1115 (10th Cir. 1993); FDIC v. Paul, 735 F. Supp. 375, 377-78 (1990); Resolution Trust Corp. v. Fiala, 870 F. Supp. 962, 972-73 (E.D. Mo. 1990) (citing cases).

The Supreme Court has squarely rejected developing federal common law to govern the standard of care used to measure the legal propriety of the conduct of directors, holding instead that state common law principles govern liability in tort. See Atherton v. FDIC, 519 U.S. 213, 217-26 (1997); see also O'Melveny & Myers v. FDIC, 512 U.S. 79, 89 (1994). In O'Melveny & Myers, the Court rebuffed the "runaway tendencies of 'federal common law' untethered to a genuinely identifiable (as opposed to a judicially constructed)" law, finding that "extraordinary cases" warrant judicial creation of a federal rule. 512 U.S. at 89. While the FDIC alleges gross negligence pursuant to P.R. LAWS ANN. 14 § 3563 rather than common law tort, negligence principles sound in both and, therefore, merit consideration of whether Bird's rationale constitutes federal common law or state common law. The answer is that the original opinion created federal common law prior to the Court's holding in O'Melveny & Myers. But Puerto Rico jurisprudence tolling statutes of limitation for delayed discovery sufficiently embraces the principles espoused in Bird. The First Circuit recognizes that Puerto Rico adheres to this rationale, holding that a statute of limitations "does not begin to run until the plaintiff possesses, or with due diligence would possess, information sufficient to permit suit." Villarini-Garcia v. Hosp. Del Maestro, 8 F.3d 81, 84 (1st Cir.1993) (citing Santiago Hodge v. Parke Davis & Co., 909 F.2d 628, 632-33 (1st Cir.1993) (discussing Colon Prieto v. Geigel, 115 P.R. 232, 247 (P.R. 1984))).

CIVIL NO. 11-2271 (GAG) (BJM)

The D&Os also argue that adverse domination should only apply to claims sounding in fraud; however, the <u>Bird</u> court weighed negligence claims in implementing adverse domination. Distinguishing negligence from fraud here would defeat the core purpose of the doctrine.  Regardless of the D&Os' intent, if putative plaintiffs are not situated to become aware of egregious lending practices and the corporation neglects to sue the directors and officers, a harm arises necessitating tolling.  To toll the statute on the ground of adverse domination, "at least once the facts giving rise to . . . liability are known, plaintiff must effectively negate the possibility that an informed stockholder or director could have induced the corporation to sue." <u>Int'l Inv. Trust v. Cornfeld</u>, 619 F.2d 909, 930 (2nd Cir. 1980) (quoting <u>Int'l Ry. of Cent. Am. v. United Fruit Co.</u>, 373 F.2d 408, 412-17 (2nd Cir. 1967)).  Although the D&Os expressly reject the principle of adverse domination, the complaint states and the D&Os acknowledge that the restated Form 10-K filed by the W Holding Board on March 16, 2009, placed any putative plaintiffs on notice of ostensibly grossly negligent action.  The FDIC's reference to Form 10-K and the D&Os acknowledgment that the form disclosed potential dereliction of duty sufficiently raises the right to relief above a speculative level.

Adverse domination and lack of disclosure toll the limitations period for any grossly negligent actor, whether or not employed by Westernbank when it published the Form 10-K or when the FDIC assumed receivership. Thus, Fuentes and Biaggi are not exempt.  Excluding D&Os under this rationale would reward grossly negligent actors who simply foresee potential litigation and resign.  Following discovery, the D&Os may proffer evidence revealing practices discoverable prior to the Form 10-K filing on March 16, 2009 not obfuscated by adverse domination, so as to start running the three-year clock at an earlier date.

(<u>See</u> Docket No. 304 at 12-14.)  The court elaborated:

The D&Os claim the court adopts the principle of adverse domination – federally created common law – as stated in <u>FDIC v. Bird</u>.  <u>See generally</u> 516 F. Supp. 647 (D.P.R. 1981).  The court does not do this.  The opinion clearly states that federal common law governing the standard of care used to measure the legal propriety of the conduct of directors is impermissible according to Supreme Court precedent, and that adverse domination principles are sufficiently similar to delayed discovery rules adopted by the

CIVIL NO. 11-2271 (GAG) (BJM)

1   Puerto Rico Supreme Court and the First Circuit. (See Docket No.
2   304 at 13-14.) The court states that Bird created federal common
3   law, offending O'Melveny & Myers when it was subsequently
4   decided, implying that the court cannot adopt this principle
5   outright. (Id.) Instead, the court merely draws a comparison
6   between adverse domination and the delayed discovery rule,
7   concluding that under either principle the statute of limitations is
8   tolled until an aggrieved party knows or reasonably should have
9   known about the alleged harm. The court does not create federal
10  common law in denying the various motions to dismiss and
11  reiterates that Puerto Rico and First Circuit precedent bind this
12  court to apply specific tolling principles throughout this litigation.
13  (Id. at 14.) To the extent that Hildenbrand and Wylie provided
14  sufficient notice, furthermore, neither party squarely addressed this
15  issue in their motions to dismiss and replies thereto. (See Docket
16  343 at 3, 6.) Rather, the D&Os claimed that preclusion
17  necessitated halting this litigation. As previously stated, following
18  discovery, the parties may fully address whether sufficient notice
19  occurred to prohibit tolling in these cases. The court will dismiss
20  any time-barred claims accordingly.

22      Relatedly, the D&Os discuss a tolling limitation principle
23  sounding in contract and statute. The D&Os claim, "The three-
24  year prescriptive period of section 261 is a statute of repose
25  (caducity), which . . . is not subject to tolling, period." (Docket
26  No. 343 at 5.) Section 261's California counterpart, according to
27  California jurisprudence, begins its three-year period from the time
28  the liability is created, "rather than from the time when the cause
29  of action accrues. Moreover . . . the time when the plaintiff
30  actually discovered the injury/wrongful act is not dispositive."
31  Briano v. Rubio, 46 Cal. App. 4th 1167, 1175 (Cal. Ct. App.
32  1996). The court, to reiterate, is not bound by California precedent
33  and need not rehash its explanation for tolling the statute of
34  limitations discussed in the original opinion and order denying the
35  various motions to dismiss. (Docket No. 304.) The doctrine of
36  caducity, furthermore, does not apply here. Caducity concerns
37  expiration dates in contracts or statutes. For example, in Rivera-
38  Flores v. Puerto Rico Tel. Co., the First Circuit discussed caducity
39  in the context of Puerto Rico's workers' compensation statute:
40  "Where employers need hold a disabled worker's position open for
41  only twelve months, after which they are not obligated to reinstate
42  the worker, caducity applies to prohibit tolling past the twelve-
43  month period." 64 F.3d 742, 750 (1st Cir. 1995). The D&Os fail

1        to cite any case or law directly tying section 261 to the doctrine of
2        caducity.
3
4 (Docket No. 362 at 3-4.)

5      The court revisits the matter once more.  In 2008, Hunter Wylie instituted a shareholder

6 derivative suit against Westernbank's directors for Sarbanes-Oxley violations, breach of

7 fiduciary duties, waste of corporate assets, and other harms.  <u>Wylie v. Stipes</u>, Civ. Case No. 08-

8 1036; Docket No. 15 (D.P.R. 2010).  In no uncertain terms, Wylie and the shareholders who

9 joined him sued for the alleged grossly negligent Inyx loan.  (<u>Id.</u>)  The board convened a special

10 litigation committee ("SLC") to determine whether to allow the suit to proceed.  The SLC

11 prohibited the suit from coming to fruition, and this court held: "[T]his does not appear to be a

12 case in which the 'result' was so 'irrational' or 'egregious' as to compel the court to second

13 guess the recommendation of the SLC."  (<u>Id.</u> at Docket No. 193 at 16 (citation omitted).).

14      This suit displays that the shareholders had a serious concern about Westernbank's asset-

15 based lending program and the bank's overall well-being.  The only thing preventing them from

16 accessing the courthouse doors was the prohibitive step of receiving permission from the SLC.

17 Were it not for the SLC, the shareholders would have had their day in court and the issue of

18 Westernbank's directors' liability for the Inyx loan, and perhaps all of the other loans, would

19 have come to light.   But that never happened, not for want of trying, but for want of cooperation

20 from the SLC.  While the court determined the SLC's conclusion was not unreasonable, the

21 reasonableness of its determination substantially differs from the core question of whether the

22 D&Os were actually grossly negligent.

CIVIL NO. 11-2271 (GAG) (BJM)

1    _Wylie_ is the exact reason why adverse domination is useful, and its creation as a rule that

2    logically stems from 12 U.S.C. § 1821(d)(14)(A)-(C) makes so much sense.  If a state-chartered

3    institution's shareholders successfully bring suit against D&Os for grossly negligent loans, the

4    bank receives the damages and, ostensibly, will not need to go into receivership.  If the

5    shareholders are denied the opportunity to pursue the suit and the bank consequently fails, the

6    FDIC steps in and brings the action against the D&Os.  The hole in this process lies at the point

7    where the FDIC is at the mercy of state limitations periods that expire after the derivate suit was

8    filed and before the three-year period preceding when the FDIC takes over as receiver.  If the

9    standard is that stale state-law claims cannot be revived by section 1821(d)(14), then adverse

10   domination is imperative to fill a hole in state limitations periods.  The FDIC is going to know or

11   should reasonably know through due diligence that a bank is suffering.  Its analyses of the bank

12   and its decision to take over as receiver, however, are vastly different.  A shareholder derivate

13   suit is a much more preferable vehicle through which to resolve alleged gross negligence claims

14   because the damages revert back to the bank and business keeps on going.  The FDIC should be

15   afforded more time to allow such a scenario to play out before instituting a tectonic shift that

16   accompanies a takeover.

17        Arguing for a change in this structure is not without its shortcomings, both generally and

18   as applied to this case.  The FDIC does not technically have to wait for the state regulatory

19   agency to request it to take over as receiver when it senses imminent harm to its insurance fund

20   and it could have done so if its 2007-2009 reports set off the appropriate alarms.  _See_ 12 U.S.C.

21   1821(c)(10).  The court is not sitting in judgment of the FDIC's policy decisions.  Quite the

22   contrary.  It advocates for a general common law rule already adopted by many states that

CIVIL NO. 11-2271 (GAG) (BJM)

1   overcomes a flaw in typical tolling provisions of state limitations period.  At this juncture,

2   however, the court cannot impose this principle on Puerto Rico when it seems that no Puerto

3   Rico cases have adopted it.  The closest thing to affirmation of the principle in Puerto Rico is

4   Professor Diaz Olivo's corporate law book.  He states that the principle applies here.  Carlos E.

5   Diaz Olivo, Corporaciones 288-89 (1999).  While he may be correct, he cites no Puerto Rico

6   cases upon which the court may rely, nor does the FDIC in its opposition to the motions for

7   summary judgment.  Furthermore, the court has found nothing aside from Bird and its progeny

8   supporting the notion that Puerto Rico would follow the doctrine.  While tolling based on this

9   principle would be the right thing to do, it would also be incorrect.

10  **III.    Conclusion**

11          For the reasons stated above, the court **DENIES** the motions for summary judgment at

12  Docket Nos. 893 and 913.


            SO ORDERED.

            In San Juan, Puerto Rico this 24th day of July, 2014.


                                        /S/ Gustavo A. Gelpí
                                        GUSTAVO A. GELPI
                                        United States District Judge

24